No. 23-2364 & 16-3508

In the

# United States Court of Appeals

## For the Seventh Circuit

ROBERT FLETCHER and BARTLOW GALLER, LTD.,

*Plaintiffs, Cross-Appellees,*

v.

PETER DOIG,

*Defendant-Appellee, Cross-Appellant.*

v.

WILLIAM FREDERICK ZIESKE,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 13-cv-03270.
The Honorable **Gary S. Feinerman** and **Mary M. Rowland**, Judges Presiding.

————

## BRIEF OF APPELLANT – WILLIAM FREDERICK ZIESKE

————

JOSEPH R. MARCONI
DAVID M. MACKSEY
ADAM J. SEDIA
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
312.372.0770
marconij@jbltd.com
mackseyd@jbltd.com
sediaa@jbltd.com

*Attorneys for Respondent-Appellant*
WILLIAM FREDERICK ZIESKE

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-2364 & 16-3508__

Short Caption: __Fletcher v. Doig (William Frederick Zieske)__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
__William Frederick Zieske__

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
__Johnson & Bell, Ltd.__

(3)     If the party, amicus or intervener is a corporation:

    i)     Identify all its parent corporations, if any; and
__N/A__

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:
__N/A__

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
__N/A__

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
__N/A__

Attorney's Signature: __Joseph R. Marconi__     Date: __7.25.2023__

Attorney's Printed Name: __Joseph R. Marconi__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑     **No** ☐

Address: __Johnson & Bell, Ltd. 33 West Monroe Street, Suite 2700__

__Chicago, IL 60603__

Phone Number: __312.372.0770__     Fax Number: __312.372.9818__

E-Mail Address: __marconij@jbltd.com__

rev. 12/19 AK

**Save As**     **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2364 & 16-3508

Short Caption: Fletcher v. Doig (William Frederick Zieske)

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
William Frederick Zieske

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Johnson & Bell, Ltd.

(3)   If the party, amicus or intervener is a corporation:

   i)   Identify all its parent corporations, if any; and

       N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:

       N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: David M. Macksey   Date: 9.20.2023

Attorney's Printed Name:  David M. Macksey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  Johnson & Bell, Ltd. 33 West Monroe Street, Suite 2700

   Chicago, IL 60603

Phone Number: 312.372.0770   Fax Number: 312.372.9818

E-Mail Address: mackseyd@jbltd.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2364 & 16-3508

Short Caption: Fletcher v. Doig (William Frederick Zieske)

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
William Frederick Zieske

_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Johnson & Bell, Ltd.

_____

(3)   If the party, amicus or intervener is a corporation:

   i)   Identify all its parent corporations, if any; and

     N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:

     N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: Adam J. Sedia     Date: 9.20.2023

Attorney's Printed Name: Adam J. Sedia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: Johnson & Bell, Ltd. 33 West Monroe Street, Suite 2700

Chicago, IL 60603

Phone Number: 312.372.0770     Fax Number: 312.372.9818

E-Mail Address: sediaa@jbltd.com

rev. 12/19 AK

## TABLE OF CONTENTS

Disclosure Statement, Joseph R. Marconi ..........................................................................

Disclosure Statement, David M. Macksey ........................................................................

Disclosure Statement, Adam J. Sedia ...............................................................................

Table of Contents ........................................................................................................... i

Table of Authorities .....................................................................................................iii

Jurisdictional Statement ............................................................................................... 1

Issues Presented for Review .......................................................................................... 2

Statement of the Case .................................................................................................... 2

Summary of Argument ................................................................................................ 21

Argument ..................................................................................................................... 22

1.      Standard of Review ......................................................................................... 22

2.      The District Court misapplied authority from this court holding that survival of summary judgment is inconsistent with a later finding that the lawsuit is frivolous absent egregious circumstances in favor of less stringent standard unsupported by persuasive authority. ........................... 22

2.1     *LeBeau's* holding. ........................................................................................ 23

2.2     Persuasive authority is consistent with *LeBeau's* higher standard and not with the District Court's Opinion. ............................................................. 25

2.3     The District Court spent considerable efforts determining credibility, weighing testimony, and extrapolating to fill "gaps" it found in the narrative and timelines, which is inconsistent with a finding of frivolousness under *LeBeau* ......................................................................... 27

3.      Despite this court's decision in *Shales v. General Chauffeurs*, Section 1927 should be read to contain a punitive aspect, which implicates due process concerns and therefore Zieske's ability to pay, which the District Court did not consider. ...................................................................... 33

4.    The court operated with a presumption of the reasonableness of the requested fees and expenses and improperly shifted the burden onto Zieske, and included in its sanctions award fees by Doig's attorneys for opposing a successful motion for discovery sanctions against Doig................ 38

Conclusion ...................................................................................................... 40

Certificate of Compliance with FRAP 32(a)(7) ...............................................................

Circuit Rule 30 Statement..............................................................................................

Appendix Page ...............................................................................................................

Table of Contents of the Appendix.................................................................................

Certificate of Service.....................................................................................................

# TABLE OF AUTHORITIES

## Cases

*Arlington Specialties, Inc. v. Urban Aid, Inc.,*
847 F.3d 415 (7th Cir. 2017) ..................................................................... 24

*Blue v. Hartford Life & Accident Ins. Co.,*
698 F.3d 587 (7th Cir. 2012) ..................................................................... 22

*Calloway v. Marvel Entertainment Group,*
854 F.2d 1452 (2d Cir. 1988),
*rev'd in part on other grounds,* 493 U.S. 120 (1989) ......................... 26, 27, 30, 31, 32

*Delgado v. Mak,*
No. 06 C 3757, 2008 U.S. Dist. LEXIS 27140 (N.D. Ill. Mar. 31, 2008) ................... 36

*De Manez v. Bridgestone Firestone N. Am. Tire, LLC,*
533 F.3d 578 (7th Cir. 2008) ..................................................................... 34

*Gekas v. Atty. Reg'n & Disc. Comm'n of Supreme Ct.,*
793 F.2d 846 (7th Cir. 1986) ..................................................................... 25

*Harrington v. City of Chicago,*
433 F.3d 542 (7th Cir. 2006) ..................................................................... 22

*Havoco of America, Ltd. v. Hollobow,*
702 F.2d 643 (7th Cir. 1983) ..................................................................... 31

*Haynes v. City and County of San Francisco,*
688 F.3d 984 (9th Cir. 2012) ..................................................................... 35

*Hennessy v. Penril Datacomm Networks,*
69 F.3d 1344 (7th Cir. 1995) ..................................................................... 37

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ............................................................................... 38

*In re W.A.R. LLP,*
No. 11-00044, 2012 Bankr. LEXIS 4465 (Bankr. D.D.C. Sep. 25, 2012) ................... 35

*Intellect Wireless, Inc. v. Sharp Corp.,*
87 F. Supp. 3d 817 (N.D. Ill. 2015) .............................................................. 35

*Kapco Mfg. Co. v. C & O Enters., Inc.,*
886 F.2d 1485 (7th Cir. 1989).................................................................34

*Kemezy v. Peters,*
79 F.3d 33 (7th Cir. 1996).............................................................. 34, 37

*Kingdomware Techs., Inc. v. United States,*
579 U.S. 162 (2016).......................................................................35

*LeBeau v. Libbey-Owens-Ford Co.,*
799 F.2d 1152 (7th Cir. 1986).................21, 23, 24, 25, 27, 31, 32, 33, 40

*Malinski v. N.Y.,*
324 U.S. 401 (1945).......................................................................37

*McGill v. Faulkner,*
18 F.3d 456 (7th Cir. 1994)...........................................................32

*McKinley v. Trattles,*
732 F.2d 1320 (7th Cir. 1984)........................................................37

*Moffett v. Kolb,*
930 F.2d 1156 (7th Cir. 1991)........................................................32

*Novoselsky v. Zvunca,*
324 F.R.D. 197 (E.D. Wis. 2017)....................................................35

*Riddle & Assocs., P.C. v. Kelly,*
414 F.3d 832 (7th Cir. 2005)..........................................................35

*Shales v. General Chauffeurs,*
557 F.3d 746 (7th Cir. 2009)...............21, 22, 33, 34, 35, 36, 37, 38

*Spegon v. Catholic Bishop,*
175 F.3d 544 (7th Cir. 1999)..........................................................38

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003).......................................................................36

*Swick v. Liautaud,*
169 Ill. 2d 504 (1996) ...................................................................36

*Szabo Food Serv. v. Canteen Corp.,*
823 F.2d 1073 (7th Cir. 1987)........................................................32

iv

*Tarkowski v. County of Lake,*
775 F.2d 173 (7th Cir. 1985)................................................................................. 25

*United States v. Ferron,*
357 F.3d 722 (7th Cir. 2004)................................................................................. 23

*United States v. Lemaster,*
891 F.2d 115 (6th Cir. 1989)....................................... 25, 26, 27, 30, 31, 32

*United States v. Rogers Cartage Co.,*
794 F.3d 854 (7th Cir. 2015)................................................................................. 23

*Wagoner v. Lemmon,*
778 F.3d 586 (7th Cir. 2015)................................................................................. 32

*Walsh v. Alight Solns. LLC,*
44 F.4th 716 (7th Cir. 2022) ................................................................................ 23

*William J. Templeman Co. v. Liberty Mut. Ins. Co.,*
316 Ill. App. 3d 379 (1st Dist. 2000)................................................................. 36

## Statutes

28 U.S.C. § 1291................................................................................................................ 2

28 U.S.C. § 1332(a) ......................................................................................................... 1

28 U.S.C. § 1927.............................................................. 2, 16, 17, 20, 22, 23, 33-40

Fed. R. Civ. P. 11 ...................................................................................... 3, 16, 22, 23

Fed. R. Civ. P. 37(c)(1) ...................................................................................... 5, 18

Fed. R. Civ. P. 59 ................................................................................................ 1, 21, 22

## JURISDICTIONAL STATEMENT

The District Court had diversity jurisdiction over this civil action under 28 U.S.C. § 1332(a). Plaintiff Robert Fletcher ("Fletcher") is a citizen of Canada. ([DE 1], p. 2.) Plaintiff Bartlow Gallery, Ltd. ("the Gallery"), has a sole member, Peter Bartlow, who is a citizen of Illinois. ([DE 1], p. 2.) Defendant Peter Doig ("Doig") is a citizen of Trinidad and Tobago. ([DE 1], p. 2.) Defendants Gordon VeneKlasen ("VeneKlasen") and Matthew S. Dontzin ("Dontzin") are citizens of New York. ([DE 1], p. 2.) The Dontzin Law Firm, LLP ("the Dontzin Firm"), has a sole partner, Matthew S. Dontzin, who is a citizen of New York. ([DE 1], p. 2.) The amount in controversy as alleged in the complaint exceeds $75,000, excluding interest and costs. ([DE 1], p. 4.) The District Court had jurisdiction over the Appellant William Frederick Zieske ("Zieske") as an attorney licensed to practice before it. *See*, ILND L.R. 83.58.5.

The District Court entered final judgment disposing of all claims between all parties on August 23, 2016 [DE 261]. On October 21, 2016, the defendants then filed a post-judgment motion for sanctions [DE 273] against the plaintiffs and their counsel ("Respondent"). The District Court entered a final judgment against Respondent on December 30, 2022 [DE 413], that included a monetary sanctions award. Respondent then filed a Motion to Amend Judgment under Fed. R. Civ. P. 59 on January 27, 2023 [DE 418]. The District Court issued its order disposing of Respondent's Rule 59 motion on June 12, 2023 [A3-5]. Respondent filed his Notice of Appeal on July 11, 2023 [A1-2].

1

The United States Court of Appeals has jurisdiction to decide this case under 28 U.S.C. § 1291, as the sanctions order disposed of all remaining post-judgment claims between all parties.

## ISSUES PRESENTED FOR REVIEW

1) Whether the District Court misapplied authority from this court holding that survival of summary judgment is inconsistent with a later finding that the lawsuit is frivolous absent egregious circumstances in favor of less stringent standard unsupported by persuasive authority.

2) Whether the District Court erred by not reading 28 U.S.C. § 1927 to contain a punitive aspect, which implicates due process concerns and therefore Zieske's ability to pay, which the District Court did not consider.

3) Whether the District Court erred by presuming the reasonableness of the requested fees and expenses and improperly shifted the burden onto Zieske, and included in its sanctions award fees by Doig's attorneys for opposing a successful motion for discovery sanctions against Doig.

## STATEMENT OF THE CASE

### 1. Proceedings through Denial of Summary Judgment

Fletcher and the Gallery, with Zieske as their attorney, filed their initial complaint on April 30, 2013, claiming damages for interference with prospective economic advantage and sought a declaratory judgment regarding authorship of the work in dispute. ([DE 1], pp. 14-15.) Specifically, they alleged that Fletcher possessed an untitled acrylic-on-linen painting ("the Painting") signed "1976 Peter Doige," and

that he contracted with the Gallery to market and sell the work as by Doig, a well-known artist, and that Doig, along with his co-defendants who acted as his agents, denied his authorship of the painting, resulting in damages. ([DE 1], pp. 2-5.) Fletcher further alleged that he was a correctional officer at the Thunder Bay Correctional Facility in Ontario, Canada, at which time he met a seventeen-year-old inmate known as "Pete Doige." ([DE 1], pp. 5-6.) Later, as parole officer for "Pete Doige," Fletcher helped him find employment, encouraged him to develop his artistic talent, and purchased the Painting from him for $100, and owned the Painting continuously afterwards. ([DE 1], p. 6.) In pre-litigation correspondence Doig denied that he was the "Peter Doige" who signed the Painting, that he had ever been in Thunder Bay, and that he created any paintings before 1979. [DE 1-4].

Authorship of the Painting would impact its value significantly: Doige was unknown as a painter, without any market for his paintings. ([DE 273-8], p. 1113.) One of the plaintiffs' experts testified that a gallery would not even offer $10,000 for the Painting. ([DE 273-8], p. 1113.) The same expert testified that if Doig acknowledged the work as his, it could fetch a price of $6 to 8 million. ([DE 273-8], p. 1095.)

Early in the case – in June 2013 – Dontzin and the Dontzin Firm served the plaintiffs' counsel with correspondence advising that they intended to seek sanctions under Fed. R. Civ. P. 11 unless the complaint was withdrawn. ([DE 13]; [DE 273-3], p. 18.) The letter included documents that the defendants claimed rendered the claims frivolous: a communication from Lakehead University saying that no one with

3

Doig's name and birthdate had ever been enrolled there; the results of a search by the Royal Canadian Mounted Police that did not identify anyone with Doig's name and birthdate as having a criminal record; Doig's high school records from 1975 and 1976; correspondence between Doig and his family indicating that Doig had not been incarcerated during 1975 or 1976; and internet searches for "Peter Doige" showing others with that name who lived or had lived in Canada. ([De 273-3], pp. 61-110.)

Also, in August 2013, the defendants obtained a sworn declaration from Marilyn Doige Bovard, in which she testified that she had a half-brother named Peter Edward Doige, who attended Lakehead University in the 1970s, had been incarcerated in the Thunder Bay Correctional Center, during which he took painting and music classes, and had died in 2012. [DE 13-1] Bovard's declaration included a copy of Doige's Lakehead student ID card, which contained his photograph. [DE 13-1]

At a status hearing on September 3, 2013, the District Court noted the correspondence and Bovard's declaration and made the following statements:

> [G]iven that there's been a Rule 11 letter served, I'm wondering whether you think it would be in your interests to put the brakes on this case and figure out whether, in fact, the painting was made by Peter Doig with an "e," who seems not to have gone on with an art career, or Peter Doig without an "e," in which case your client has a painting that has some value.
> . . .
>
> If . . . the hammer comes down, you're not going to be surprised.
>
> [I]f the Dontzin defendants turn out to be right, just because you had an objectively reasonable basis, assuming you did, at the beginning of the case, you can lose an objectively reasonable basis in the middle of the litigation. And it's at least conceivable that this is that time.

4

([DE 273-6], pp. 6, 10, 11.)

Discovery proceeded, and on October 6, 2015, Fletcher and Bartlow moved to compel Doig's deposition and later moved for sanctions under Fed. R. Civ. P. 37, asking to recover the costs of traveling to London for Doig's deposition because Doig misrepresented his availability in New York City. [DE 144, 158]. Ultimately, the District Court granted the motion and awarded attorney's fees to Fletcher and Bartlow against Doig, but not against Doig's counsel based on the latter's statements regarding what they knew about Doig's whereabouts. [DE 179].

During the pendency of the Discovery Sanctions Motion, on December 10, 2015, Doig and his co-defendants moved for summary judgment, focusing on three facts to which Bovard attested in her declaration: that Doige attended Lakehead University, was an inmate at Thunder Bay Correctional Center, and obtained employment through the Seafarers' Union in Thunder Bay in the 1970's. ([DE 148-1], pp. 6, 10-12, 16; [DE 155], pp. 181-88.) Doig argued that the designated evidence showed that all of these facts applied to Doige, and that no evidence showed that they applied to Doig. ([DE 148-1], p. 10.) Doig also designated his own testimony that from 1975 to 1978, he lived in Toronto and Alberta. ([DE148-1], p. 12; [DE 156], pp. 2-16; [DE 157], pp. 10-21, 30-31, 111-15, 126-27.)

In opposing the summary judgment motion, Fletcher and the Gallery first noted the absence of prison records from Thunder Bay Correctional Center for either Peter Edward Doige or Peter Marryat Doig. ([DE 181], p. 1.) They then focused on the timeline of events. Peter Edward Doige's student records indicated that he attended

5

Lakehead University from fall 1976 through June 1978, which did not correspond with Fletcher's recollection and testimony that he met the painter of the Painting in the correctional facility *after* first meeting him as a student at Lakehead University. ([DE 181], pp. 4-5; [DE 155], pp. 207-14.) Meanwhile, Doig's school records showed him attending school in Toronto before June 1976 and after June 1978 with no documentation of his whereabouts between those times. ([DE 181], pp. 6-7; [DE 156], pp. 2-8.)

Fletcher and the Gallery also designated Fletcher's sworn declaration, in which he testified that he met Doig at Lakehead and later purchased the painting from him and that, based on his observations of media showing Doig, the mannerisms, facial features, and hand gestures of Doig were identical to those of the man he had known in Thunder Bay in the 1970s and who had created the painting. ([DE 185-1], p. 8.) They further designated the opinions of Olivia Thornton, a contemporary art expert with Sotheby's, who opined before the lawsuit was filed that the Painting was a "wonderful early Peter Doig painting with a striated landscape, trademark eeriness, and allusions to his mature work," and of Victor Wiener, a New York art appraiser of more than forty years' experience, who concluded that most prospective buyers of the Painting, including collectors, would consider it an authentic work of Doig, based in part on its stylistic similarity to his later work and the similarity of the signature on the Painting to Doig's. ([DE 181], pp. 8-9; [DE 185-6].)

6

The District Court held a hearing on the summary judgment motion on April 6, 2016. ([DE 273-6], pp. 88-89.) After hearing arguments, the court ruled orally from the bench as follows:

> I'm going to deny the summary judgment motion, and I'm going to – rather than burden the docket with an opinion, I'm just going to state my reasons on the record.
>
> This is a summary judgment motion, and I've already talked about the lens through which I have to view the record. And while it is the plaintiffs' burden of proving by a preponderance of the evidence that -- at least at a minimum, that the painting was authored by Doig, on summary judgment, it is the defendant's obligation to show that no reasonable trier of fact could conclude that -- based on the record evidence, could conclude that the painting was authored by Doig.
>
> And I can't make that -- I can't find that on summary judgment. I think if I did, I'd get reversed, and you'd just be back down here a year from now in front of a different judge, because it's a bench trial, and they probably wouldn't send it back to me.
>
> So, let me -- there are really three things that I'm basing my decision on, and all three of them, I believe, are essential to my conclusion that a reasonable fact-finder could, but of course, need not necessarily, find that the painting was authored by Doig.
> . . .
> So, number one, there's -- I can't find for purposes of summary judgment that Doig was in Toronto from the summer of '76 through the fall of '77. Now, Fletcher avers that he met Doig -- let me just say he met the author at Lakehead in 1975 or 1976, and I'm going to focus on 1976; that the author stopped showing up at Lakehead, and then the next time Fletcher saw him was at Thunder Bay Correctional Centre; that the author spent five months at Thunder Bay Correctional Centre, during which time he painted the work; and that for three to four months after his release, after the author's release, Fletcher served as his volunteer parole officer, during which time Fletcher bought the painting.
>
> So, as the defendant correctly observes, for the author to be Doig, Doig had to be living in Thunder Bay outside -- in other words, not in Toronto, for at least eight months. And viewing the record in the light most favorable to the plaintiffs, a reasonable fact-finder could find that.

7

The school records do not account for – the documents do not account for Doig's whereabouts for the 1976 to 1977 school year, and that's page 321 of the appendix. The records start there. . . . Where was he from '76 to '77?

And again, this timeline fits with the plaintiffs' theory of the case only if Fletcher met the painting's author in 1976 as opposed to '75, and only if Fletcher met the author at Lakehead before seeing him at Thunder Bay, and I have to accept those averments as true.

Further complicating the situation is that the May 29th, 2012, e-mail from Mogadassi to VeneKlasen places Doig in Alberta working as a roughneck from May 1976 to October 1976. . . .

So, it places Doig in -- the e-mail places Doig in Alberta working as a roughneck from May '76 to October of '76, and it doesn't put him in school from '77 to '78, and that . . . contradicts what Doig is currently saying, which is that he was in Toronto during that entire time, and that he was a roughneck in Alberta during the summer months of '77, not in '76.

And I understand that Doig says that the e-mail should have said 1977 rather than 1976, and he may be right; but that's a triable issue, and I can't say on summary judgment -- and it would be a -- they would laugh at me upstairs if I did say this on summary judgment, that an e-mail that Doig's partner sent to Doig's dealer, presumably with Doig's input, was indisputably a mistake. I can't say that on summary judgment.

So, in terms of the documentary evidence and the -- from the schools and the e-mail, we don't know where Doig was from '76 to '77, which is -- the summer of '76 through the all of '77, which is the key time frame.
Now, Doig points to affidavits from family members and friends placing him in Toronto during the relevant time frame. And it is true that I cannot deny summary judgment solely on the ground that the fact-finder might not find those affidavits credible. There has to be actual evidence pointing in the other direction. And I agree with that.

We have that actual evidence here. We have the school records with the gap, and we have the changing of the story from the Mogadassi e-mail to what Doig's current position is.
. . .

So, during that gap from the summer of '76 through the fall, maybe September, August or September of '77, a reasonable fact-finder could come out either way. Maybe he was in Toronto. Maybe he was somewhere else.

8

And it's true, as the defendant says, there's no record from Thunder Bay Correctional Centre placing him there, but there's no official record placing Doige there, either.

The presence of the Lakehead and the Seafarers records for Doige but not for Doig certainly favors Doig. There is no doubt about that. But it's not strong enough evidence, given all of the evidence in the record, including the evidence that I just talked about, making it indisputable, making it so that no reasonable fact-finder could conclude that Doig was not the person at Thunder Bay who was the author of the painting.

In addition to that, we have Fletcher's averments regarding the author's facial features, hand gestures, and mannerisms being the same as what he saw of Doig; and whether it was a video from the '80s or from the aughts doesn't matter. People maintain the same mannerisms -- or they often maintain the same mannerisms throughout their life, so that doesn't matter. So, that's number one.

Number two, the defendant's timeline for Peter Doige, for Doige, does not indisputably cohere. So, what -- doesn't cohere with Fletcher's timeline, which I need to assume is true.

Fletcher said that he met Doige in '75 or '76 at Lakehead and then at Thunder Bay, and that includes late '76. And because that time frame includes late '76, that causes a problem because Doige's Lakehead University student records, . . . indicate that he started at Lakehead in the fall of '76 and was in school through December of '76; and Fletcher avers that he met Doige at Lakehead before seeing him at the prison, and Doige started at Lakehead in '76. That doesn't leave enough time for Doige to have painted the work in prison in 1976.

And again, this conclusion turns on the truth, the assumed truth of Fletcher's averment that he met the author at Lakehead before seeing him at Thunder Bay and placing the timeline as including late '76.

Now, I was concerned about the signature, and that's why I asked Mr. Zieske about it. I've looked at the signatures again. They look close. Can I say as a matter of law that those signatures are by the same hand? As a matter of law, I can't say that.
. . .

Third are what the experts have said. And I know that -- I know that Wiener . . . and Thornton did not authenticate the work. However, Wiener talked about the many features that he believed are common between the disputed work and Doig's later acknowledged works.

9

And Schiff strongly disagrees with Wiener's methodology. And at trial, I may agree with Wiener. I may agree with Schiff. But that's not the grist for summary judgment.
. . .

In terms -- the defendant also makes an argument about the elements of tortious interference, and I think that the Hindman affidavit establishes a triable issue of fact as to whether she would have auctioned the work as Doig's had he not disclaimed authorship. So, I believe there was a reasonable expectation of a commercial relationship with Hindman.

So, for those reasons, I'm going to deny the summary judgment motion. And I understand that it's more than -- inconvenient doesn't even begin to describe what doing – what appearing for this trial will be for Mr. Doig and, if his partner appears, for his partner, particularly that they've just had a baby. I just -- I just can't -- I'm not – I couldn't in good conscience, given -- for the reasons that I've just given, grant summary judgment. So, we'll have to go to trial.

[A93-103]. The court also denied a motion to reconsider its order denying summary judgment [DE 216, 224].

## 2.   Trial and Judgment

The District Court conducted an eight-day bench trial between August 8 and August 23, 2016, at the conclusion of which it entered judgment on August 23, 2016. ([DE 428], pp. 63-64.)

On August 23, 2016, in an oral ruling from the bench, the District Court issued its verdict. ([DE 273-8], p. 1985.) Before reciting its findings and conclusions the court reiterated its rationale for denying summary judgment:

There's also the matter of the summary judgment motion, which at this point is spilled milk, but I just wanted to touch upon it very briefly. . . .

And the one thing I want to do is emphasize that there are significant differences, there are at least two significant differences between a judge's ruling on summary judgment and a judge's verdict at a bench trial. The first

difference is that the record on summary judgment is different than the trial record. Here, the trial record was much broader and had much more texture than the summary judgment record, and it was more complete.

The second difference is the lens through which the judge views the record. On summary judgment, the judge must resolve all genuine factual disputes in the non-movant's favor, and that, I did at summary judgment; while at trial, if it's a bench trial, the judge sits as a trier of fact and can decide which of two opposing versions of the same set of facts is more likely than not true.

[A37-38].

The court then began its verdict with a statement that "Most narratives in life have gaps . . ."

But while most narratives have gaps, and certainly the two narratives presented here both have gaps, gaps vary in their size and in their significance. And in this case, the evidence conclusively demonstrates that despite some documentary or memory gaps in the narrative of his life in 1976 and 1977, Peter Marryat Doig absolutely did not paint the disputed work. And concordantly, although it's not necessary for judgment in favor of Mr. Doig, and despite some gaps in that narrative as well, the evidence conclusively shows that Peter Edward Doige did author the work.

[A38-39].

The court accepted as credible testimony from Doig and his mother that he was not incarcerated at the Thunder Bay Correctional Center during the relevant time period, and that he instead resided with his family in Toronto. [A41, 49-51]. The court also credited the high-school yearbook photographs proffered by Doig for the 1975 through 1978 school years as showing Doig attending that school in Toronto, as well as Doig's passport photograph from 1976, and found that the person depicted in those photographs did not resemble the person in the photograph contained in the Lakehead University identification card. [A42-44]. The court contrasted this with

11

Fletcher's testimony that the man who painted the Painting resembled the person depicted in the university identification card. [A45].

The court also noted an inconsistency in Doig's narrative, specifically an e-mail sent by Doig in 2012 after the case was filed stating that he did not attend high school in 1976 and 1977. [A45]. However, it concluded that Doig was mistaken in the e-mail. [A45]. The court based this resolution on Doig's high school records, which the court found indicated that he attended high school in Toronto at least through November 1976. [A47-48].

The court also addressed another inconsistent e-mail sent by Doig's domestic partner Parinaz Mogadassi in 2012, which stated that Doig had worked on an oil rig in Alberta in the summer of 1976 rather than in the summer of 1977, which it again concluded resulted from a mistake. ([DE 273-8], pp. 935, 1662-63; [A50].)

The court noted the stipulation that Fletcher assisted the painter of the painting to become a member of the Seafarers' Union along with records of Peter Doige being in that union and the absence of records of Doig being in that union. [A55-56].

The court found that the Lakehead University identification card belonged to Doige based on his sister's testimony that she found it among his possessions after he died in 2012. [A57]. It also found credible the testimony of Ernie Adams, the art instructor at the Thunder Bay Correctional Center in 1976, that the man shown in the Lakehead University identification card was the man who painted the Painting.

[A57]. And it admitted statements Doige made to his sister before he died that he was incarcerated in Thunder Bay and mentioning Ernie Adams. [A59-63, 67].

The court also found that Fletcher initially testified that he believed that the painter of the Painting was 20 or 21 years old, which was consistent with Doige's age in 1976, but then changed his testimony at trial to estimate the age of the painter at 17 or 18 years old after learning that Doig was born in 1959. [A68].

The court also noted

> ***There are some open questions. Every narrative – no narrative is perfect, and there are some imperfections in the Peter Doige narrative.*** First, the timeline is kind of fuzzy.
>
> The records show – the prison records show that Doige was sentenced on January 13th, 1976. So, if he was sentenced on January 13th, 1976, how could he have attended Lakehead University and met Robert Fletcher in the fall of 1976? There's no – ***the evidence doesn't give a rock solid answer to this*** . . .
>
> . . . [M]aybe Doige started serving his sentence in January of '76 and was released by the fall of '76 due to some combination of dead time, which is the five-and-a-half months, and getting paroled. And we should recall that Mr. Fletcher testified that with Mr. Fletcher's assistance, Mr. Doige – or I should say the author of the work, the painter, sought and received parole. And if that were true, it's possible that Doige – that the author of the work, who I believe is Doige, was released by the fall of '76. . . .
>
> . . . ***and again, is there a rock solid answer to these questions? No.*** But none of this outweighs the ample evidence that I've already set forth that it was Peter Edward Doige who was in the Thunder Bay facility and who painted the work.
>
> ***There was another blip in the narrative.*** Bovard stated in her affidavit that Doige took music and art classes in prison while incarcerated. And that's Defendant's Exhibit 116, and the testimony was at least somewhat inconsistent with that. Those inaccuracies are immaterial and are explained by the fact that she was recalling events from decades earlier; and the affidavit was written for her by a lawyer, and as with Mr. Fletcher, when laypeople sign things that lawyers draft for them, sometimes they miss things.

Third, Adams, the art teacher, testified that the author of the work was very patient, was not volatile, and was not violent; and yet Ms. Sharpe, who was the common law wife of Mr. Doige, testified that Doige was violent and quick to anger. These seem like two different people on the surface; but that discrepancy is not significant, because it's not surprising that somebody would act differently in prison, where you need to behave to get privileges, like the ability to attend an art class, than when they're at liberty.
. . .

. . . Mr. Bartlow was the plaintiffs' expert. He served as his own expert, and there's nothing wrong with that. ***And the method that he used to authenticate the work and to identify it as a Peter Doig work is, at least in theory, not unreasonable in light of Doig's particular technique.*** And I know on this I part ways with Dr. Shiff, who is a world-famous art expert, and I am not; but as a layperson, and I emphasize in theory, ***I think that Bartlow's method can make sense if you're authenticating a Peter Doig work.***

As Mr. Doig testified, in many of his paintings, he projected images onto the canvas and used those images to outline elements or create the composition of the painting. And Mr. Bartlow's method, if performed properly, would simply reverse-engineer the composition process.

For example, Mr. Doig testified that he used the skier photograph on *Chopper* and the lion photograph on *Rain in the Port of Spain.* So, if that were true, and I think it is true, you'd be able to superimpose those photographs on the paintings, and it would match up. And that's, I think, all that Mr. Bartlow's authentication method teaches.

So, if Mr. Doig did use the disputed work as the source material for his later works – and, in fact, I think it's the plaintiffs' position – I think it's fair to say that the plaintiffs' position was that the disputed work was the mother lode of Peter Doig's later works – one could superimpose elements of the disputed work onto the elements of the later works and get a match.

But although ***that method is unobjectionable in theory***, Bartlow's use of the method here does not support – his application of the method here does not support the proposition that Doig painted the disputed work.

The shapes that Mr. Bartlow matched up between the disputed work and the later works were not unique or exceptional in any way. And as the defendant – the defendant's expert, Dr. Shiff, convincingly demonstrated, and as was demonstrated during Mr. Bartlow's cross-examination, the shapes on Doig's later work could just as easily match with Larney or Magritte or DaVinci.

14

There are only so many shapes in the world, and the fact that some of the disputed work's shapes match up with some of the shapes in Mr. Doig's later work does not at all prove that Mr. Doig painted the disputed work.
. . .

So, what I became convinced of during the course of the trial in hearing from Mr. Bartlow, hearing his cross-examination, and hearing from Mr. Shiff, is that as applied to the disputed work, the matches that Mr. Bartlow's method found were purely coincidental as opposed to something that actually happened.

And contrary to the argument that the plaintiff made in closing argument, the method – Mr. Bartlow's method did not reveal multiple elements in multiple paintings. Rather, the method focused on individual elements in individual paintings, much of which were explained by the photographs, the actual photographs.
. . .

Now, it's true that some of Doig's work has western themes and the disputed work has a western theme; but a lot of artists work in western themes, and the western theme is not specific enough to demonstrate common authorship between the disputed work and Doig's acknowledged works . . . .

Likewise, I'm persuaded by Dr. Shiff that the aesthetic personality of the disputed work is unlike the aesthetic personality of Peter Doig's acknowledged works.
. . .

***Like the biographical evidence, the artistic evidence is not perfect.*** Olivia Thornton at Sotheby's, when contacted by the plaintiffs, initially referred to the work as a wonderful early painting by Doig; but her e-mail . . . requested more information regarding the work's provenance. . . .

What I'm going to find is that the first e-mail, Thornton's initial reaction, is best explained as business development. She was indicating enthusiasm for the work; and that makes sense, given the likely high price of selling a Peter Doig painting if the work were, in fact, authentic.
. . .

Marilyn Bovard testified credibly that Doige was an amateur artist throughout his life, and that he had painted a number of works, including *Killing Time.* And I saw a number of Peter Doige's works, and again, I'm no art expert; but as a layperson viewing these works, the talent that was required to paint those

15

works, at least a couple of those works, is on par with the talent that was required to paint the disputed work.

Then finally, what do I do with plaintiffs' testimony, especially Mr. Fletcher's historical testimony? He said he saw the author. . . .
. . .

*And Mr. Fletcher's memory was incomplete and inconsistent, and that's no -- I don't mean that pejoratively because as I mentioned at the outset, Mr. Fletcher's testifying about matters from about 40 years ago*. . . .

*And those gaps in recollection are understandable*, . . . ; and given the other lapses in memory, I'm not going to credit Mr. Fletcher's testimony. In other words, *I don't think he's being intentionally untruthful, but I think he's just incorrect* . . . .

As for Mr. Bartlow, I believe that his desire to attribute the work to Mr. Doig clouded his judgment as an authenticator. Mr. Bartlow acknowledged that this case is personal to him and that he is – he acknowledged at some point that he was obsessed with this matter. And I believe that this led to motivated reasoning on Mr. Bartlow's part in authenticating the work.

I think that his method – his application of the method to the disputed work revealed to Mr. Bartlow what he really wanted the method to reveal. As Dr. Shiff noted, as he aptly observed, if you're looking for coincidences between two works of art, you're going to find coincidences.
. . .

So, those are the factual findings . . . .

[A68-85]. (emphases added).

The oral judgment was entered as a minute order [DE 260], and Fletcher and the Gallery appealed that judgment on September 22, 2016 ([DE 428], p. 64), with their appeal being subsequently consolidated with the present appeal by order of this court.

### 3.    Proceedings on Defendants' Motion for Sanctions

On October 21, 2016, Doig and his co-defendants moved for sanctions against both of the plaintiffs and Zieske under Fed. R. Civ. P. 11, 28 U.S.C. § 1927 ("Section

1927"), and the court's inherent power. [DE 273] In their supporting memorandum, they raised ten separate arguments in support of their sanctions award, including special focus on the District Court's statement of September 3, 2013, that the plaintiffs should not be surprised "if the hammer comes down." [DE 273-1] In opposing the defendants' motion, Zieske appeared by his own counsel and argued that his conduct was not sanctionable. ([DE 428], p. 65; [DE 344].)

On June 13, 2017, the District Court held oral argument on the motion for sanctions. ([DE 428], p. 68; Tr. Jun. 13, 2017, p. 1.) There, the court reiterated its reasons for denying summary judgment:

> So I denied summary judgment, and here's why: Because we had Fletcher saying, "I saw the painter paint the painting. I've seen videos of Peter Doig. They're the same person.
>
> And the way the summary judgment standard is, it's ‑‑ it's really hard to prevail on summary judgment where you have testimony like that. Even if the College of Cardinals and the Pope submitted affidavits saying, "No, the painter was not Peter Doig," it doesn't matter.
>
> There's an exception on summary judgment to if you have disputed testimony, you have to deny – disputed testimony on a material fact, you have to deny summary judgment, and that's if there's a videotape. . . .
>
> We obviously didn't have a videotape in this case of whoever it was painting the painting, but it's at least conceivable that Doig could have presented a documentary record that was so compelling that it would have been the functional equivalent of a videotape . . . to support a grant of summary judgment.
>
> And for a variety of reasons, I concluded, a variety of reasons, including the holes in the school record and other matters, that the documents didn't do the trick.
>
> Let's assume that if the documents, the more extensive documentary record submitted at trial, including the letters that were found right before trial in Mrs. Doig's attic and connecting the dots in the yearbooks, like connecting the

17

cover of the yearbook to the actual page that was shown, assuming that -- assume with me that had those additional materials been presented at summary judgment, that would have done the trick for Doig.

Should I conclude that the fact that this case survived summary judgment -- sure, the responsibility of that lies at the plaintiffs' feet, but that the defendant is also partially responsible for the case not getting resolved at summary judgment by not presenting to me at summary judgment what he presented at trial . . . ?

(Tr. Jun. 13, 2017, pp. 44-45.) The "letters that were found right before trial" referred to twelve letters dating from 1975-76 Doig's mother discovered that the defense disclosed to the plaintiff's by e-mail less than a week before trial and that the court ultimately excluded from evidence under Fed. R. Civ. P. 37(c)(1) ([DE 273-8], pp. 1433-40, 1913.)

After a delay of nearly five and a half years, on November 10, 2022, the District Court *sua sponte* ordered Defendants to submit a memorandum "itemizing the reasonable attorney fees and non-taxable costs/expenses they incurred from 5/7/2014 through the entry of judgment" in 2016. ([DE 291].) The court then provided only one month for Zieske and Plaintiffs to respond to more than 350 pages of billings submitted by Defendants and denied Zieske's motion for additional time to obtain an expert to provide an opinion on the fee petition. It also granted a blanket protective order allowing Defendants to file their memorandum and invoices under seal and preventing Zieske from disclosing anything about the amount of sanctions sought against him -- $3.5 million. Although Zieske moved for relief from the order, the court kept the protective order in place unmodified until the time it issued the sanctions

18

order. The court also refused to strike a reply brief that Defendants filed after asking for, and not obtaining, leave of court to file.

### 4.    The District Court's Sanctions Order and Subsequent Proceedings

Finally, having held the issue of sanctions under advisement so many years after oral argument, the District Court issued its opinion and order granting the motion for sanctions on December 30, 2022 – less than two hours before the close of business on the district judge's last day on the bench. ([DE 428], pp. 68, 81-82.)

In its sanctions order, the District Court stated its rationale as follows:

> By May 7, 2014, at the latest, it should have become indisputably clear to Plaintiffs and Zieske that their claims stood no chance of success and, in fact, that the claims were factually meritless. On that day, Zieske explained to the court that Doige's mother would not cooperate and that Bovard was a witness for Defendants (as her August 2013 affidavit made clear). By that point, Plaintiffs and Zieske should have realized that there were no "other people related to [Doige]" that would undermine Bovard's account or otherwise overcome Defendants' evidence that Doig never attended Lakehead or spent any time in Canadian prison; they also should have recognized that Doige, in fact, was the person whom Fletcher had met in Thunder Bay and who had created the painting. To continue the litigation past that point was objectively unreasonable, as the complaint's central allegations had completely unraveled under the weight of contrary evidence. Sanctions are accordingly warranted for Plaintiffs' and Zieske's continuing this litigation from May 7, 2014 through the entry of judgment.
> . . .
>
> Zieske's primary argument against sanctions is that this suit remained objectively reasonable through judgment because it survived summary judgment in April 2016 and proceeded to trial. . . . That Plaintiffs' claims survived summary judgment means that the court concluded that a plaintiff's verdict was reasonably possible when viewing the summary judgment record in the light most favorable to Plaintiffs. The basis for the court's denial of summary judgment, far from being a mystery, was exceptionally clear. The court could not have awarded summary judgment to Defendants given the evidence adduced by Plaintiffs—especially Fletcher's assertion that he had seen video interviews of Doig and, based on Doig's mannerisms and gestures

in the video, that Doig was the person who had he met in Thunder Bay in the 1970s and who had authored the painting.
. . .

All that said, Plaintiffs should have known by May 2014 that their primary evidence—Fletcher's recollections, at that point—was irreparably shaky and, in fact, wrong. Given the evidence that Defendants had marshaled by that date—much of it from neutral sources in Canada, showing that it was Doige, not Doig, whom Fletcher knew in Thunder Bay and who created the painting— Fletcher could not reasonably have believed that his identification of Doig as the painter was accurate, Bartlow could not reasonably have believed that his analysis of the painting (later entered as expert testimony) as Doig's was sound, and Zieske could not reasonably have believed either of those things.
. . .

Plaintiffs' primary evidence came from Bartlow and Fletcher, whose testimony was necessarily self-serving given their stake in the case. The remainder of Plaintiffs' case consisted largely of attempts to poke holes in Doig's story as to his whereabouts in the 1970s. Even if Plaintiffs succeeded in poking some such holes—which is entirely expected for events occurring some forty years earlier—those holes could not reasonably imply that Doig, not Doige, was the painting's author. . . . [N]o reasonably objective person—viewing the case as a trier of fact—could have expected as of May 2014 that Plaintiffs' story would prevail over Doig's. A further and perhaps more important point is that the evidence adduced by Defendants by that point would have led any reasonable person in Fletcher's and Bartlow's shoes to reconsider what at the case's inception might have been a sincere belief that Doig authored the painting and to recognize that the author surely was Doige, not Doig.

Defendants ask the court to sanction Plaintiffs and Zieske for conduct other than failing to withdraw their claims . . . . The cited conduct present non-frivolous bases for sanctions, but it is not the conduct for which the court imposes sanctions. Rather, the court imposes sanctions specifically for Plaintiffs' and Zieske's decision to continue this litigation past May 7, 2014, by which time it should have been absolutely clear to them that their claims were factually meritless and stood no chance of success. Still, the other conduct cited by Defendants underscores the conduct for which Plaintiffs and Zieske are sanctioned, and it is consistent with the court's determination that they either ignored or turned a blind eye to the fact that their claims were meritless.

In sum, Plaintiffs and Zieske either knew or should have known by May 7, 2014, that they had no objectively reasonable basis for their claims and that it was unreasonable for them to continue with the suit. Sanctions are proper under Rule 11 (as to Plaintiffs) and Rule 11 and § 1927 (as to Plaintiffs and

Zieske). The court does not impose sanctions under its inherent authority because Rule 11 and § 1927 are adequate to impose sanctions for the entire period that Plaintiffs and Zieske continued litigating even after it had become objectively unreasonable to do so.

[A16-21]. Ultimately, the court entered a sanctions award of $2,525,958.35, for which Zieske and his two clients were jointly and severally liable. [A33].

On January 27, 2023, Zieske filed a Motion to Amend Judgment under Fed. R. Civ. P. 59, arguing that the court committed various errors of law discussed below. [DE 418] The case was assigned to a new district judge, and after briefing on the motion, the new judge denied the motion on June 12, 2023. ([DE 428], p. 82-83; [DE 421, 422, 424].) In its order denying Zieske's Rule 59 motion, the court acknowledged that it was "aware that the *law allows,* albeit in a rare case, the denial of summary judgment and a finding that pursuing a case was frivolous," but concluded that it had "carefully reviewed the progression of this case and specifically noted the evidence Defendants presented (an affidavit from the *actual* non famous painter's sister in May of 2014) that made pursuing the case untenable." [A4]. It further strictly adhered to this court's decision in *Shales v. General Chauffeurs*, 557 F.3d 746 (7th Cir. 2009), in upholding the original order of sanctions under Section 1927. [A4]. Finally, the court concluded that even though "[a] Court never relishes imposing sanctions," it nonetheless determined "that sanctions were unfortunately appropriate." [A5]. This appeal ensued.

## SUMMARY OF ARGUMENT

First, the District Court misapplied this court's holding in *LeBeau v. Libbey-Owens-Ford Co.,* 799 F.2d 1152 (7th Cir. 1986), which, along with persuasive

authority from other circuits, establishes that when a claim survives summary judgment, sanctions for frivolousness are appropriate only in the most egregious cases. Given that eight genuine issues precluded summary judgment and that it had to apply significant weighing and gap-filling to the evidence admitted at trial, the District Court applied an impermissibly low standard to award sanctions.

Second, the District Court misapplied this court's holding in *Shales v. General Chauffeurs*, 557 F.3d 746 (7th Cir. 2009), by failing to take Zieske's ability to pay into account in awarding sanctions under Section 1927. Prior authority unaffected by *Shales*, subsequent district court decisions contravening *Shales*, and the internal inconsistency in *Shales*' rationale require clarification as to the punitive nature of Section 1927 sanctions, with the result that due process and therefore consideration of ability to pay should factor into that determination.

Lastly, the District Court by the language in its order improperly shifted the burden of proof from the defendants as the party moving for sanctions to Zieske, requiring a reevaluation under the proper standard.

All of these errors require reversal of the District Court's sanctions award.

## ARGUMENT

### 1.     Standard of Review

Rulings on a motion brought under Fed. R. Civ. P. 59 are reviewed for abuse of discretion. *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). "To prevail on a Rule 59(e) motion to amend judgment, a party must 'clearly establish' (1) that the court committed a manifest error of law or fact, or (2) that newly

discovered evidence precluded entry of judgment." *Id.* (quoting *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006)). The underlying sanctions order based on Fed. R. Civ. P. 11, Section 1927, and the court's inherent authority, is likewise reviewed for abuse of discretion. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 862 (7th Cir. 2015).

A district court, however, also abuses its discretion when it misapplies the law. *See, United States v. Ferron*, 357 F.3d 722, 724 (7th Cir. 2004). "Questions of law are reviewed *de novo.*" *Walsh v. Alight Solns. LLC*, 44 F.4th 716, 721 (7th Cir. 2022) (internal quotation omitted).

**2.    The District Court misapplied authority from this court holding that survival of summary judgment is inconsistent with a later finding that the lawsuit is frivolous absent egregious circumstances in favor of less stringent standard unsupported by persuasive authority.**

In its sanctions order, the District Court reasoned, "The fact that a claim survives summary judgment, however, is not a shield against sanctions for pressing the claim," and in support of that proposition cited this court's opinion in *LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1158 (7th Cir. 1986) [A23]. This reading of *LeBeau*, however, misapplies this court's actual holding and applies a much lower standard for imposing sanctions than that holding permits.

**2.1    *LeBeau*'s holding.**

In *LeBeau*, this court *reversed* a district court's award of attorney's fees in favor of the defendant under Title VII after having denied the defendant's summary judgment motion. 799 F.2d at 1156-58. Indeed, the court stated, "we can only say that when a trial judge rules that there are facts under which a plaintiff can prevail,

23

*it is highly inconsistent for him to later find the suit frivolous* because it is foreclosed as a matter of law." *Id.* at 1158 (emphasis added).

Overlooking this actual holding in *LeBeau*, the District Court instead quoted as authority dicta in an explanatory footnote ("Footnote 7"):

> We do not suggest, as the dissent assumes, that *no* suit that survives a motion for summary judgment can ever be found frivolous. We do, however, believe that the district court would not have denied the motion for summary judgment if . . . [the defendant]'s state of mind had presented no material question of fact.

*Id.* at 1158 n.7 (emphasis added). This statement, first of all, affirms that the basis for the majority's reversal of the attorney fee award was indeed the district court's earlier denial of summary judgment. But it also allows for only an extremely narrow leeway for a claim that survives summary judgment to be able to be determined frivolous later without risking inconsistency in the judicial determinations. In other words, only egregious circumstances justify departure from the commonsense rule that denial of summary judgment is nearly always inconsistent with a later determination of frivolousness.

This aspect of *LeBeau* remains unmodified. Thus, the law in this circuit is that denial of a summary judgment motion that attempts to dispose of a plaintiff's claim strongly disfavors any finding that the suit is frivolous. This is consistent with the underlying standards for summary judgment and frivolity. A court must grant summary judgment only "if no reasonable trier of fact could find in favor of the non-moving party." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017). "'A suit is frivolous if it has no reasonable basis, whether in fact or in law.'"

24

*Gekas v. Atty. Reg'n & Disc. Comm'n of Supreme Ct.*, 793 F.2d 846, 850 (7th Cir. 1986) (quoting *Tarkowski v. County of Lake*, 775 F.2d 173, 176 (7th Cir. 1985)). Finding that a reasonable trier of fact could find in favor of a party and at the same time that the party's advocate had no reasonable basis for prevailing is logically inconsistent, and can only be proper when the non-movant employed some improper means specifically calculated to avoid summary judgment. This inconsistency becomes even more glaring in this case, in which the court denied summary judgment only four months before trial upon numerous bases, and further denied a motion for reconsideration of that denial just three months before trial.

The District Court did not apply this stringent standard, and a review of the evidence designated on summary judgment versus that admitted at trial confirms this misapplication of law.

### 2.2 Persuasive authority is consistent with *LeBeau*'s higher standard and not with the District Court's opinion.

*LeBeau* is far from an outlier in federal jurisprudence on this issue. The District Court cited the Sixth Circuit's decision in *United States v. Lemaster*, 891 F.2d 115 (6th Cir. 1989), but that decision also supports the strictest standard for frivolousness when a claim survives summary judgment. There, a husband and wife and their son asserted several claims seeking more than a billion dollars in damages against the IRS and its agent, alleging that assets seized to satisfy the parents' tax liability belonged to their son, although in reality the son to whom the parents had transferred their business assets had nothing to do with their business. 891 F.2d at 116-17. Only one of the many claims survived the motion for summary judgment, and

25

at trial the only issue was whether the father had been acting as an agent for his son. *Id.* at 118, 121 n.4. At trial, the district court found that the transfer of assets had been nothing but a "sham" for the purpose of avoiding tax liability. *Id.*

Quite unlike the facts here, *LeMaster* involved highly egregious behavior by the plaintiffs in which the lawsuit itself was part of an attempt to defraud the government by a delinquent taxpayer. Even so, the Sixth Circuit still undertook a sort of balancing test, in which a single claim proceeding to trial and later deemed frivolous did not outweigh the greater number of more substantive claims terminated on summary judgment. Thus, it was not only the egregious nature of the plaintiff's behavior, but also the overwhelming majority of the claims' failure to survive summary judgment that favored sanctions – again, unlike the case here.

The District Court also cited the Second Circuit's decision in *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir. 1988), *rev'd in part on other grounds*, 493 U.S. 120 (1989), which is likewise distinguishable on its facts. There, the court based its sanctions award on the revelation at trial that an affidavit prepared by the plaintiff's attorney and used in opposing summary judgment stated a material fact for which there had never been any basis. 854 F.2d at 1473. Specifically, the plaintiff's affidavit asserted that his signature was forged, but the handwriting expert that the plaintiff himself retained six months later opined that the signature at issue was likely made by the plaintiff. *Id.* at 1472. In other words, a single fact to which the non-movant attested prevented entry of summary judgment,

26

and that later turned out to be unsupported, rendering the claim baseless by the time of trial.

Even though *LeMaster* and *Calloway* reached the opposite result from *LeBeau* in terms of imposing sanctions, both holdings are entirely consistent with *LeBeau* and, read together with it, articulate a rule that only the most egregious and exceptional cases can justify an award of sanctions if a claim survives summary judgment.

### 2.3 The District Court spent considerable efforts determining credibility, weighing testimony, and extrapolating to fill "gaps" it found in the narrative and timelines, which is inconsistent with a finding of frivolousness under *LeBeau*.

Applying *LeBeau* and its related authority to the claims before the District Court confirms that the court misapplied the rule they articulate. Furthermore, the record below is unique in that the case was tried to the bench, not a jury, and that the District Court gave a detailed record of its findings and the reasoning behind them in both its summary order and in its judgment rendered after trial. Thus, this court can read the District Court's disposition at these two stages of the case and consider the stark inconsistency of its reasoning there with its subsequent sanctions order.

At the summary judgment hearing, the District Court based its denial of the defendants' summary judgment motion on no less than eight grounds: (1) the lack of conclusive records showing where Doig was or was not between summer 1976 and autumn 1977; (2) the lack of any official record placing either Doig or Doige at the Thunder Bay Correctional Center; (3) the failure of Lakehead University and

27

Seafarers' Union records for Doige to preclude Doig from having been at the prison; (4) Fletcher's testimony that Doige's features, gestures, and mannerisms were the same as those of the painting's creator; (5) the failure of Lakehead University records to fit into the timeline urged by Defendants for Doige being at Lakehead and the Correctional Center; (6) the lack of an exact match between the signature from Doige's Lakehead University ID and the signature on the painting; (7) the court's professed need to determine Fletcher's credibility from his in-person testimony; and (8) the disagreement between the parties' experts. [A93-103].

The defendants themselves contributed significantly to the denial of summary judgment. The e-mails they designated from Doig and Mogadassi contained date discrepancies as to the year in which Doig claimed to have worked in an oil field. ([DE 275-6], pp. 149-50.) Doig's high school yearbook photographs – which the defense had in its possession – were not presented in a continuous series through 1976 until trial. [A46-48, 96]. And the letters from Doig's mother that the court stated after trial would have allowed it to grant summary judgment were not produced until a week before trial and ultimately excluded from evidence. ([DE 273-8], pp. 1433-40.) Also, the plaintiff raised an issue to the court on summary judgment that one of Doige's signatures offered by the defendants on summary judgment as a "match" had been altered for submission to the court. ([DE 273-6], pp. 121-30.) The court did not address the discrepancy in its ruling, but it certainly did not bolster the defense's case on summary judgment. The defendants' sanctions motion was effectively a request for a

windfall, as they asserted a claim was frivolous against which they were unable to prevail on summary judgment and which required a factfinding at trial to resolve.

After trial, the court in its oral ruling cited multiple "gaps" in the record, that required resolution through factfinding. [A39, 84]. The court issued no less than thirty-four credibility determinations, including for Doig, his mother, Bovard, Shiff, and Fletcher. [A41, 44, 47, 48-52, 55, 58, 60, 77, 79-80, 82]. Thus, the court had to weigh the credibility of witnesses to decide which version of events to believe ultimately.

It should be emphasized that the court found Fletcher "credible" and even "very credibl[e]" three times in its findings. [A47, 57, 83]. It also noted that it discredited Fletcher's testimony not because he was being "intentionally untruthful," but because his memory of events forty years in the past was likely imperfect, which the court found "understandable." [A83-84]. The court used that same forty-year lapse to resolve inconsistencies in Doig's statements in Doig's favor, which it also found "understandable." [A51-52]. And although it was less generous with Bartlow's expert testimony than with Fletcher, the court did not conclude that Bartlow was "intentionally untruthful" either, but simply that his personal interest in the outcome of the case "clouded his judgment." [A84]. Even then, it found Bartlow's methodology "can make sense" and was "not unreasonable" and "unobjectionable in theory." [A73-74]. In that instance, the court was using its lay perspective to weigh the conflicting expert testimonies of Bartlow and Schiff. [A73, 82].

29

The District Court's only criticism of Fletcher's testimony was his lapse in memory on certain points, which it found "understandable." Regarding Bartlow, that a stake in the outcome of the case "clouded his judgment" can be said of any person testifying in a civil case to which he is a party or of any expert rendering testimony, but the overwhelming majority of such cases do not result in a six-figure sanctions award. But even more inconsistent with an award of sanctions, the court found "gaps" in the evidence at trial that required its own extrapolation to resolve. (*E.g.*, [A69-70].) While Fletcher and Bartlow ultimately did not prevail, the evidence they presented and the evidence against them required the court to spend considerable time weighing and analyzing. The court's own treatment of the issues at trial, therefore, contradicts its later sanctions award.

Quite unlike in both *LeMaster* and *Calloway*, not only was Fletcher and Bartlow's designated evidence on summary judgment not later found to be baseless, but the evidence they presented at trial required detailed factfinding and analysis. Unlike in *Calloway*, in which only a single fabricated affidavit precluded summary judgment, the designated evidence here precluded summary judgment on no less than eight grounds, combined with inconsistencies in the defendants' designated evidence. And unlike in *LeMaster*, the trial testimony did not reveal the entire factual basis of the claim to be a sham, but instead required credibility determinations, weighing of expert testimony, and extrapolation to fill "gaps" – with findings that certain testimony of Fletcher was "very credible" and that Bartlow's expert methodology "can make sense" and was "not unreasonable."

This case is anything but the egregious misuse of the justice system perpetrated by the plaintiffs in *LeMaster* and *Calloway*. However it was decided after trial, this was a factually supported if ultimately unsuccessful attempt to authenticate a painting. The District Court's sanctions order reads as though it were written by a different judge from the one who issued his oral findings and conclusions after trial. The sanctions order treated the documents accompanying the July 2013 Rule 11 letter as conclusively confirming the case was frivolous, but the summary judgment order from 2016 found genuine issues with respect to Doig's whereabouts in 1976 and the findings issued after trial not only found "gaps" in the chronology that required the weighing of conflicting testimony to resolve, but also conflicting expert artistic analyses that required a factfinder's resolution. The sanctions order is irreconcilable with the court's own prior rulings on summary judgment and after trial, and even the court's remarks in 2017 during the sanctions motion argument.

Confirming *LeBeau* as articulating strict standard for claims that survive summary judgment not only ensures a result in this case both internally consistent and consistent with precedent, but furthers the longstanding judicial policy of ensuring open courts. "Free access to the courts as a means of settling private claims or disputes is a fundamental component of our judicial system, and courts should be open to litigants for the settlement of their rights without fear of prosecution for calling upon the courts to determine such rights." *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 647 (7th Cir. 1983) (internal quotation omitted) (declining to extend tort liability for wrongful filing of a lawsuit beyond a malicious prosecution

31

action). This court has previously not given much weight to the "chilling effect" of sanctions awards. *See, McGill v. Faulkner*, 18 F.3d 456 (7th Cir. 1994). In this case, however – with the high profile of its sanctions award and the highly questionable circumstances for its imposition – the policy of open access to courts demands serious consideration of just such a chilling effect.

First, a stringent *LeBeau* standard ensures that plaintiffs are not punished for seeking to vindicate claims, only to find that when they are unsuccessful they suffer "not only loss of one's case but loss of one's shirt as well." *Szabo Food Serv. v. Canteen Corp.*, 823 F.2d 1073, 1085 (7th Cir. 1987) (Cudahy, J., dissenting). Summary judgment is designed to "weed out" spurious claims. *See, Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). That is where the overwhelming majority of frivolous claims should – and will – perish. But for a claim that has enough merit to proceed to trial, only the most exceptional cases in which subversive means were used to evade summary judgment – as in *LeMaster* and *Calloway* – should warrant sanctions for frivolousness.

Although this case involved a bench trial, this rule should hold especially true in cases tried to a jury, which often yield unpredictable results. *See, e.g., Moffett v. Kolb*, 930 F.2d 1156, 1162 (7th Cir. 1991) ("This court, however, recognizes the fact that no one understands how a jury reaches a verdict and that their decisions are often unpredictable.") Here, at least, the District Court left a record of its findings of fact and conclusions of law that demonstrates its inconsistency with a later sanctions award. Attorneys trying cases to a jury unsuccessfully will have no such shield, and

32

will be left to a trial judge's mercy as to whether their evidence was strong enough to render their clients' claims meritorious rather than frivolous. This is not a question to be reserved for another day: clarifying *LeBeau*'s standard as stringent here will foreclose future abuses of the sanctions process in federal courts.

Thus, not only this court's decision in *LeBeau* and harmonious persuasive authority, but the District Court's record of its decisions and sound judicial policy all mandate reversal of the sanctions award under Rule 11, Section 1927, and the District Court's inherent authority. The District Court misapplied the law, and therefore abused its discretion.

3.    **Despite this court's decision in *Shales v. General Chauffeurs*, Section 1927 should be read to contain a punitive aspect, which implicates due process concerns and therefore Zieske's ability to pay, which the District Court did not consider.**

Section 1927 reads in full, "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

In opposing sanctions under Section 1927, Zieske presented evidence of his limited ability to pay based on his status as a solo practitioner with a young family to support, and argued for reducing any fee award on that basis. ([DE 406], pp. 15-16; [DE 406-1].) The District Court, however, rejected his arguments, relying on this court's opinion in *Shales v. General Chauffeurs*, 557 F.3d 746 (7th Cir. 2009), to deny Zieske any reduction in the fee award based on his ability to pay. [A33]. *Shales*, the

33

court noted, analogized sanctions under Section 1927 to damages for an intentional tort, and applied the principle that tort damages are gauged by the injury caused, not the tortfeasor's ability to pay, to conclude that an attorney's ability to pay cannot reduce a sanctions award under Section 1927. 557 F.3d at 749-50.

*Shales* says in *dicta*, "We speak here of compensatory rather than punitive damages in tort litigation; the award under §1927 is compensatory, not punitive." *Id.* at 729. This statement, however, is problematic because it contradicts prior authority from this court without expressly overruling it, has not been consistently applied since, has been rejected by other federal circuit courts, and is not internally sound as it contradicts analogous state-law treatment of intentional torts.

First, two years before deciding *Shales*, this court stated – also in *dicta* – that the purpose of Section 1927 is to punish sanctionable conduct. *See, De Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008). Three years before that, this court held that "[t]he purpose of § 1927 'is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them'" – that is, to punish as an example. *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) (quoting *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989)); *see also, Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996) ("The standard judicial formulation of the purpose of punitive damages is that it is to punish the defendant for reprehensible conduct and to deter [the defendant] and others from engaging in similar conduct."). *Shales*

34

fails to address either of these prior characterizations by this court of Section 1927 sanctions as punitive, which can therefore be considered as remaining authoritative.

Confirming this equivocation, district courts within this circuit continue affirm post-*Shales* that Section 1927 serves a punitive purpose. *E.g.*, *Novoselsky v. Zvunca*, 324 F.R.D. 197, 207 n.7 (E.D. Wis. 2017) ("Section 1927 empowers courts to *punish* any lawyer or litigant who 'multiplies the proceedings in any case unreasonably and vexatiously'") (quoting 28 U.S.C. § 1927) (emphasis added); *Intellect Wireless, Inc. v. Sharp Corp.*, 87 F. Supp. 3d 817, 844 (N.D. Ill. 2015) (quoting *Riddle*, 414 F.3d at 835).

At the same time, courts in other circuits have explicitly rejected the *dicta* in *Shales* characterizing Section 1927 sanctions as solely compensatory. Most significantly, the Ninth Circuit has held that Section 1927's use of "may" means that fee awards are discretionary and that the court may permissibly take ability to pay into account. *Haynes v. City and County of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012). A bankruptcy court, when faced with choosing to apply *Shales* or *Haynes*, rejected *Shales*' logic. *In re W.A.R. LLP*, No. 11-00044, 2012 Bankr. LEXIS 4465, at *7-8 (Bankr. D.D.C. Sep. 25, 2012). It is well-established that the word "may" "implies discretion." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). The language of Section 1927 contains no language limiting the discretionary term "may," rendering *Shales* a limitation on a district court's discretion that is absent from the statutory language. To allow a district court discretion in awarding Section 1927

35

sanctions without allowing it the discretion to weigh a consideration mandated by due process (*see, infra*) does not comport with the plain statutory directive.

Finally, the very reasoning followed in *Shales* does not foreclose a punitive element to Section 1927 sanctions. *Shales*' analogy of Section 1927 to an intentional tort invokes a punitive element. In Illinois (the locus of Zieske's representation), the intentional tort of malicious prosecution – roughly analogous to Section 1927 – allows for recovery of punitive damages. *Delgado v. Mak*, No. 06 C 3757, 2008 U.S. Dist. LEXIS 27140, at *12-13 n.4 (N.D. Ill. Mar. 31, 2008) (citing *Swick v. Liautaud,* 169 Ill. 2d 504, 522 (1996)); *see also, William J. Templeman Co. v. Liberty Mut. Ins. Co.*, 316 Ill. App. 3d 379, 384 (1st Dist. 2000) ("Damages for malicious prosecution are compensatory and not intended to punish the defendant, although they may have a punitive aspect in that punitive damages may be awarded.").

The sum of these weaknesses in *Shales*' treatment of prior authority, application, and rationale means that the decision should be revisited and its effect on prior authority clarified. Given particularly *Shales*' analogy to state-law intentional torts, the District Court was wrong not to consider Zieske's evidence of his limited ability to pay in awarding sanctions under Section 1927. That is because punitive damages invoke due process concerns. While "[c]ompensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct[,] . . . punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "The Due Process Clause of the Fourteenth Amendment

36

prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.*[1]

This court, following suit, holds that ability to pay is indeed a factor to consider in determining whether a punitive damages award violates due process:

> The usual practice with respect to fines is not to proportion the fine to the defendant's wealth, but to allow him to argue that the fine should be waived or lowered because he cannot possibly pay it. . . . Given the close relation between fines and punitive damages, this is the proper approach to punitive damages as well. The defendant who cannot pay a large award of punitive damages can point this out to the jury so that they will not waste their time and that of the bankruptcy courts by awarding an amount that exceeds his ability to pay.

*Kemezy*, 79 F.3d at 36. "An award of punitive damages . . . must be supported by the record and may not constitute a windfall to the prevailing party." *Hennessy v. Penril Datacomm Networks*, 69 F.3d 1344, 1352 (7th Cir. 1995). "[A]n award substantially exceeding the guideline which . . . might result in a windfall . . . would, in its effect, exceed the necessary and permissible level of punishment and deterrence." *McKinley v. Trattles*, 732 F.2d 1320, 1328 (7th Cir. 1984).

*Shales* treats these due process concerns as "debt relief in a quasi-bankruptcy proceeding," in which a district court "tr[ies] to administer debt relief one debt at a time, creating an odd (and extra-statutory) set of priorities . . . ." 557 F.3d at 749. This, however, is a policy decision that presupposes that Section 1927 contains no

---

[1] *Campbell* addressed a punitive damages award under Utah law, and thus applied the Fourteenth Amendment's due process clause. 538 U.S. at 415-17. Because a federal statute is involved here, the same analysis applies, though under the due process clause of the Fifth Amendment. *See, Malinski v. N.Y.*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring).

punitive aspect, a position belied by state-law treatment of analogous intentional torts. When due process is implicated, the requirements of the Constitution render these policy concerns moot.

The District Court erred in overlooking the punitive aspect of Section 1927 sanctions. *Shales* does not overrule prior authority of this court affirming that aspect and district courts in this circuit still acknowledge it post-*Shales*. Zieske's ability to pay was very much a relevant inquiry under Section 1927, and due process demanded that the District Court consider it here.

**4.     The court operated with a presumption of the reasonableness of the requested fees and expenses and improperly shifted the burden onto Zieske, and included in its sanctions award fees by Doig's attorneys for opposing a successful motion for discovery sanctions against Doig.**

"The party seeking the fee award bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed." *Spegon v. Catholic Bishop*, 175 F.3d 544, 550 (7th Cir. 1999) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). In its order awarding sanctions, however, the District Court stated:

> But Zieske is wrong that he could not meaningfully respond to Defendants' itemized fees and costs. The court told Zieske that he "should assume that the court will find that sanctions are warranted for the post-5/7/2014 time frame." Doc. 398. That meant that *Zieske should explain* whether the fees and costs incurred by Defendants after May 7, 2014 were reasonable—plainly indicating that *the court would find that reasonable fees and costs incurred after that date directly resulted from his sanctionable conduct* (continuing the litigation).

[A28] (emphasis added). In this statement, the court effectively – and improperly – shifted the burden onto Zieske to *disprove* not only the reasonableness, but the relatedness, of the attorney's fees sought – an impossibility in light of the defendants' incomplete descriptions of fees and expenses and the unreasonably short time

provided to Zieske, apparently due to the district judge's impending departure from the bench. Throughout its opinion, the court accepted the rates and the basis for them as submitted by Defendants at face value. At one point, the court recited that it was the defendants' burden to prove the reasonableness of non-taxable costs requested, but at the same time it proceeded from the assumption that "much of the costs identified by Defendants must have been reasonable." [A31]. Again, this operates from a presumption of reasonableness and improperly shifted to Zieske the burden of disproving the reasonableness of the defendants' asserted costs.

Another aspect of the District Court's improper burden-shifting in this regard is its fixation on its statement in a minute entry on December 5, 2022, that it would find sanctions warranted beginning on May 7, 2014, based on an oral admonition on September 13, 2013, to the plaintiffs not to be surprised "if the hammer comes down" on them. In short, the court's reasoning was that the plaintiffs and their counsel should have *expected* sanctions even though it later denied the defendants' summary judgment motion – sending a mixed message if ever there were one. In light of that subsequent ruling, it was not proper for the court to require Zieske and the plaintiffs to expect that they had no basis to prevail on their claims. More fundamentally, however, the court's treatment of this admonition as the starting point for calculating the sanctions award provides further indication that it presumed an award of sanctions and improperly shifted the burden to Zieske to rebut that predetermined outcome.

39

Also problematic in this regard is the court's sanctions award covering all costs incurred after the arbitrarily selected May 7, 2014 date – even fees and costs associated with the defendants' counsel opposing the *plaintiffs'* earlier motion for discovery sanctions during the litigation. ([DE 393-1], Ex. 9, pp. 85-88). As a result of that motion, the court granted sanctions against Defendant Doig, awarding Plaintiffs their costs of traveling to London to take his deposition after Doig was found to have intentionally misled the court in an affidavit concerning his availability in New York. Doig's attorneys themselves escaped sanctions only through their court-ordered statements about what they knew of Doig's deception. ([DE 145, 152, 179].)

In light of the improper burden-shifting statements in its order, as well as the fees it included, the District Court must revisit its analysis and undertake a proper review of Defendants' requested fees and costs by determining whether they have met *their* burden to prove the reasonableness of the fees and costs they requested, not by requiring Zieske to disprove it.

## CONCLUSION

The District Court erred when it awarded sanctions against Zieske under Rule 11, Section 1927, and its inherent authority because (1) it applied an impermissibly low standard for sanctions contrary to this court's authority in *LeBeau*, (2) it should have factored Zieske's ability to pay into its award of Section 1927 sanctions, and (3) it improperly shifted the burden to Zieske to disprove the reasonableness and relatedness of the defendants' attorneys' fees. For all of these reasons, Zieske requests

40

that this court reverse the judgment of the District Court and remand for reconsideration consistent with the proper standards.

Respectfully submitted,

**Respondent-Appellant**

By:  */s/ Adam J. Sedia*
One of the Respondent-Appellant's Attorneys

Joseph R. Marconi - ARDC No. 01760173
DAVID M. MACKSEY - ARDC NO. 6205319
ADAM J. SEDIA  - ARDC NO. 6318987
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
marconij@jbltd.com
mackseyd@bjtld.com
sediaa@jbltd.com
312-372-0770

<u>CERTIFICATE OF COMPLIANCE</u>
<u>WITH TYPE-VOLUME LIMITATION</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains <u>12,523</u> words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) & Cir. R. 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 12 point Century.

<u>/s/ Adam J. Sedia</u>

**CIRCUIT RULE 30 STATEMENT**

The undersigned hereby certifies that all of the materials required by parts (a) and (b) of Circuit Rule 30 are contained in the following appendix.

<u>/s/ Adam J. Sedia</u>

# APPENDIX

# TABLE OF CONTENTS

Notice of Appeal, July 11, 2023 [DE 425] ..................................................................A1

Order, entered June 12, 2023 [DE 424] ....................................................................A3

Memorandum Opinion and Order, entered December 30, 2022 [DE 413] ...............A6

Report of Proceedings, August 8, 2016 [DE273-8], pages 1986-2043 .....................A34

Report of Proceedings, April 6, 2016 [DE 273-6], pages 60-70 ..............................A93

**NOTICE OF APPEAL TO A COURT OF APPEALS
FROM A JUDGMENT OF THE DISTRICT COURT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT FLETCHER and<br>BARTLOW GALLERY, LTD.,<br>    Plaintiffs, | ) ) ) | |
| | ) | Case No. 1:13-cv-3270 |
| v. | ) | |
| PETER DOIG, GORDON V. KLASEN,<br>MATTHEW S. DONTZIN, and<br>THE DONTZIN LAW FIRM, LLP, | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| WILLIAM FREDERICK ZIESKE,<br>    Respondent. | ) ) | |

**RESPONDENT'S NOTICE OF APPEAL**

Respondent, WILLIAM FREDERICK ZIESKE ("Zieske") by counsel, appeals to the

United States Court of Appeals for the Seventh Circuit from the order of the district court

entered on June 12, 2023 [DE 424], denying Respondent's Motion to Amend Judgment,

and the order of the district court entered on December 30, 2022 [DE 413], granting in part

Defendant's Motion for Sanctions and awarding monetary sanctions against Respondent.

Respectfully submitted,

WILLIAM F. ZIESKE, Respondent

By: ___ /s/ *Joseph R. Marconi*_____
        One of His Attorneys

A1

Joseph R. Marconi (marconij@jbltd.com)
Victor J. Pioli (pioliv@jbltd.com)
Adam J. Sedia (sediaa@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe Street - Suite 2700
Chicago, IL 60603
(312) 372-0770
(312) 372-9818 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2023, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to all attorneys of record.

/s/ Joseph R. Marconi

2

A2

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Robert Fletcher and
Bartlow Gallery LTD ,

Plaintiffs,

v.

Peter Doig, Gordon V. Klasen,
Matthew S. Dontzin, and
The Dontzin Law Firm, LLP,

Defendants,

v.

William Frederick Zieske,

Respondent.

Case No. 13-cv-3270

Judge Mary M. Rowland

## **ORDER**

Respondent William Frederick Zieske, through counsel, moves [418], pursuant to Fed. R. Civ. Pro. 59(e), to amend the award of sanctions entered on December 30, 2022. *Fletcher v. Doig,* 13 cv 3270, 2022 WL 18027447 (N.D. Ill. Dec. 30, 2022). The sanctions were awarded jointly and severally against the Plaintiffs and their counsel, Mr. Zieske, in the amount of $2,525,958.35.[1]

A Rule 59(e) motion requires the movant to clearly establish that the court committed a manifest error of law or fact or that newly discovered evidence precludes entry of judgment. *See A&C Constr. & Installation, Co. WLL v. Zurich Am. Ins. Co.,* 963 F.3d 705, 709 (7th Cir. 2020).

Following denial of summary judgment to Defendant, the case proceeded to a bench trial. Zieske first argues that the Court erred by misapplying Seventh Circuit authority finding that survival of summary judgment is inconsistent with the

---

[1] Familiarity with the Order awarding sanctions, *Fletcher v. Doig,* 13 cv 3270, 2022 WL 18027447 (N.D. Ill. Dec. 30, 2022), is presumed.

A3

imposition of sanctions. The Court directly addressed Zieske's "primary arguments against sanctions" being that the case was "objectively reasonable through judgment because it survived summary judgment in April 2016" *Fletcher v. Doig*, 2022 WL 18027447 at *9. The Court, unable to play the role of factfinder, stated that it: "could not have awarded summary judgment to Defendants given the evidence adduced by Plaintiffs—especially Fletcher's assertion that he had seen video interviews of Doig and, based on Doig's mannerisms and gestures in the video, that Doig was the person who he had met in Thunder Bay in the 1970s and who had authored the painting." *Id.*

Zieske asserts the Court misread *LeBeau v. Libby-Owens-Ford Co.,* 799 F.2d 1152 (7th Cir. 1986), where the Court reversed a district court's ordering fees be paid to defendant under Title VII. Respectfully, the Court did not misunderstand *LeBeua* which held that "when a trial judge rules that there are facts under which a plaintiff can prevail, it is *highly inconsistent* for [it] to later find the suit frivolous because it is foreclosed as a matter of law" and also noted that it was not holding "as the dissent assumes, that *no suit* that survives a motion for summary judgment can ever be found frivolous." *LeBeau v. Libbey-Owens-Ford Co.,* 799 F.2d 1152, 1158 and n.7 (7th Cir. 1986) (emphasis added). The Court, aware that the *law allows*, albeit in a rare case, the denial of summary judgment and a finding that pursuing a case was frivolous, carefully reviewed the progression of this case and specifically noted the evidence Defendants presented (an affidavit from the *actual* non famous painter's sister in May of 2014) that made pursuing the case untenable. *Fletcher*, 2022 WL 18027447 at *8.[2] Despite this evidence, the Court was faced, on summary judgment, with a material fact that was the province of the fact finder. This does not amount to a manifest error of law.

Zieske next argues that the Court erred in failing to account for his ability to pay under 28U.S.C. § 1927. Zieske then acknowledges, as he must, that the governing case authority, *Shales v. General Chauffeurs,* 557 F.3d 746, 749-50 (7th Cir. 2009), provides that §1927 damages are akin to damages for an intentional tort and therefore governed by the injury to the tortfeasor not the wrongdoer's ability to pay. The Court committed no manifest error of law in this regard.

Finally, Zieske argues that the Court erroneously presumed the requested fees were reasonable and failed to deduct the erroneous billing by one attorney who billed 78.7 hours in one day. This is not accurate. The Court considered the hourly rates charged and the fact that the defense firm was based in New York, particularly in light of the fact that Defendants had moved to change venue because they lived in New York and Trinidad and Tobago. *Fletcher*, 2022 WL 18027447 at *11. The Court also found that the "case required expertise in art law and demanded resources and

---

[2] Later Zieske was presented with a list of witnesses who could testify to Doig's whereabouts during the relevant time period, underscoring the implausibility of the Plaintiffs' claims. *Id.*

A4

legwork to identify persons who could shed light on Doing's whereabouts and activities four decades ago." *Id*. The Court also considered that Plaintiffs sought nearly $8 million in damages and reviewed the billing statements for thoroughness despite the block billing. *Id*.

As for the 70 hours billed in one day, the Court specifically deducted $40,250 from the sanctions award to account for that billing error. *Id*. at *12. The Court also deducted 20% from the total request after finding that "the firm in some instances billed more than was reasonably necessary for certain tasks and engaged in some billing practices that preclude meaningful review of their reasonableness." *Id*. There is no basis to find that the Court committed a manifest error of law in its review of the billing records. To the contrary its review was careful and deliberate.

A Court never relishes imposing sanctions. The Court in this instance conducted a thorough review of the progression of the case and specifically when certain information became available to Plaintiffs and their counsel in determining that sanctions were unfortunately appropriate. Zieske's motion to amend judgment [418] is denied. Case remains closed.

E N T E R:

Dated: June 12, 2023

MARY M. ROWLAND
United States District Judge

A5

6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FLETCHER and BARTLOW GALLERY LTD., | ) ) ) | |
| Plaintiffs, | ) ) | 13 C 3270 |
| vs. | ) ) ) | Judge Gary Feinerman |
| PETER DOIG, GORDON VeneKLASEN, MATTHEW S. DONTZIN, and THE DONTZIN LAW FIRM LLP, | ) ) ) ) | |
| Defendants, | ) ) | |
| vs. | ) ) ) | |
| WILLIAM FREDERICK ZIESKE, | ) ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Robert Fletcher and Bartlow Gallery Ltd. brought this diversity suit against Peter Doig and some of his associates, alleging interference with prospective economic advantage and requesting damages and declaratory relief. Doc. 1. Plaintiffs alleged that Defendants falsely denied that Doig, an internationally renowned artist, had created a painting owned by Fletcher and thereby frustrated Plaintiffs' ability to sell the work. After the court dismissed the claims against Doig's associates, Docs. 74-75 (reported at 125 F. Supp. 3d 697 (N.D. Ill. 2014)), and denied Doig's summary judgment motion, Doc. 198, the case proceeded to a bench trial. The court rendered a verdict for Doig, finding that he had not authored the painting. Docs. 260-261. Before the court is Defendants' motion for sanctions under Civil Rule 11, 28 U.S.C. § 1927, and the court's inherent authority against Plaintiffs and their (now former) counsel, William Zieske. Doc. 273. With sincere apologies for the substantial delay in resolving this difficult and

1

A6

unfortunate coda to the litigation—placing at risk Zieske's professional reputation and involving large sums of money for both Zieske and Plaintiffs—Defendants' motion is granted in part and denied in part.

## Background

To support their sanctions motion, Defendants submitted an appendix comprising over 4,000 pages of materials. Much of this material is located elsewhere in the record or was admitted at trial; to the extent it is not, neither Plaintiffs nor Zieske object to its consideration for the purposes of this motion.

### A.    The Painting

From 1975 to 1978, Fletcher attended Lakehead University in Thunder Bay, Ontario. Doc. 273-5 at p. 86, ¶ 9. At the same time, Fletcher worked as a correctional officer at the Thunder Bay Correctional Center ("TBCC"). Doc. 273-8 at 139 (138:2-24). In 1976, a prisoner incarcerated at TBCC created the painting at issue in this case. Doc. 273-5 at p. 86, ¶¶ 4, 11. Over a period of months, Fletcher observed the painting progress from its initial stages to completion. *Id*. at p. 86, ¶ 11. After the painter's release from TBCC, Fletcher assisted him in gaining employment through the Seafarers Union. *Id*. at p. 86, ¶ 10. Fletcher later purchased the painting from its creator for $100. Doc. 273-8 at 292-295 (291:20-294:3).

Fast forward to 2011, when a friend visiting Fletcher's home noticed the painting and told him that it had been created by a renowned artist named Peter Doig, *id*. at 305 (304:7-23)— perhaps after noticing that the work was signed with a very similar name, "Pete Doige," Doc. 273-3 at p. 3, ¶ 8. Fletcher contacted Peter Bartlow, the owner of Bartlow Gallery Ltd. in Chicago, in hopes that the gallery could sell the painting on his behalf. Doc. 273-8 at 312-316

(311:10-315:17).  In September 2011, Fletcher and Bartlow Gallery entered into an agreement to split the proceeds of any sale.  Doc. 273-11 at 49-50.

Around the same time, Fletcher contacted Sotheby's for an auction estimate and received the following response:

> Thank you very much for sending in your auction estimate form and accompanying image of your wonderful early painting by Peter Doig.  It is rare to see such a complete and highly resolved early painting by Doig, with clear allusions to his mature style.  Your work has the trademark eeriness of the empty landscape, and a stratified composition which recalls his later work.
>
> It would be wonderful … to get more information f[ro]m you regarding the piece.  We would love to know its date of execution, if it is signed or dated or titled anywhere, and also the size of the work (height by width).  We would also be very interested to know the history behind the work—how you came to own it, and if you bought it from a gallery or from the artist directly, or through some other route?  Once we have this extra information we will be delighted to give you an auction estimate … .

Doc. 273-12 at 24-25.  The email added this disclaimer: "The above estimates are preliminary only and subject to change based on first-hand inspection and further research.  We have provided these estimates based on our assumption that the property can be offered freely and openly in the international market."  *Id*. at 25.

Given that Doig is a renowned artist, a work authenticated as his would sell for significantly more than one lacking such authentication.  Quite sensibly, Bartlow wanted to authenticate the work before selling it.  In September 2011, he attempted to contact Doig by email, stating: "We would like to contact [Doig] regarding the authentication of one of his early paintings done in Thunder Bay while in school.  It was sold to a classmate who still has it, Bob Fletcher."  Doc. 273-18 at 29-30.  One of Doig's associates responded: "Mr. Doig never lived/attended school in Thunder Bay, Ontario.  Additionally he does not believe he knows or did know a Mr. Bob Fletcher."  *Id*. at 29.

3

A8

9

In October 2011, Bartlow emailed Gordon VeneKlasen, an employee at the Michael Werner gallery, which represents Doig:

> Robert Fletcher alleges to have purchased this painting from the same Peter Doig who he can see in interviews on You Tube. …
>
> He was not merely a classmate of Mr. Doig's, and he says he helped the artist gain membership to the seafarer's union. …
>
> …
>
> I have searched, and I can't find anything that accounts for Peter Doig's life from 1976-1978.  Mr. Fletcher is only interested in receiving a fair price for the painting, and does not wish to bring up anything which Mr. Doig would wish to remain private. …
>
> …
>
> If we are wrong, we apologize, but we would need a little convincing before following every possible lead to find the truth. …
>
> …
>
> Please ask the artist to agree to admit he painted it and the circumstances shall remain forgotten.

Doc. 273-15 at 7.  VeneKlasen responded: "Whatever this person alleges is untrue" and "The painting is NOT by Peter Doig.  Anyone can see that." *Id*. at 6.  VeneKlasen continued: "We are not interested in any further communication related to this.  Good luck in finding the real artist for this." *Ibid*.  VeneKlasen concluded: "Any attempt to attribute this painting to Peter Doig in any way will be dealt with by our attorneys." *Ibid*.

The same day, Bartlow responded to VeneKlasen, writing:

> According to interviews, [Doig] dropped out of school for a time to 'work.' …
>
> …
>
> According to a biographer, he fabricated elaborate school records when applying to art school.
>
> …

4

A9

> We are curious as to why we cannot find any reference to anywhere Peter Doig was in 1976 other than tales of oil rigs and roustabouts.
>
> Then there is the curious lack of any reference to his life before 1979. No mention of siblings, no names of parents.
>
> Unfortunately, my client has not said anything that can be debunked by anyone other than the artist, and he has admitted to lying about his past.
>
> If we have the wrong man, we are sorry, but we are going to have to get more pro[o]f to just forget about this.
>
> You should have Peter talk to his attorneys and tell them if there is anything he needs to tell them. If we can get proof of his name and life during those years we will stop.

*Id*. at 5-6. VeneKlasen wrote back to again dismiss the possibility that Doig had painted the work, *id*. at 5, to which Bartlow responded with the suggestion that Doig had falsified records and was attempting to cover something up about his past, *id*. at 2-3. Bartlow also suggested that Doig's ability to enter the United States might be compromised if it was determined that he had falsified his records. *Id*. at 3. The same day, Bartlow emailed Fletcher, stating: "The dealer denied it again, so I may have to turn up the heat a notch." Doc. 273-16 at 36.

Bartlow's attempts to authenticate the painting continued through 2012, when he contacted Doig's father several times. *Id*. at 38-43. Bartlow's statements to Doig's father included: "[Doig] could have put an end to this a year ago [b]y providing some proof. We will not stop until he comes forward one way or the other"; "What I can't figure out is if you are protecting him, or if he is protecting you. We can still work this out like gentlemen."; and "You cannot hide forever, and I am not the least intimidated by attorneys or auction houses. … This is not anything close to extortion, by the way. … If [Doig] is lying, I guess that is not illegal unless this ends up in court. It could end up in court. … I do not want to go that route. … Why don't we work something out that will put an end to this? We are not unreasonable." *Id*. at 40-43.

**B.** **Procedural Background**

Plaintiffs filed this suit in April 2013, naming as defendants Doig, VeneKlasen, Matthew Dontzin (Doig's attorney), and Dontzin Law Firm LLP (Dontzin's law firm). Doc. 1. The complaint alleged (incorrectly as to Doig) as follows. Doig and Fletcher met in 1975 or 1976, while both were enrolled at Lakehead University. *Id*. at ¶ 21. Shortly after enrolling at Lakehead, Doig was convicted for LSD possession and incarcerated at TBCC, where Fletcher was a correctional officer. *Id*. at ¶¶ 22-23. During his time at TBCC, Doig participated in the prison's fine arts educational program. *Id*. at ¶ 23. Doig authored the painting at issue while at TBCC, and Fletcher viewed the painting at several stages of its creation. *Id*. at ¶ 24. After Doig was granted parole, Fletcher helped him find employment through the Seafarers Union in Thunder Bay. *Id*. at ¶¶ 25-27. Fletcher purchased the painting from Doig for $100. *Id*. at ¶ 28.

The complaint further alleged the following. Doig was in his late teens in 1976; he had publicly admitted to using LSD; several of his paintings' titles referenced LSD; Doig could not account for his whereabouts or activities between 1976 and 1979; and the painting "has uncanny commonalities in composition and execution with known works by Doig." *Id*. at ¶¶ 32(a), (c)-(e). The complaint also alleged: "Despite extensive research, no evidence has been found of any other person with a first name of Pete or Peter and a family name of Doig or Doige in Canada in the late 1970s." *Id*. at ¶ 32(f).

In June 2013, Dontzin and the Dontzin Law Firm served Plaintiffs and Zieske with Rule 11(c)(2) correspondence, demanding withdrawal of the complaint. Doc. 273-3 at 18. Attached to the motion were several pieces of evidence that Dontzin and his law firm claimed rendered frivolous the complaint's allegations, including: a communication from Lakehead University saying that no one by the name Peter Doig, with Doig's birthdate, had ever been

enrolled at Lakehead; a search conducted by the Royal Canadian Mounted Police that did not identify anyone by the name Peter Marryat Doig (his full name) with Doig's birthdate as having a criminal record; secondary school records of Doig's suggesting that he was not incarcerated in 1975 or 1976; various correspondence between Doig and his family indicating that Doig had not been incarcerated during that time; and internet searches for "Peter Doige" showing others with that name who lived or had lived in Canada. *Id*. at 61-110.

Plaintiffs did not withdraw their complaint. Defendants continued their own investigation, finding a woman named Marilyn Doige Bovard, the sister of one Peter Edward Doige. Doc. 273-4 at 3. In August 2013, Bovard signed a declaration averring that she was Doige's sister; that Doige attended Lakehead University in the 1970s; that he had been convicted of a crime in Sudbury, Ontario, and subsequently incarcerated at TBCC; and that he had died in 2012. *Id*. at p. 6, ¶¶ 2-4, 6. Bovard further averred that Doige had told her that he took painting and music classes while incarcerated at TBCC, *id*. at p. 6, ¶ 5, and she attested that Doige had created various artworks, including a painting of a desert scene (though not the one that Fletcher possessed), *id*. at p. 7, ¶ 9. Having been shown a copy of the painting that Fletcher possessed, Bovard asserted that the desert scene it depicted resembled an area in Arizona where her and Doige's mother had lived after divorcing their father. *Id*. at p. 8, ¶ 12. Bovard attached to her declaration a copy of Doige's Lakehead student ID card (bearing his name, photograph, and signature), his carpenter union membership card, his driver's license, and a statement of his death from a funeral home director. *Id*. at 10-13.

Plaintiffs did not withdraw their suit in response to Bovard's declaration. At a September 2013 status hearing, Plaintiffs, through Zieske, took issue with the fact that Bovard had not submitted an "official death certificate" (instead just a mortician's statement of death) and

suggested that that supposed evidentiary shortfall was just the "tip of the iceberg" as to other discrepancies raised by her declaration. Doc. 273-6 at 4-5 (3:24-4:14). The court asked Zieske whether—given the Rule 11 correspondence—"it would be in your interests to put the brakes on this case" to determine whether the painting had been authored by Doige rather than Doig. *Id*. at 6. Zieske responded that "there are other people related to [Doige] who say that it's impossible for him to have been in Thunder Bay" at the time the painting was created, though he claimed that he did not want to disclose the entirety of his investigation. *Id*. at 6-7 (5:24-6:1). Before the hearing ended, the court cautioned Zieske to "bear in mind, if the … defendants turn out to be right, just because you had an objectively reasonable basis, assuming you did, at the beginning of the case, you can lose an objectively reasonable basis in the middle of the litigation. And it's at least conceivable that this is that time." *Id*. at 10 (9:16-21).

On February 17, 2014, Zieske submitted an affidavit claiming that he had spoken with Doige's mother and that she had told him that Doige had perhaps been incarcerated in Florida, but not Canada, and that Doige had not spent time in Ontario or Thunder Bay. Doc. 48-3 at ¶ 13. (Defendants' counsel would tell the court that Bovard told them that her mother was ill and had been confused by Zieske's call. Doc. 273-6 at 30-31 (17:25-18:5).) Still, Plaintiffs never submitted evidence from Doige's mother—in the form of a deposition or affidavit or otherwise—supporting Zieske's claims about what she supposedly had told him. Indeed, at a May 7, 2014, hearing—where the court discussed the logistics of obtaining Doige's records from Canadian governmental agencies with the assistance of Doige's family—Zieske explained that Doige's mother would not cooperate as a witness, while Doige's sister was a witness for Defendants. *Id*. at 26-27 (13:11-14:20).

In May 2015, Zieske obtained from the Seafarers Union a record of membership for Doige. Doc. 273-11 at 45-47. Zieske also asked Lakehead University for "any records that may be in your possession relating to either Peter Doige or Peter Doig, including but not limited to: any applications, enrollment records, tuition payment and financial aid applications and records, and course and grade reports in the 1970s." *Id*. at 40. Lakehead responded in June 2015, stating that it had records and a transcript for Peter Edward Doige—whose Canadian Social Insurance Number on those records matched that of the member of the Seafarers Union whose records Zieske had obtained—indicating that Doige had attended Lakehead from 1976 to 1978. *Ibid*. Lakehead also stated that it had no records indicating that a Peter Marryat Doig had ever attended. *Id*. at 41.

In October 2015, Doig disclosed under Civil Rule 26(a)(1) the names of over twenty individuals whom he claimed had knowledge of his whereabouts during the relevant timeframe, including eleven for whom contact information was provided. Doc. 273-5 at 9-13. At trial, Bartlow admitted that he never attempted to contact those individuals. Doc. 273-8 at 736-737 (735:2-737:18). Doing so would have served no purpose, according to Bartlow, because, in his view, those individuals would have refused to say anything to hurt Doig. *Id*. at 736-737 (735:11-736:18).

In November 2015, Doig deposed Bartlow and Fletcher. At both depositions, Bartlow and Fletcher were questioned about Bovard's declaration and asked whether they had a factual basis to dispute her assertion that Doige had attended Lakehead and served time at TBCC. Doc. 273-6 at 324 (69:13-16), 528-533 (100:10-105:8). Bartlow was unable to muster any basis to dispute Bovard's statements. *Id*. at 324 (69:13-16). Nor was Fletcher for the most part, except that he questioned whether Doig could have attended Lakehead based on documents he

had obtained from a Thunder Bay courthouse, which he interpreted to arguably suggest that Doige would have spent too much time in prison to attend Lakehead. *Id*. at 533-36 (105:13-108:16). He conceded, however, that his interpretation rested on uncertain assumptions about the documents. *Id*. at 536 (108:6-15).

In December 2015, Doig obtained declarations from Ernest Adams and Matthew Esquega. Doc. 273-5 at 200-203. Esquega averred that he had been an inmate at TBCC in the late 1970s, that he had reviewed the image of Doige from his Lakehead University ID card, and that he recognized him as a TBCC inmate whose name was Peter Doige and who was a good painter. *Id*. at 200. Adams averred that he was the art teacher at TBCC from 1975-1977, that he had reviewed the same photo of Doige, that the individual pictured was a former student in the TBCC art class during the late 1970s, and that his name was Peter Doige. *Id*. at 203. Adams also said that he had reviewed an image of the painting, and that he recalled Doige creating it at TBCC. *Ibid*.

In July 2016, Zieske deposed LeeAnn Sharpe, Doige's ex-wife. Doc. 273-7 at 445-446 (24:17-25:8). Sharpe testified that Doige had gone to school "for art," at "Lakehead, I think it was called?" *Id*. at 478 (57:17-22). She further testified that Doige had told her that he had been in trouble with the law, in Sudbury, Ontario, and that he had gone to jail in Thunder Bay. *Id*. at 589 (168:3-13). She also testified that Doige told her that he would "draw, paint, play music" while incarcerated. *Id*. at 604 (183:10-17).

In December 2015, Doig moved for summary judgment. Doc. 160. (By this point, the court had dismissed the claims against the other Defendants.) Plaintiffs' evidence in response to Doig's motion consisted primarily of an expert report from Bartlow purporting to authenticate the painting as Doig's; a report by Victor Wiener, an art appraiser, assessing the value of the

work under the assumption that it had been painted by Doig; Fletcher's recollections that he had met Doig at Lakehead and later purchased the painting from him; and Fletcher's assertion that, based on the mannerisms, facial features, and hand gestures he observed in YouTube videos of Doig taken after he had become a famous artist, the man depicted in the videos was the man Fletcher had known in Thunder Bay in the 1970s and who had created the painting. Doc. 160-4 at 54-55 (126:1-131:2); Doc. 185 at 4-10; Doc. 185-1 at p. 8, ¶ 16.

The court denied the summary judgment motion. The court explained that it could not find, on the summary judgment record, that Doig absolutely was in Toronto (and therefore not in Thunder Bay) from the summer of 1976 to the fall of 1977. Doc. 273-6 at 148 (61:15-17). The reason was that his school records showed a gap from 1976 to 1977, and the court could not, through the lens required at summary judgment, accept as true the assertions of Doig's family members over Fletcher's personal recollections. *Id*. at 148-53 (61:15-66:7). The court added that Plaintiffs had offered expert testimony supporting Doig's authorship of work, including Wiener's expert opinion, which—though it was offered to prove the value of the painting—could also be taken as authentication evidence given that it noted similarities between the painting at issue and Doig's known works. *Id*. at 155 (68:2-9). And, significantly, the court noted "Fletcher's averments regarding the author's facial features, hand gestures, and mannerisms being the same as what he saw of Doig; and whether it was a video from the '80s or from the aughts doesn't matter. People maintain the same mannerisms—or they often maintain the same mannerisms throughout their life, so that doesn't matter." *Id*. at 153 (66:1-7).

The court held a bench trial in August 2016 and returned a verdict for Doig. Doc. 260. In reaching the verdict, the court made various findings of fact, including that Doig did not paint the painting and—though it was not necessary to reach the verdict—that Doige did paint it.

11

A16

Doc. 273-8 at 1991 (1990:21-25).  After the verdict, Defendants moved for sanctions against Plaintiffs and Zieske, noting the Rule 11 correspondence served on Plaintiffs and Zieske at the outset of the litigation.  Doc. 273 at 2.  Shortly thereafter, Zieske withdrew as counsel for Plaintiffs.  Doc. 279.  Fletcher proceeds *pro se*, while Bartlow Gallery (an entity that cannot proceed *pro se*) has not obtained representation.

<strong>Discussion</strong>

As noted, Doig moves for sanctions against Plaintiffs and Zieske under Rule 11, 28 U.S.C. § 1927, and the court's inherent authority.

**I.     Whether Sanctions Are Warranted**

"Rule 11(b) prohibits the filing of frivolous claims, and when a frivolous claim is made, Rule 11(c)(1) gives the court discretion to 'impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.'"  *United States v. Rogers Cartage Co.*, 794 F.3d 854, 863 (7th Cir. 2015) (quoting Fed. R. Civ. P. 11(c)(1)).  Rule 11 asks "whether the party or attorney made a reasonable inquiry into the facts, and whether the party or attorney made a reasonable inquiry into the law." *Ins. Benefit Adm'rs, Inc. v. Martin*, 871 F.2d 1354, 1358 (7th Cir. 1989).  Significant here, while a primary objective of Rule 11 is to ensure parties and attorneys make a reasonable inquiry into the facts before commencing litigation, it also "emphasizes the duty of continuing candor by subjecting litigants to potential sanctions for insisting upon a position after it becomes untenable." *Noe v. Interstate Brands Corp.*, 188 F.R.D. 513, 515 (S.D. Ind. 1999); *see also Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (affirming Rule 11 sanctions where a lawyer "continued to advocate a claim that had no legal basis and refused to alter or withdraw it when that deficiency was pointed out"); *Egan v. Maguire*, 338 F. Supp. 3d 799, 804 (N.D. Ill. 2018) ("[W]hen a lawyer learns during

12<br>A17

discovery that his client's case against one defendant has fallen apart, the only proper course is to dismiss that defendant."). This continuing duty is explicit on the face of the rule, which provides that a party or lawyer may face sanctions for "later advocating" a position that falls short of Rule 11's standards. Fed. R. Civ. P. 11(b).

Section 1927 provides that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To show that a lawyer is liable under § 1927, "[s]ubjective bad faith" need be shown only where "the conduct under consideration had an objectively colorable basis." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006). "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005); *see also Dal Pozzo*, 463 F.3d at 614 ("The standard for objective bad faith does not require a finding of malice or ill will; reckless indifference to the law will qualify."); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) ("[A] lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law."). And as with Rule 11, while an attorney may commence a case with an objectively reasonable basis, "dogged pursuit of a colorable claim becomes actionable bad faith [under § 1927] once the attorney learns (or should have learned) that the claim is bound to fail." *TCI Ltd.*, 769 F.2d at 445.

In addition to Rule 11 and § 1927, a district court has inherent authority "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)

(describing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices") (internal quotation marks omitted). "Sanctions imposed pursuant to the district court's inherent power are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661-62 (7th Cir. 2012); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). This power is "permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal quotation marks omitted).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009) ("A district court should be cautious when exercising … inherent authority."). The inherent power should be used "sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation … , and (2) not adequately dealt with by other rules." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."). "But if in the informed discretion of the court, neither [a] statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50. That authority is properly exercised under circumstances where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," because "requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent

14

A19

power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id*. at 51.  For this reason, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."  *Id*. at 49; *see also Mach*, 580 F.3d at 502.

Defendants contend that Plaintiffs and Zieske initiated this lawsuit without an objectively reasonable basis and made reckless or misleading allegations in the complaint.  Doc. 273-1 at 46, 51-52.  The complaint alleged that Doig had painted the disputed work despite it being signed "Doige"; it alleged that Plaintiffs could not find other persons named "Peter Doige" in Canada even though simple internet searches revealed otherwise; and it claimed that Doig had been incarcerated for LSD possession and wished to deny authorship of the painting to hide his past. And Defendants are correct that making reckless claims in a complaint may warrant sanctions. *See Egan v. Pineda*, 808 F.3d 1180, 1180 (7th Cir. 2015) ("Bad faith can be recklessly making a frivolous claim.") (internal quotation marks omitted).

While the court agrees that Plaintiffs and Zieske could have investigated further before filing suit, it cannot say with the requisite level of confidence that they initiated the suit without an objectively reasonable basis.  Fletcher possessed a painting authored by a "Pete Doige"—a name similar to "Peter Doig," a renowned artist who in his teens spent some time living in Canada—and the painting arguably possesses some artistic similarities to Doig's known works. Fletcher attempted to authenticate the painting by mining his memories, while Bartlow attempted to do so by contacting Doig and his family.  Although Plaintiffs' pre-suit authentication efforts did not succeed, the court cannot say that Plaintiffs and Zieske did not make a reasonable inquiry into the facts prior to commencing this litigation.

Shortly after filing suit, however, Plaintiffs and Zieske should have begun to have substantial doubt about their claims. In June 2013, Defendants served Plaintiffs with Rule 11 correspondence providing evidence from Lakehead University strongly suggesting that Doig never attended and evidence from the Royal Canadian Mounted Police indicating that Doig had no criminal record in Canada. In August 2013, Defendants provided an affidavit from Doige's sister, Bovard, casting greater doubt on Plaintiffs' claims and strongly suggesting that Doige created the work. Bovard explained that Doige had attended Lakehead in the 1970s and provided a copy of his student ID card—bearing his name, photograph, and signature—as well as other identification cards bearing his name and photograph.

Given this evidence, and as noted, the court asked Plaintiffs (via Zieske) at a September 2013 status hearing whether they wanted to put the brakes on the litigation, reminding them that a suit can become objectively unreasonable after filing even if it had been commenced with an objectively reasonable basis. Zieske's response was that there were "other people related to [Doige] who say that it's impossible for him to have been in Thunder Bay." Doc. 273-6 at 7. In no uncertain terms, Zieske conveyed (incorrectly, it turned out) that Plaintiffs possessed evidence undermining Bovard's account.

By May 7, 2014, at the latest, it should have become indisputably clear to Plaintiffs and Zieske that their claims stood no chance of success and, in fact, that the claims were factually meritless. On that day, Zieske explained to the court that Doige's mother would not cooperate and that Bovard was a witness for Defendants (as her August 2013 affidavit made clear). By that point, Plaintiffs and Zieske should have realized that there were no "other people related to [Doige]" that would undermine Bovard's account or otherwise overcome Defendants' evidence that Doig never attended Lakehead or spent any time in Canadian prison; they also should have

16

A21

recognized that Doige, in fact, was the person whom Fletcher had met in Thunder Bay and who had created the painting. To continue the litigation past that point was objectively unreasonable, as the complaint's central allegations had completely unraveled under the weight of contrary evidence. Sanctions are accordingly warranted for Plaintiffs' and Zieske's continuing this litigation from May 7, 2014 through the entry of judgment. *See Egan*, 338 F. Supp. 3d at 803-04 (sanctioning a lawyer who continued to litigate even after discovery made clear that his client's claims had no factual merit); *In re Meier*, 223 F.R.D. 514, 519 (W.D. Wis. 2004) (sanctioning a lawyer who "persist[ed] in [her client's] claims" even after opposing counsel pointed out an irresolvable flaw in them).

While Plaintiffs and Zieske should have known that their claims were meritless and stood no chance of success by May 7, 2014, later developments only served to underscore the total implausibility of their claims and to evince their unwillingness to even entertain contrary evidence. Most troublingly, Doig provided Plaintiffs with a list of individuals who could testify to his whereabouts during the relevant time period, yet Plaintiffs did not seek evidence from any of them. *See City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 182 (N.D. Ill. 2014) (issuing sanctions where "[t]he information turned out to be blatantly false, and if counsel had made any attempt to verify the information, they would have easily discovered this"); *cf. Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987) ("The ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless.").

Zieske's primary argument against sanctions is that this suit remained objectively reasonable through judgment because it survived summary judgment in April 2016 and proceeded to trial. Doc. 283 at 13-14, 21-22. That Plaintiffs' claims survived summary

judgment means that the court concluded that a plaintiff's verdict was reasonably possible when viewing the summary judgment record in the light most favorable to Plaintiffs. The basis for the court's denial of summary judgment, far from being a mystery, was exceptionally clear. The court could not have awarded summary judgment to Defendants given the evidence adduced by Plaintiffs—especially Fletcher's assertion that he had seen video interviews of Doig and, based on Doig's mannerisms and gestures in the video, that Doig was the person who had he met in Thunder Bay in the 1970s and who had authored the painting.

The fact that a claim survives summary judgment, however, is not a shield against sanctions for pressing the claim. *See LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1158 n.7 (7th Cir. 1986) (rejecting the position "that no suit that survives a motion for summary judgment can ever be found frivolous"); *Media Duplication Servs., Ltd. v. HDG Software, Inc.*, 928 F.2d 1228, 1240 n.10 (1st Cir. 1991) ("[S]uccessful opposition to a summary judgment motion does not always conclusively establish the reasonableness of the claim in question."); *Lemaster v. United States*, 891 F.2d 115, 121 (6th Cir. 1989) ("[M]ere survival of a summary judgment motion, in which all facts are construed in the non-movant's favor, does not insulate the party from sanctions if it is later determined that all factual claims were groundless."); *Calloway v. Marvel Ent. Group*, 854 F.2d 1452, 1472-73 (2d Cir. 1988) (holding that the denial of the defendants' summary judgment motions did not shield the plaintiff's attorney from Rule 11 sanctions), *rev'd in part on other grounds*, 493 U.S. 120 (1989). That is the case here.

At summary judgment, the court did not and could not view the evidence through the lens of a factfinder at trial. Nor did or could the court negatively assess either Fletcher's credibility in asserting that the person (Doig) he saw in the videos was the same person who created the painting or that of Plaintiffs' other witnesses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 595 (7th Cir. 2002) (holding that a judge may find a witness lacks credibility at a bench trial but not at summary judgment). Rather, the court was required to accept Plaintiffs' evidence on its face, which resulted in genuine and material factual disputes with the evidence adduced by Defendants.

All that said, Plaintiffs should have known by May 2014 that their primary evidence—Fletcher's recollections, at that point—was irreparably shaky and, in fact, wrong. Given the evidence that Defendants had marshaled by that date—much of it from neutral sources in Canada, showing that it was Doige, not Doig, whom Fletcher knew in Thunder Bay and who created the painting—Fletcher could not reasonably have believed that his identification of Doig as the painter was accurate, Bartlow could not reasonably have believed that his analysis of the painting (later entered as expert testimony) as Doig's was sound, and Zieske could not reasonably have believed either of those things. *See Lemaster*, 891 F.2d at 121 ("If a party loses because its witnesses were deemed incredible, and it is apparent to a party considering the case that the witness testimony is unbelievable, the offering party cannot reasonably think the credibility issues will be resolved in its favor.").

Zieske suggests that sanctions may be imposed for claims surviving summary judgment only where a plaintiff's only evidence was a "self-serving and unsupported affidavit with no independent evidence." Doc. 283 at 14. The court can discern no rule in governing precedent that sanctions are warranted for cases surviving summary judgment only in such circumstances. And even if that were the rule, this case would fit the bill. Plaintiffs' primary evidence came

19

A24

25

from Bartlow and Fletcher, whose testimony was necessarily self-serving given their stake in the case.  The remainder of Plaintiffs' case consisted largely of attempts to poke holes in Doig's story as to his whereabouts in the 1970s.  Even if Plaintiffs succeeded in poking some such holes—which is entirely expected for events occurring some forty years earlier—those holes could not reasonably imply that Doig, not Doige, was the painting's author.  To be clear, the court does not suggest that there is anything inherently wrong with Bartlow and Fletcher offering "self-serving" testimony.  *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.").  The point is that no reasonably objective person—viewing the case as a trier of fact—could have expected as of May 2014 that Plaintiffs' story would prevail over Doig's.  A further and perhaps more important point is that the evidence adduced by Defendants by that point would have led any reasonable person in Fletcher's and Bartlow's shoes to reconsider what at the case's inception might have been a sincere belief that Doig authored the painting and to recognize that the author surely was Doige, not Doig.

Defendants ask the court to sanction Plaintiffs and Zieske for conduct other than failing to withdraw their claims, including Plaintiffs' pre-litigation attempts to (in Defendants' view) extort Doig and his family, Plaintiffs' and Zieske's alleged failure to adequately investigate prior to filing suit, Plaintiffs' alleged alterations to their claims after receiving evidence from Defendants, and Zieske's alleged discovery abuses.  Doc. 273-1 at 42-59.  The cited conduct present non-frivolous bases for sanctions, but it is not the conduct for which the court imposes sanctions.  Rather, the court imposes sanctions specifically for Plaintiffs' and Zieske's decision to continue this litigation past May 7, 2014, by which time it should have been absolutely clear

20

A25

to them that their claims were factually meritless and stood no chance of success. Still, the other conduct cited by Defendants underscores the conduct for which Plaintiffs and Zieske are sanctioned, and it is consistent with the court's determination that they either ignored or turned a blind eye to the fact that their claims were meritless.

In sum, Plaintiffs and Zieske either knew or should have known by May 7, 2014, that they had no objectively reasonable basis for their claims and that it was unreasonable for them to continue with the suit. Sanctions are proper under Rule 11 (as to Plaintiffs) and Rule 11 and § 1927 (as to Plaintiffs and Zieske). The court does not impose sanctions under its inherent authority because Rule 11 and § 1927 are adequate to impose sanctions for the entire period that Plaintiffs and Zieske continued litigating even after it had become objectively unreasonable to do so. *See Rogers Cartage*, 794 F.3d at 863 (holding that the district court abused its discretion where it imposed sanctions under its inherent authority where Rule 11 was adequate).

The "safe harbor" provision of Rule 11(c)(2) does not preclude Rule 11 sanctions, as Dontzin and the Dontzin Law Firm served a Rule 11 motion in September 2013 before moving for sanctions. *See Ardisam, Inc. v. Ameristep, Inc.*, 343 F. Supp. 2d 726, 731 (W.D. Wis. 2004) ("Although a party may file a Rule 11 motion after a court enters judgment, the party must have served the alleged violator at least 21 days before the entry of judgment."). In any event, neither Plaintiffs nor Zieske contend that Defendants failed to satisfy Rule 11(c)(2)'s service or any other safe harbor requirement, thereby forfeiting any such contention. *See Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 927 (7th Cir. 2004) (suggesting that arguments based on Rule 11's safe harbor provision can be forfeited); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 396 (4th Cir. 2004) (en banc) (holding that Rule 11's safe harbor provision is not jurisdictional and therefore may be forfeited); *In re Kitchin*, 327 B.R. 337, 362 (Bankr.

N.D. Ill. 2005) (holding that a party waived an analogous provision of the Bankruptcy Rules). Nor do Plaintiffs or Zieske dispute that the September 2013 service by Dontzin and the Dontzin Law Firm satisfies the requirement as to all Defendants, who join the present motion, thereby forfeiting that point as well.

## II.    Sanctions Amount

For a Rule 11 violation, the court may "order … payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1031 (7th Cir. 1999) (explaining that, "[i]n using attorneys' fees to determine the amount of sanctions, that amount must be limited to fees incurred as a direct result of" the Rule 11 violation). Likewise, § 1927 authorizes the court to aware costs and fees incurred "because of" a lawyer's sanctionable conduct. 28 U.S.C. § 1927; *see Shales v. Gen. Chauffeurs*, 557 F.3d 746, 749 (7th Cir. 2009) (analogizing § 1927 to an intentional tort for which damages are compensatory in nature).

The court ordered Defendants to submit evidentiary support for the attorney fees and non-taxable costs and expenses incurred from May 7, 2014 through the entry of judgment, and it ordered Plaintiffs and Zieske to respond with challenges to the reasonableness of Defendants' requested fees and costs. Docs. 261, 391. Defendants submitted a memorandum itemizing their fees and costs, Doc. 394, and Zieske responded, Doc. 406. Fletcher also filed a response *pro se*, though it is unresponsive to the reasonableness of the claimed fees and costs, Docs. 402-403, while Bartlow Gallery, without representation, did not respond.

Zieske contends that he cannot meaningfully respond to Defendants' itemized fees and costs because he did not know which conduct would provide the basis for sanctions. Doc. 406 at 3-6. The argument rests on the legal premise just explained, that a sanction ordering a party or

lawyer to pay his adversary's fees and costs may be imposed only for fees and costs incurred because of the sanctionable conduct. But Zieske is wrong that he could not meaningfully respond to Defendants' itemized fees and costs. The court told Zieske that he "should assume that the court will find that sanctions are warranted for the post-5/7/2014 time frame." Doc. 398. That meant that Zieske should explain whether the fees and costs incurred by Defendants after May 7, 2014 were reasonable—plainly indicating that the court would find that reasonable fees and costs incurred after that date directly resulted from his sanctionable conduct (continuing the litigation).

Defendants request attorney fees in the amount of $2,799,221.25 ($2,731,311.75 from Dontzin Nagy & Fleissig LLP, and $67,909.50 from Agrawal Evans LLP) and non-taxable costs and expenses in the amount of $610,398.90. Doc. 394 at 2. Zieske raises several disputes as to the reasonableness of those claimed fees and costs. First, he argues that the billing rates charged by Dontzin Nagy & Fleissig LLP, a New York firm, are unreasonable. Doc. 406 at 10. The firm's hourly rates ranged from $475 to $1,050 for attorneys and $200 to $225 for legal assistants. *Ibid.*; Doc. 394 at 2-4. Zieske contends that those rates are unreasonable based on one recent decision's finding that the average hourly late for a lawyer engaged in civil litigation in Chicago is $297. *See Sonrai Sys., LLC v. Romano*, 2022 WL 4551893, at *8 (N.D. Ill. Sept. 29, 2022).

The court disagrees that the hourly rates charged by Dontzin Nagy & Fleissig LLP were unreasonable. It would be inappropriate to find that the average rate should obtain in a case that is far from average. This case required expertise in art law and demanded resources and legwork to identify persons who could shed light on Doig's whereabouts and activities four decades ago. The complaint sought a damages award of an undetermined amount "to exceed $1 million,"

Doc. 1 at ¶ 62, and Plaintiffs ultimately requested $7,900,000 in damages, Doc. 273-8 at 1943 (1942:15-20).  The nature of the case was therefore not ordinary, and above-average rates are wholly justified.  *See Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1183 (7th Cir. 2020) (affirming fees awarded at a rate of $1,000 per hour in an intellectual property royalties dispute); *Prather v. Sun Life & Health Ins. Co. (U.S.)*, 852 F.3d 697, 700 (7th Cir. 2017) (affirming fees at a rate of $620 per hour in an insurance case); *Mullen v. GLV, Inc.*, 2022 WL 4534789, at *7 (N.D. Ill. Sept. 28, 2022) (awarding fees at a rate of $800 per hour in a fraud case); *see also Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982) (awarding fees for attorneys based in New York and Washington, D.C., for a case litigated in South Bend because "[t]he complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally").  Nor should Defendants have been expected to use only local counsel when they did not choose this forum—and indeed where they attempted to get the case dismissed based for lack of personal jurisdiction and *forum non conveniens*.  Docs. 22, 26, 34.  Three of the four Defendants reside in New York, while Doig resides in Trinidad and Tobago.  Doc. 1 at ¶¶ 4-7.

Zieske also argues that Dontzin Nagy & Fleissig LLP's fee invoices are plagued with block billing and vague descriptions of the tasks performed, making it impossible to determine the reasonableness of the charges.  Doc. 406 at 11.  There is nothing about block billing that necessarily precludes the recovery of attorney fees.  *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006) ("Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more.").  In any event, block billing and

vague entries are not as pervasive as Zieske suggests; while he identifies some entries that could have been more precise, Doc. 406 at 11-12; Doc. 406-2, the vast majority of the time entries are detailed and particularized to the work performed, Doc. 394-2 at 38-270.

A problem that Zieske does identify is the entry of 70 hours by one Dontzin Nagy & Fleissig LLP lawyer on a single day, April 1, 2016. *Id*. at 151; Doc. 406 at 9. The $40,250 charged for those 70 hours (at $575 per hour) should be deducted. Defendants contend that this amount was already deducted from their bill pursuant to a $500,000 credit that the law firm provided to Defendants on the September 27, 2016 invoice. Doc. 408 at 4 n.4. But the court cannot confirm that that credit was intended to compensate for the 70-hour entry error.

And while the court finds that Dontzin Nagy & Fleissig LLP's hourly rates and billing practices were not unreasonable as a general matter, the firm in some instances billed more than was reasonably necessary for certain tasks and engaged in some billing practices that preclude meaningful review of their reasonableness. Given the court's overall sense of the litigation and careful review of the bills, the remaining Dontzin Nagy & Fleissig LLP fees are reduced by an additional 20% to account for the unnecessary work and opaque bills. *See Vega v. Chi. Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021) ("[T]he [Supreme] Court has noted that district courts may consider their overall sense of the suit and may use estimates in calculating and allocating an attorney's time.") (internal quotation marks omitted); *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("The district court acted within its discretion when it chose to cut the number of hours by a lump sum in response to appellees' claim that the time was inflated. We endorse the court's approach as a practical means of trimming fat from a fee application; it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application."). The court therefore finds that the reasonable fees charged by Dontzin Nagy & Fleissig LLP are

$2,152,849.40.  (The $2,731,311.75 charged, less the $40,250 billing error, less 20% of the remaining $2,691,061.75).

Neither Zieske nor Plaintiffs contend that Agrawal Evans LLP's fees were unreasonable. The court has reviewed the invoices submitted by that firm, and it finds that the $67,909.50 that it charged Defendants was reasonable.

Finally, there is Defendants' claim for $610,398.90 in non-taxable costs.  Zieske observes that Defendants' evidentiary support for those costs does not include detailed descriptions of the expenditures.  Rather, Defendants provide a report providing the category ("Meals," for example), date, and cost of an expenditure.  Doc. 394-2 at 272-297.  Without providing specifics as to the purpose of each expense, it is impossible to confirm whether a particular expenditure was reasonable.  At the same time, it is beyond dispute that many of the costs must have been reasonable, even if the court cannot say which ones.  For example, Defendants had to spend considerable resources attempting to find persons throughout Canada who might confirm Doig's whereabouts in the 1970s.

In recognition of the fact that much of the costs identified by Defendants must have been reasonable, as well as the fact that it is Defendants' burden to substantiate the costs, it is appropriate to award Defendants' 50% of their claimed non-taxable costs and expenses, which amounts to $305,199.45.  *See United States ex rel. Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 173 (2d Cir. 1996) (affirming an award of $5,000 for photocopying costs where the movant had requested nearly $20,000 but failed to itemize the costs or explain why they were necessary); *see also Francois v. Mazer*, 523 F. App'x 28, 29 (2d Cir. 2013) ("[W]hen items are insufficiently itemized or not supported by an

26

A31

explanation as to why such expenditures were necessary, the court may reduce the total amount awarded based on the court's estimate of those expenditures.").

Zieske cites *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, 2014 WL 1097471 (N.D. Ill. Mar. 20, 2014), to argue that the relative lack of supporting evidence requires the court to deny recovery of non-taxable costs entirely. In *Jaffe*, the court denied costs for exemplification and copying under 28 U.S.C. § 1920 because the movant's documentation did not allow the court to determine whether the expenditures had been incurred necessarily or merely for the movant's own convenience. *Id*. at *3-4; *see also Collins v. Gorman*, 96 F.3d 1057, 1058 (7th Cir. 1996) (reversing the district court order granting a bill of costs in total where the supporting documentation did not allow the district court to determine which costs were permitted under § 1920). That differs from this case, where it is clear that much of Defendants' expenditures were necessary. *Cf. Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) ("The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment.").

Adding the $2,152,849.40 for the Dontzin Nagy & Fleissig LLP fees, $67,909.50 for the Agrawal Evans LLP's fees, and $305,199.45 in non-taxable costs and expenses, the court imposes on Plaintiffs and Zieske a sanction of $2,525,958.35 to be paid to Defendants. Because sanctions are warranted against Plaintiffs (under Rule 11) and Zieske (under Rule 11 and § 1927), Plaintiffs and Zieske are jointly and severally liable for that amount. *See Matlin*, 979 F.3d at 1180 (affirming sanctions imposed jointly and severally on parties and their counsel under Rule 11).

One issue remains.  Zieske contends that various equitable considerations—that he is a solo practitioner and has a family to support—require the court to lessen the sanction imposed.  Doc. 406 at 15-16.  Zieske is correct that the court may take into account equitable considerations, such as a lawyer's ability to pay, when issuing sanctions under Rule 11.  *See Brown v. Fed'n of State Med. Bds. of the U.S.*, 830 F.2d 1429, 1439 (7th Cir. 1987) ("[I]n appropriate cases, a district court should reflect upon equitable considerations in determining the amount of the sanction.").  The problem with Zieske's argument, however, is that he is also sanctioned under § 1927, which leaves the court with no such equitable discretion.  *See Shales*, 557 F.3d at 749 ("[A] lawyer's ability to pay does not affect the appropriate award for a violation of § 1927.").  And neither Fletcher nor Bartlow Gallery contend that sanctions should be reduced to account for their ability to pay.

### Conclusion

Defendants' motion for sanctions is granted in part and denied in part.  Plaintiffs and Plaintiffs' counsel, Zieske, shall pay Defendants $2,525,958.35 in sanctions.  Plaintiffs and Zieske are jointly and severally liable for the sanctions.  Zieske's motion to strike Defendants' reply to his response to Defendants' itemization of their costs, Doc. 410, is denied as moot because the reply did not affect the court's ultimate conclusion as to the appropriate amount of sanctions.

December 30, 2022

_____
United States District Judge

28

A33

34

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2 of 2044 PageID #:9937
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT FLETCHER and BARTLOW )
GALLERY, LTD., )
                                         )
            Plaintiffs, )
                                         )
-vs- ) Case No. 13 C 3270
                                         )
PETER DOIG, ) Chicago, Illinois
                                         ) August 8, 2016
            Defendant. ) 10:00 a.m.

VOLUME 1-A
TRANSCRIPT OF PROCEEDINGS - Bench Trial
BEFORE THE HONORABLE GARY FEINERMAN

APPEARANCES:

For the Plaintiffs:     ZIESKE LAW
                        BY:  MR. WILLIAM F. ZIESKE
                        300 Front Street
                        Suite 202D
                        Harvard, Illinois  60033
                        (312) 252-9599


For the Defendant:     DONTZIN NAGY & FLEISSIG, LLP
                        BY:  MR. MATTHEW S. DONTZIN
                             MR. TIBOR L. NAGY
                             MR. ANTHONY S. KAMMER
                             MR. PATRICK R. McGEE
                        980 Madison Avenue
                        2nd Floor
                        New York, New York  10075
                        (212) 717-2900


Court Reporter:

                CHARLES R. ZANDI, CSR, RPR, FCRR
                     Official Court Reporter
                   United States District Court
             219 South Dearborn Street, Room 2128
                    Chicago, Illinois  60604
                    Telephone:  (312) 435-5387
             email:  Charles_zandi@ilnd.uscourts.gov

A34

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1987 of 2044 PageID #:11922
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

1986

(Proceedings heard in open court:)

THE CLERK:  13 C 3270, Fletcher versus Doig.

THE COURT:  Good afternoon, everybody.  Let me ask the plaintiffs' side to make their appearances.

MR. ZIESKE:  Good afternoon, your Honor.  William Zieske on behalf of the plaintiffs; and with me are Peter Bartlow, principal of plaintiff Bartlow Gallery, Ltd, and Robert Fletcher.

THE COURT:  And who do we have for the defendants in the courtroom?

MR. DONTZIN:  Good afternoon, your Honor.  I think we're all on the phone other than Mr. Agrawal, who's in the courtroom.  It's Matthew Dontzin.  Good afternoon.  Tibor Nagy is on the phone.  I believe Mr. Kammer and Mr. McGee from my office are on the phone, and Mr. Doig as well.

THE COURT:  All right.  Good afternoon.  So, our -- the trial concluded last Tuesday, concluded except for the verdict; and as allowed by the rules, I'm going to deliver my verdict in an oral ruling consisting of findings of fact and conclusions of law.

Before I get to -- before I get to the merits of the case, I just wanted to briefly touch upon a couple of preliminary issues.  The first has to do with personal jurisdiction.

And the reason I'm addressing personal jurisdiction

A35

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1988 of 2044 PageID #:11923
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

1987

is that much of the defendant's proposed conclusions of law dealt with personal jurisdiction, and also because there was some evidence presented at trial, mostly through Mr. Doig, regarding personal jurisdiction.

Now, I denied Peter Doig's Rule 12(b)(2) motion earlier in the case, and that's at docket No. 74 and 75. There was a motion for reconsideration, and I denied reconsideration for the reasons I stated orally on the record on May 16th, 2016. And in that oral ruling, I elaborated on and refined the analysis set forth in my earlier written opinion.

There was testimony at trial to the effect -- from Mr. Doig, to the effect that -- and I'm paraphrasing -- he didn't really care where Leslie Hindman and Peter Bartlow were at the relevant time. In other words, he didn't care that they were in Illinois. And the implication, at least as I gathered, is that because Peter Doig didn't care that Bartlow and Hindman were in Illinois, that makes personal jurisdiction inappropriate over him in Illinois.

But whether a defendant cares that a person is in Illinois, as opposed to Idaho or Iowa or Indiana, is not relevant to the personal jurisdiction analysis. The inquiry is whether the defendant had sufficient contacts with the forum state, not whether he cared whether the forum state was Illinois or Iowa or Indiana or Idaho.

And turning the personal jurisdiction analysis on whether the defendant cared whether the contacts were with one state or another would make no sense and would overly complicate the personal jurisdiction inquiry because a defendant could always argue, "Well, I didn't care that the plaintiff was in Montana.  For all I cared, he could have been in Missouri."  And then personal jurisdiction would turn on whether the defendant was telling the truth or not, and that's just not how things work.

There was also testimony from Mr. Doig that he did not know where Bartlow and Hindman were, and those were the two recipients of the letters that are alleged to have effected the tortious interference.  And I'm construing Mr. Doig's testimony that he didn't know at the outset of these events where Bartlow and Hindman were because the location of Bartlow and Hindman are clear from the letters sent by Doig's agents to Bartlow and Hindman.  The letters are addressed to Illinois, and Mr. Doig was copied on those letters, so he -- I'm sure that he knew where the letters were being directed.  And given that, it just confirms my prior conclusion that personal jurisdiction is appropriate in Illinois.

There's also the matter of the summary judgment motion, which is at this point spilled milk, but I just wanted to touch upon it very briefly.  I denied summary judgment in

an oral ruling on April 6, 2016, and I denied the motion for reconsideration in an oral ruling on May 16, 2016, at the same time I denied reconsideration of the personal jurisdiction ruling.

And the one thing I want to do is emphasize that there are significant differences, there are at least two significant differences between a judge's ruling on summary judgment and a judge's verdict at a bench trial. The first difference is that the record on summary judgment is different than the trial record. Here, the trial record was much broader and had much more texture than the summary judgment record, and it was more complete.

The second difference is the lens through which the judge views the record. On summary judgment, the judge must resolve all genuine factual disputes in the non-movant's favor, and that, I did at summary judgment; while at trial, if it's a bench trial, the judge sits as a trier of fact and can decide which of two opposing versions of the same set of facts is more likely than not true.

So, with those preliminaries out of the way, I'll move on to the merits of the case. And I'll start by observing that we have two conflicting narratives in this case, one presented by the plaintiffs, Bartlow Gallery and Mr. Fletcher, and the other presented by the defendant, Peter Marryat Doig. And most narratives in life -- in law or in

life, have gaps, either due to the lack of documents or failures of memory or other things. And very few narratives are airtight.

This is especially true when considering events that took place 40 years ago, 35 to 40 years ago, actually, more like 40 years ago, and all the moreso when the events in question are, for the most part, with some exceptions, quotidian routines of daily life, schooling, employment, travel, and communication, the routines of daily life that seem unremarkable and, in fact, are unremarkable at the time of their occurrence.

And that's -- the difference and distinction is all the moreso before the era of Facebook and Instagram and e-mail where those quotidian events are recorded for all posterity, no matter how insignificant.

But while most narratives have gaps, and certainly the two narratives presented here both have gaps, gaps vary in their size and in their significance. And in this case, the evidence conclusively demonstrates that despite some documentary or memory gaps in the narrative of his life in 1976 and 1977, Peter Marryat Doig absolutely did not paint the disputed work. And concordantly, although it's not necessary for judgment in favor of Mr. Doig, and despite some gaps in that narrative as well, the evidence conclusively shows that Peter Edward Doige did author the work.

And explaining why I came to this conclusion will take some time, and I appreciate your patience as I go through the evidence as I saw it.

I'll begin with the stipulations.  The parties entered into a number of stipulations.  They're at docket 245 at page 8.  Three stipulations establish that the painter of the disputed work was incarcerated at Thunder Bay Correctional Center for at least five months and that he created the work there.

Stipulation No. 3, "The person who painted the disputed painting was incarcerated at Thunder Bay Correctional Center for a total of at least approximately five consecutive months."

Stipulation No. 4, "The person who painted the disputed painting was incarcerated at the Thunder Bay Correctional Center when he painted the disputed painting, which is dated 1976."  It's actually dated '76, but everybody seems to agree that it's 1976.

And stipulation No. 11, "While the person who painted the disputed painting was incarcerated at Thunder Bay Correctional Center, Plaintiff Robert Fletcher saw the disputed painting progress over an approximately three-month period from its initial stages to its completion in 1976."

The evidence very convincingly establishes that Peter Doig was not incarcerated at Thunder Bay Correctional

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1993 of 2044 PageID #:11928
Case: 16-3508    Document: 90        Filed: 09/20/2023    Pages: 158

1992

Center for at least five months, or even at all, and, therefore, could not have painted the disputed work, because as the parties stipulated, the disputed work was painted by somebody who was then incarcerated at Thunder Bay.

Mary Doig, who is Peter Doig's mother, and Peter himself testified credibly that for the entirety of the relevant time period, Peter was not incarcerated at Thunder Bay Correctional Center at all, let alone for at least five months.

Mary testified credibly that from -- Mary Doig testified credibly that from 1975 to 1979, putting aside vacations and Peter's summer job in western Canada, Peter was living in Toronto with his family, including his mother Mary, his father David, his brother Andrew, his sister Sophie, and for part of the period, his sister Dominie, who for some time was at boarding school in Scotland.

The family resided on Edgewood Crescent in the Rosedale area of Toronto. And further confirming Mary Doig's and Peter Doig's credible testimony for the 1976 to 1977 period are the letters that were sent by Mary Doig to her mother, and also a letter that was authored by Dominie Doig, and those letters have been preserved.

And I'll get into those letters more in a few moments, but those letters are unimpeachable. They're unvarnished reportage from that time frame, and none of the

senders had any motive to lie about what they were talking about at the time those letters were written.

Then there's the matter of the yearbooks, the high school yearbooks from Jarvis Collegiate Institute.  There were yearbooks from -- there's the 1975 yearbook, which covers the school year '74 to '75, the '76 yearbook, the '77 yearbook, and the '78 yearbook.

And the 1975 yearbook, which I'm not going to put up, but it shows Peter at page 83 listed as being in the 10th grade.

The 1976 to 19- -- I'm sorry, the 1976 yearbook, which covers the school year '75 to '76, shows Peter Doig at page 109, and that's Exhibit 528.  And I'm going to ask my law clerk Jimmy Kylstra to display -- I'm not going to display all the exhibits, for certain, but just some of the more significant ones.

It's Exhibit 528 at page 109.  And the photograph is in the lower right-hand corner.

Is it on in the gallery and in the jury box and also at the tables?

The photograph right there shows Mr. Doig in the back row towards the middle, in the upper row towards the middle, and his name is listed there in the list of students.  And it's 11A, which shows that he was in 11th grade at that time.

The yearbook from the following year, which is

A42

43

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1995 of 2044 PageID #:11930
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

1994

Exhibit No. 529 -- do you want to put that back together?

LAW CLERK: Sorry?

THE COURT: If you want to put that back together, you can.

LAW CLERK: Okay. Great.

THE COURT: The yearbook from the 1977 yearbook, which is Exhibit 529, at page 163, and that is in -- it's the upper right-hand corner. It's the picture in the upper right-hand corner. And Mrs. Doig and Peter Doig testified that the young man in the upper right-hand corner of that photo whose face is partially obscured is Peter Doig. And he's listed there in 12th grade.

And there was some assertion by the plaintiffs at trial that the partially obscured figure in that photo was Andrew Doig rather than Peter Doig. That's unpersuasive. The yearbook lists that individual there in the bottom, second-to-last line of 12L as Peter Doig. And Andrew Doig is shown on page 155 of the same yearbook in the 11th grade. And that photo is in the top middle; and Andrew Doig is in the sixth row, and he's listed as such in the yearbook.

And then finally, the -- and that's the 1977 yearbook. And finally, there's a 1978 yearbook, which is Exhibit 530. And there -- no class picture was pointed out, and I could not find one; but Peter Doig is listed -- is shown on page 86 of Exhibit 530 as a member of the ski team. And

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1996 of 2044 PageID #:11931
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

1995

he's there in the back row, right above the young girl with the turtleneck. And Peter's brother Andrew is two to -- two people to our left. And it shows that there are two people named Doig at the high school at the time, and that Peter Doig was on the ski team at least during the '77-to-'78 school year.

Now, Peter identified himself in those photographs, and the yearbook pages list him as present in the photographs. And the person identified in the photographs as Peter Doig strongly resembles and is the same person as the photo in Peter Doig's passport from 1976, which I'm not going to show.

Actually, why don't we show that. It's Exhibit 19, I believe, page 4.

And Mary Doig testified credibly that the passport photo resembled Peter circa 1976. Yeah, it's the bottom one. The top one seems to be much younger. The bottom one looks very much like the young man or the boy who was pictured in the yearbooks.

That person does not -- if you go to 103, please, that person, both in the yearbooks and in the passport photo, does not look at all like the person pictured on the Lakehead University identification card from the same time. And I can see with my own eyes, and Mary Mary Doig testified credibly, that that person looked nothing like how her son looked in 1976.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1997 of 2044 PageID #:11932
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

1996

Mr. Fletcher, the plaintiff, by contrast, testified that the author of the work, the person who painted the painting, strongly resembled the person photographed on this Lakehead University identification card from the fall of 1976. And that's the person who, according to Fletcher, looked like the person who painted the work; and yet the photographs of Peter Doig from the yearbooks, and in particular the 1978 yearbook -- and that photo could not have been taken any earlier than the fall of 1977.  The person in that yearbook is a relative boy compared to the man who is pictured in this Lakehead University ID.  They are quite plainly different people.

And as I mentioned, and I'll mention it again, Mr. Fletcher testified that it's the guy in Exhibit 103 who painted the work.

Mary Doig and Peter Doig also testified credibly, and the letters confirm, that for the first half of 1976, Peter was working at the Old Fire Hall Dinner Theater in Toronto for five or six nights per week.  He was working with his friends Rob Cochrane, Dave Ainsworth, and Paul Fenn.  And as the yearbooks confirm, Mary Doig and Peter Doig testified credibly that over this period Peter was in school at the Jarvis Collegiate Institute.

Mary and Peter testified credibly that in the summer of 1976, Peter went to Scotland with his family to visit

A45

46

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1998 of 2044 PageID #:11933
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

1997

relatives, and that when the rest of the family returned to Canada, Peter and a friend went to the Lake District and the Reading Music Festival in London for about two weeks and then returned home later.

Mary and Peter testified credibly that in the fall of 1976, Peter was attending Jarvis Collegiate Institute and working nights at the Old Fire Hall Dinner Theater with Cochrane, Ainsworth, Ted Dudas, and Paul Fenn.

The yearbook photograph from the 1977 yearbook confirms that Doig at least began the 1976 to 1977 school year at Jarvis, and it undermines -- that undermines the plaintiffs' proposition that he was enrolled at or auditing classes at Lakehead University in the fall of 1976.

Now, Mr. Fletcher testified that the person who painted the work either attended or was enrolled -- attended classes at or was enrolled at Lakehead University in the fall of 1976. The Lakehead ID, Exhibit 103, strongly indicates that he was enrolled there in '76. Otherwise, how would he have gotten an ID? And the ID says, "FF 1976."

And so Peter Doig was not attending school, either as an auditor or as an enrolled student, at Lakehead in 1976. And as an independent reason why that's true, Peter Doig had not finished at least 12 grades of school by the fall of 1976. He had finished only 11 grades of school, because he was born in 1959; and in the 1976 yearbook, he's listed in 11th grade.

A46

47

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 1999 of 2044 PageID #:11934
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

1998

And his school transcript, which is Exhibit 22 at page 2 -- this is a transcript that was obtained from the Toronto School District -- shows that in June of 1976, Mr. Doig was in the 11th grade.

So, in the fall of 1976, Mr. Doig would not have completed the 12th grade.  And why is that important?  It's important because Mr. Fletcher testified very credibly that at the time, Canadian students normally attended 13 grades of school before attending university, with some exceptions made for exceptional students who had completed 12 grades.  And we know from the documents that Peter Doig had not completed 12 grades by the fall of 1976.

Now, as I mentioned at the beginning, every narrative has a gap or a wrinkle or an inconsistency, and one of them's going to appear now.  Peter Doig, and this is Plaintiffs' Exhibit H, which you don't have to show -- actually, why don't we show it, just for the sake of completeness -- in an e-mail sent to an employee of Werner Gallery, stated that he did not attend high school in '76 and '77.

Peter Doig did write that in an e-mail to somebody at the Werner Gallery in connection with this case, because the e-mail is dated after this case was filed.  And I conclude, based on the testimony and the documentary evidence, that Peter Doig was mistaken in this e-mail.

We have the 1977 yearbook, which shows that he was

A47

48

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2000 of 2044 PageID #:11935
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

1999

enrolled at least for some time during that year.  We have Doig's school records, Exhibit 22, at page 4, which you'll see there on the right -- in the right column, it says -- well, in the left column, it says, "Jarvis Toronto," and then it says, "September 1974 to November of 1976."  So, these school records indicate that Peter Doig at least started the '76 to '77 school year, and that November '76 date is consistent with both Mary Doig and Peter Doig's testimony that Peter left Jarvis in the middle of the school year in November of 1976.  And then we have Mary Doig's letters, which also reflect that Peter was in school during that time.

Now -- and Doig's errant recollection there on Plaintiffs' Exhibit H is understandable and does not harm his credibility.  People don't have a perfect memory of matters from 40 years ago.  And as will be discussed, the plaintiffs' errors in recollection are far more severe and are not corrected by the documentary record.

Mary Doig and Peter Doig testified credibly that in November of 1976, Peter left school and began working full-time, including lunch and dinner shifts, at the Old Fire Hall Dinner Theater.  There is a lack of records of tax payments indicating Peter's employment during that time, but that does not undermine Mary's and Peter's testimony.

If this were a jury trial, the jury would be instructed that in considering the evidence, they can take

A48

2000

into account their own observations in life.  The same applies to a bench trial.  And the lack of tax records can easily be explained in that the income of high school students or food service workers often are not reported to the tax authorities or are reported along with their parents' returns.  And I say that with the understanding that any statute of limitations that might apply to the years that I was in high school for tax infractions has long since passed.

Or maybe it's possible that the Canadian tax authorities may not return records -- may not retain records from the '70s for low earners like Doig.  None of that was established at trial, but those are reasons why the lack of tax records is not significant, at least in my view.

Fletcher -- Mr. Fletcher testified that the creator of the work entered the Thunder Bay Correctional Center in October of 1976.  And in light of Peter Doig's and Mary Doig's credible testimony about Peter's whereabouts at that time, the Jarvis yearbook from the '76-to-'77 school year, the Toronto school records, Peter Doig could not have entered the Thunder Bay Correctional Center in August of '76 and, therefore, could not be the author of the painting.

Moving on in time, Mary and Peter testified credibly that on December 2nd, 1976, Peter moved with his family to 470 Wellesley Street East in the Cabbagetown area of Toronto, where he lived with his parents, his brother Andrew, and his

A49

50

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2002 of 2044 PageID #:11937
Case: 16-3508    Document: 90         Filed: 09/20/2023    Pages: 158

2001

sister Sophie.  Dominie by that time had gone to boarding school in Scotland.

Mary Doig testified credibly that from January to March of 1977, Peter was working at the Fire Hall and took several ski trips with his brother Andrew and their friends Dave Ainsworth, Paul Fenn, Rob Cochrane, and sometimes Nick Bacon or Ted Dudas.  The ski trips were frequently around Toronto or near Collingwood, and there was one two- to three-week to Utah in January of 1977 to visit an old friend and a one-week trip to Stowe with Dave Ainsworth.  And both Peter and Mary testified as to those trips and to the fact that the Utah trip was a bit of a bust due to the lack of snow.

And Mary Doig testified credibly that it would have been impossible during this time period, fall of '76 through spring of '77, or even summer of '77, for Peter to have snuck out of the house and disappeared for weeks at a time, as she would lie half awake each night until she heard him go upstairs after returning from work at the Fire Hall.

Mary and Peter testified credibly that after the ski season, from April to May of '77, Peter remained in Toronto living at home and working at the Fire Hall; and they both testified credibly that in June of 1977, Peter, accompanied by his friend Paul Fenn, got a job as an oil rigger in Alberta, aided by David Doig's, Peter's father David Doig's friend Stan

Chad.

Peter testified credibly that he and Fenn flew to Alberta, to Calgary, that Peter reported for work in Edmonton while Fenn remained in Calgary.  Peter described the details of where he stayed and where he was and where he worked during that time frame in the summer of 1977.

And here's another hiccup in the narrative.  Doig originally -- Mr. Doig, Peter Doig, originally recalled to Miss Mogadassi that he had worked as an oil rigger in the summer of 1976 rather than the summer of 1977.  And that was in an e-mail -- that's Plaintiffs' Exhibit F, in an e-mail that Ms. Mogadassi wrote.  And I'm inferring that Ms. Mogadassi didn't just make it up.  She had to have heard it from Peter Doig that the oil rigger work in Alberta was in the summer of '76, not the summer of '77.

But I conclude that this was a mistake, an understandable mistake, and does not harm Mr. Doig's credibility because it was 40 years ago.

And again, drawing on my own experiences in life, I was a junior counselor at Camp Ojibwa.  Was it during the summer of 1981 or the summer of 1982?  If you ask me now, I probably couldn't answer it.  If I'm filling out an FBI form for a background check, I probably could, and I probably did six years ago.  But if you just asked me on the spot, I probably didn't know.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2004 of 2044 PageID #:11939
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

2003

Did I work at Michael Reese Hospital during the day and wait tables at Bennigan's in Evanston at night during the summer of 1985 or the summer of 1986?  I could see giving the wrong answer.  And most of us have these experiences where things that happened 20, 30, 40 years ago, we're off by a year or two.

And the mistake -- or Peter Doig's statement that it was the summer of '76 would have had more significance were it not for the unimpeachable documentary and testimonial evidence that it was, in fact, 1977, the summer of '77, when Peter Doig went to the oil fields in western Canada.

I believe Mary Doig on that score.  I believe she testified credibly.  And the contemporaneous letters that she wrote confirm that Peter worked at the rigs in the summer of '77 and then returned to Toronto from Alberta in early September of 1977.

Let me ask, Jimmy, if you can put up Exhibit 457.

This is a letter that Mary Doig wrote to her mother in -- I don't know where it is, somewhere in the United Kingdom, and, Jimmy, if you can remove the sticker, the envelope is reproduced there.  It bears a 1977 stamp.  I believe I spoke with -- Ms. Doig testified that this letter was from -- the stamp says August of '77 or somewhere in the summer of '77.

And in this letter to her mother, Mrs. Doig says

that, "Peter phoned from Edmonton.  He is off to the oil rigs fairly soon in Saskatchewan.  He is by himself now, as Paul got a job in Calgary, but he sounded quite happy."

Again, there's no reason for Mrs. Doig to have made this up.  This is just unvarnished reportage from Mrs. Doig to her mother, to Peter's grandmother, about what was going on during that year -- I'm sorry, during that summer.

And then there is Dominie's letter, which is Exhibit 465.  If you could put that up, please, Jimmy.

This letter, at the bottom, says that, "Peter's hair is long and messy.  If you smell his hat, it smells of oil." Again, that is confirmation that Peter Doig was at the oil fields, and it's dated Monday, the 5th, Monday, September 5th. And September 5th -- Monday, September 5th, was in 1977.

And Peter Doig testified credibly that he did not detour to Sudberry or Thunder Bay on his return from Alberta to Toronto.  Instead, he flew standby from Edmonton to Toronto.

Mary and Peter testified credibly that in the fall of 1977, Peter attended Jarvis for some classes and the S.E.E.D. school, that's capital S, capital E, capital E, capital D, and that he worked at Sherlock's, which was a pub-type restaurant in Toronto.

And here's another hiccup in the narrative.  In her declaration, Mary Doig stated that -- averred that Peter had

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2006 of 2044 PageID #:11941
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2005

worked at the Fire Hall through 1978. And as it turns out, she then testified at trial that he worked at Sherlock's from a little after Labor Day in '77 through '78. Again, that mistake is understandable and not significant in light of the similar positions that Peter held at the two restaurants and the fact that Mary was recalling a period of time nearly 40 years later.

And this is a declaration that Mary signed, and when laypeople sign affidavits or declarations or complaints that are drafted by lawyers, sometimes they miss nuance, and they miss minor points; and that's demonstrated by the complaint in this case, and in particular paragraph 32F, which Mr. Fletcher verified. He verified an allegation that he did not find anybody else in Canada with the name Peter Doig or Peter Doige during the relevant time period, no records of it. That turned out to be incorrect because he did know about Peter Doige, Peter Edward Doige; and he said that he read -- he overlooked it.

And I don't believe he was intentionally lying. It was written by a lawyer. He overlooked it. And he interpreted it as meaning, "I didn't find anybody as Peter Doig or Peter Doige who I believed was a good candidate for somebody who had painted the disputed work."

It happens when non-lawyers sign documents that are drafted by lawyers. It happened with Mr. Fletcher. It

happened with Mrs. Doig. It also happened with Ms. Bovard for certain aspects of the declaration that she signed.

Mary and Peter testified credibly that Peter did not leave Toronto on a permanent basis until 1979 when he left to attend Wimbeldon College for the Arts in the UK.

Peter testified credibly that he does not have a felony conviction or criminal record in Canada. There was testimony from Larry Cowley on that score. Just erring way on the side of caution, way on the side of caution, I'm not considering Cowley's testimony on that point, given uncertainty as to whether criminal records involving teenagers from the '70s are retained in Canada. There are no records, and I think a reasonable person could conclude that if there were records, they would have been found; but I'm going to err on the side of caution and not consider Cowley's testimony on that particular point.

So, pursuant to the first set of stipulations that I mentioned regarding the disputed work being painted by somebody who was incarcerated at Thunder Bay Correctional Center for at least five months, Peter Doig could not have been the author of the work. And it's not just the five months -- or five-and-a-half months in the correctional center. There were also about three or four months while the author of the work was on parole in Thunder Bay, and Mr. Fletcher testified to that. So, in order for Peter Doig

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2008 of 2044 PageID #:11943
Case: 16-3508     Document: 90        Filed: 09/20/2023     Pages: 158

2007

to have been the painter of the work, he would have had to have been gone from Toronto not just for five months, but for eight or nine months, and that just does not fit with the timeline. It does not fit with the documents. It doesn't fit with my evaluation of the witnesses' credibility. Peter Doig was not away from home for anywhere near that period of time any time from '75 to '78.

Okay. There were a second set of stipulations that are important. Stipulation No. 5, "The person who painted the disputed painting sought employment through the Seafarers Union in Thunder Bay." In stipulation No. 10, "Plaintiff Robert Fletcher assisted the person who painted the disputed painting in his attempts to gain employment with the Seafarers International Union of Canada in Thunder Bay."

And as the above -- as the chronology I've laid out highlights, Peter Doig did not seek employment in Thunder Bay with the Seafarers Union in the '76-to-'77 time frame. To reiterate, he remained in Toronto for the entirety of the relevant time period, other than his summer in Alberta and Saskatchewan. He did not leave Toronto on a permanent basis until '79. He was continuously employed during this period either at the Old Fire Hall Dinner Theater, the oil fields in Alberta with Sedco-Hightower, and Sherlock's, not the Seafarers Union.

And we'll get to this when I'm talking about Peter

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2009 of 2044 PageID #:11944
Case: 16-3508     Document: 90       Filed: 09/20/2023     Pages: 158

2008

Doige.  Peter Doige was a member of the Seafarers Union.  And there are records of that.  There are no records, when the Seafarers Union was asked, of Peter Marryat Doig being a member of the Seafarers Union.

So, that's the Peter Doig narrative, and I'm now going to turn to the Peter Doige narrative, Peter Edward Doige.  And I find that Peter Doige almost certainly painted the work.  And that's based on the biographical evidence.

Peter Doige was incarcerated at Thunder Bay Correctional Center.  Mr. Fletcher credibly testified that he processed the author's -- the painter's intake at Thunder Bay and that he recognized the painter from Lakehead University, where he appeared to be a student, either a student or somebody who was attending classes.

Peter Doige's Lakehead University identification card, which we've already seen, Exhibit 103, shows that Mr. Doige -- I'm just going to call him Mr. Doige with a soft "g," to distinguish him from Mr. Doig, hard "g" with no "e." Mr. Doige had this identification card indicating that he was enrolled in the fall of 1976.

And, Jimmy, could you put that up one more time, No. 103.

And you'll see there on the bottom, it says, "FF 76." And there's no reason to doubt that this identification card is authentic and accurate.  Ms. Bovard, Peter Doige's sister,

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2010 of 2044 PageID #:11945
Case: 16-3508      Document: 90        Filed: 09/20/2023      Pages: 158

2009

testified that the person on this identification card was her brother, Peter Doige, as did Leann Sharpe, who was Mr. Doige's common law wife for some time. And Ms. Bovard testified that she found this card in her brother's possessions after he died in 2012. So, this is Peter Doige's card.

Adams, the art teacher at Thunder Bay Correctional Center, Ernie Adams, when shown Exhibit 103, said that that was the guy who painted the disputed work. And that guy, we know from Marilyn Bovard and Leann Sharpe, and from the name on the card, and from the birthday on the card, that person is Peter Doige, not Peter Doig.

And I found Mr. Adams's testimony to be especially credible. First, he just seemed like he was telling the truth. He had no motive to lie. And, in fact, his motive probably would be to lie because if the guy who painted the painting was Peter Doig, the world-famous artist, Ernie Adams would have then gotten a world-famous artist off on his artistic career.

But I don't even have to go there. Ernie Adams was credible. He had a good memory of who the painter was. And he testified that the guy in Exhibit 103, who is Peter Doige, was the person who painted the painting.

The Lakehead University records, which are Exhibit 514, show that Doige, Peter Doige, attended the university from '76 to '78, but they do not indicate his

Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2010

continuous enrollment.  In fact, he failed all of his classes in the fall term of '76 and missed the spring term of '77, which is consistent with Mr. Fletcher's testimony that the author of the painting was imprisoned from about October of '76 through the spring -- either the late winter or early spring of '77.

And that exhibit is up on the screen, and then there's another page showing work -- showing classes that he attended during subsequent years.

I find that the Lakehead University records are authentic.  There's no basis to doubt their authenticity. They were sent by Lakehead University in response to a request from the parties in this case.

The plaintiffs point out that there may be an error in Doige's cumulative grade point average.  Whether there's an error or not is immaterial.  It shows which classes were taken and during which years.  And I don't even know if there was an error because I don't know how the grade point average was calculated, how certain courses were weighed, whether it was done by computer or by hand.

So, even if there was an error in the cumulative grade point average, the records demonstrate that Doige was enrolled at Lakehead University for the period in question. And the fact that the records show a year level of 2, which is up there on the top of the screen, is entirely consistent

A59

60

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2012 of 2044 PageID #:11947
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

2011

with the fact that, as the records show, Doige was enrolled at Lakehead for about two or so academic years.

And Mr. Fletcher testified that the creator of the work entered Thunder Bay Correctional Center in late September or early October of '76, which is consistent with Doige's having begun the 1976-1977 school year at Lakehead University. And unlike Mr. Doig, Peter Doig, the defendant, Mr. Doige was old enough to attend the university in the fall of 1976.

If you can go to Exhibit 523, in Mr. Doige's personal effects, Ms. Bovard found a book entitled, "The Notebooks of Anthony Thorn." And if you could show the first page of that, you'll see on the bottom, this seems to be a book by Anthony Thorn. It's a reproduction or a duplication of a book, and it shows that he's at Lakehead University, Thunder Bay, Ontario. And then if you can go to the next tabbed page, on top, you'll see Peter Doige's signature. And again, this book was found in Peter Doige's personal effects.

Why is this important? It connects -- it's a further connection of Peter Doige to Lakehead University, and it shows that Peter Doige took art classes at Lakehead University, which supports the notion that Peter Doige had an artistic inclination and could have been and was the one who painted the disputed work while in prison.

Ms. Bovard credibly testified that her brother, Peter Doige, told her that he had been incarcerated at Thunder Bay.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2013 of 2044 PageID #:11948
Case: 16-3508    Document: 90        Filed: 09/20/2023    Pages: 158

2012

I actually don't have to -- let's say Bovard didn't testify to this.  I still would reach the same conclusion, that it was Peter Edward Doige who was incarcerated at Thunder Bay and who painted the painting.  So, Bovard's testimony that her brother told her that he had been incarcerated at Thunder Bay is the equivalent of the third cherry on top of the sundae, but I'm going to mention it for the sake of completeness.

And I've already explained on the record why I believe that this testimony is admissible as an exception to the hearsay rule, but I'm going to lay out my thoughts on that one more time for the sake of completeness.

First, it's admissible under Federal Rule of Evidence 804(b)(4)(A) as a fact of personal or family history.  In the *Porter* case, 722 F.3d 94 at 98, Second Circuit 2013, the Second Circuit held that, "The exception for statements of family history, like other exceptions to the hearsay rule, is premised on the view that certain categories of statements are free enough from the risk of inaccuracy and untrustworthiness such that the test of cross-examination would be of marginal utility."

And in *Tome versus United States*, 513 U.S. 150 at 160 to 161, the Supreme Court said, "Neither the rules nor the advisory committee notes define the scope of similar facts of personal or family history, but the Supreme Court has instructed that absent express provisions to the contrary, we

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2014 of 2044 PageID #:11949
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2013

may presume that the drafters of the rule intended to adhere to the common law in the application of evidentiary principles.

"At common law, the scope of the exception for declarations of family history was defined by the following question:  Were the circumstances named in the statement such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would likely be based on fairly accurate knowledge and to be sincerely uttered?"

That absolutely describes Peter Doige's statement to his sister, Marilyn Bovard, at their father's deathbed, that he had been incarcerated at Thunder Bay Correctional Center. An incarceration period of several months in a distant city -- Thunder Bay is very far away from Moncton, New Brunswick -- is a significant aspect of family history within the meaning of the rule, and the circumstances of Doige's telling Bovard by their father's hospital bed is persuasive.

I compare the *Rassano versus INS* case, 377 F.2d 971, Seventh Circuit 1976, where the father's out-of-court statement that he was a naturalized citizen was excluded because at the time the statement was self-interested.  There was nothing self-interested about Doige's statement to his sister that he had been imprisoned.  If anything, that was against his self interests because it's embarrassing to have

been imprisoned.

Doige's statement, if not admissible under 804, is admissible under the residual exception of 807.  As the Seventh Circuit recently reminded is in *Flournoy versus Chicago*, 2016 Westlaw 3924378 at page 5, from July 21st of this year, the exception applies only when the hearsay statement has adequate circumstantial guarantees of trustworthiness, is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts, and admitting it would serve the interests of justice.

Although -- in terms of circumstantial guarantees of trustworthiness, Doige had no reason to admit to his sister that he was imprisoned at Thunder Bay if he was not, in fact, imprisoned at Thunder Bay.  It was a material fact.  Placing Peter Doige at Thunder Bay Correctional Center is clearly material to this case, because if he weren't there, he couldn't have painted the work.

Probative value, there is -- there are other evidentiary materials, the documents indicating that Peter Doige was at Thunder Bay Correctional Center, and I believe that those documents standing alone are more than sufficient to establish that Peter Doige was at Thunder Bay Correctional Center; but the statement from Doige's mouth himself is more probative on that point than any other piece of evidence.

A63

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2016 of 2044 PageID #:11951
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2015

And it would serve the interests of justice. Determining -- to admit this statement. Determining whether Doige was in prison and, if so, where would serve the interests of justice by aiding the trier of fact.

There is further record evidence that Doige was incarcerated at Thunder Bay Correctional Center. We don't have any prison records, but we have court records. And Mr. Fletcher found Doige's court records at the Thunder Bay courthouse.

And Mr. Cowley testified credibly, and on this, I am considering his evidence on this, that according to Canadian prison and record-keeping practices at the time, when somebody is sentenced in one courthouse to a prison that's closer to another courthouse, the records are sent to that other courthouse. So, the fact that Mr. Doige's court records from Sudberry and from Toronto were found at the Thunder Bay courthouse is highly probative of the fact that Mr. Doige was, in fact, incarcerated at Thunder Bay Correctional Center.

I'm not relying on Mr. Cowley's testimony about what Sam Guyiab, G-U-Y-I-A-B, the court clerk at Toronto Superior Court, told Mr. Cowley about when the records were transferred to the Thunder Bay courthouse and the fact that they were transferred to the Thunder Bay courthouse. I admitted that testimony, and I think that was a mistake. I think I mistakenly admitted that testimony.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2017 of 2044 PageID #:11952
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2016

It's true that Federal Rule of Evidence 703 allows the expert to rely on hearsay, but I think what was happening here was that Guyiab's history was being laundered through an expert; and, therefore, I'm going to exclude that testimony, and I'm not considering it. I have not considered it. It has not contributed one whit to my conclusion that Peter Doige was incarcerated at Thunder Bay Correctional Center. All of the other evidence I've talked about amply demonstrates that point.

And again, I did see the evidence and I heard the evidence; but as I explained during the trial, that's what happens during a bench trial. At a bench trial, the judge has to be the trier of fact and also has to rule on evidentiary matters; and in order to rule on evidentiary matters, the judge has to look at or hear the evidence. And if the judge excludes the evidence that he or she has seen or heard, the judge is deemed to have not considered that evidence when reaching a decision in the case. That's just the nature of a bench trial.

And Mr. Fletcher testified that court records would travel with the defendant to the place of incarceration, and that's slightly different from Cowley's testimony that the court records would be sent to the courthouse. And maybe -- maybe both of them are right. Maybe sometimes it was sent to the institution, sometimes it was sent to the courthouse.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2018 of 2044 PageID #:11953
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2017

But it doesn't matter in this case, because for Peter Doige, for Peter Edward Doige, his records were at the courthouse; and that fact fits with Cowley's explanation, based on his experience, that when -- if somebody is sentenced in Sudberry or Toronto and incarcerated in Thunder Bay, the records are sent to the nearest courthouse.

But even if Mr. Fletcher were right and the records were sent to the prison, it's understandable that the prison would send the records to the nearest courthouse after the sentence was completed. And again, that's by inference. There's no testimony that that happened, but it's certainly understandable and can explain the mild inconsistency between Cowley's and Fletcher's testimony on that particular point.

Mr. Fletcher did testify that the records are destroyed after seven years; and that may have been the general practice, but it certainly wasn't the practice here because the court records were not destroyed. They were there at the Thunder Bay courthouse.

And the fact that those records were at the Thunder Bay courthouse is entirely consistent with Doige having been at the Thunder Bay Correctional Center in the fall of '76 and the spring of '77.

And then there are other court records that the parties -- that both Mr. Fletcher and Mr. Cowley discussed. I believe that Mr. Cowley testified credibly and persuasively,

A66

based on the court records, that Doige received bail at his hearing in Toronto on March 4th of 1975. That's Plaintiffs' Exhibit E, page 2, at the top. I'm not going to put that up on the screen, because it's really hard to see, and those records are inscrutable and -- except to an expert like Mr. Cowley, who was in that field for many, many years and can testify to the meaning of those records based on his experience. And I'm going to conclude that after receiving bail in Toronto, Mr. Doige made his way to Thunder Bay.

Ms. Bovard found slides in Mr. Doige's, Peter Doige's personal effects, labeled, "Thunder Bay." That's more evidence that Peter Doige was in Thunder Bay.

Miss Bovard testified credibly that Mr. Doige mentioned Ernie Adams in connection with his painting. That was not hearsay. I don't believe there was a hearsay objection; but if there was a hearsay objection, Doige simply mentioning Ernie Adams is not hearsay. And this connects Doige to Thunder Bay Correctional Center, the prison art classes, and the relevant time period of '76 to '77, which is the only year that Ernie Adams taught at Thunder Bay Correctional Center.

How would Peter Edward Doige know of Ernie Adams if he weren't in Thunder Bay Correctional Center during the relevant time period from '76 to '77 and took art classes there? And when you link up that testimony with Adams's

A67

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2020 of 2044 PageID #:11955
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

2019

testimony that the person in Exhibit 103 was the person who painted the work, it's exceptionally strong evidence that the person who painted the work was Peter Edward Doige.

And Adams, for good measure, testified credibly that there was only one person in his class with the last name of Doige and that there was no person with the name of Doig, with no "e," in his art class.

And finally, Peter Doige was born in 1955, so he would have been 21 or so when the disputed work was painted, which is precisely the age that Mr. Fletcher initially maintained the author had been when he painted the work; and that's defense Exhibit 127, which we don't have to show. Mr. Fletcher then changed the estimate of the painter's age from 20 to 21 to 17 to 18 after learning that Peter Doig was born in 1959.

And I know that there was a hearsay objection to Exhibit 127. I'm very confident in my ruling that this came in under 801(d)(2). But even if I was wrong and even if I put aside that piece of evidence, I still would reach the conclusion that, based upon all the other evidence, to which there was no evidentiary objection, that it was Peter Doige who painted the work while at Thunder Bay Correctional Center.

There are some open questions. Every narrative -- no narrative is perfect, and there are some imperfections in the Peter Doige narrative. First, the timeline is kind of

A68

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2021 of 2044 PageID #:11956
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

2020

fuzzy.

The records show -- the prison records show that Doige was sentenced on January 13th, 1976. So, if he was sentenced on January 13th, 1976, how could he have attended Lakehead University and met Robert Fletcher in the fall of 1976? There's no -- the evidence doesn't give a rock solid answer to this, but based upon the testimony and based on inferences that I'm drawing from the documents, one of two things happened.

The first is that Doige was sentenced in January of '76 and was given time to report to the designated facility in Thunder Bay. That happens all the time in the United States in 2016, 2015 or 2016. Somebody who is on bail and is sentenced is told to report at some point months later. And there's no reason to believe that this didn't happen in Canada in the '70s.

And I emphasize Canada in the '70s, particularly given that Canada at that time was a place where you can get arrested and charged with robbery in Sudberry, given pretrial release, get arrested again in Toronto and charged with another robbery, and once again given pretrial release. Things seem to have been a little loosey-goosey in Canada in the '70s, so it's entirely understandable, and it's -- it's -- it can easily have happened that Doige was sentenced in January of '76 and told not to report to the designated

A69

70

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2022 of 2044 PageID #:11957
Case: 16-3508     Document: 90       Filed: 09/20/2023     Pages: 158

2021

facility in Thunder Bay until October of '76.  Or maybe Doige started serving his sentence in January of '76 and was released by the fall of '76 due to some combination of dead time, which is the five-and-a-half months, and getting paroled.

And we should recall that Mr. Fletcher testified that with Mr. Fletcher's assistance, Mr. Doige -- or I should say the author of the work, the painter, sought and received parole.  And if that were true, it's possible that Doige -- that the author of the work, who I believe is Doige, was released by the fall of '76.

And again, is there a rock solid answer to these questions?  No.  But none of this outweighs the ample evidence that I've already set forth that it was Peter Edward Doige who was in the Thunder Bay facility and who painted the work.

There was another blip in the narrative.  Bovard stated in her affidavit that Doige took music and art classes in prison while incarcerated.  And that's Defendant's Exhibit 116, and the testimony was at least somewhat inconsistent with that.  Those inaccuracies are immaterial and are explained by the fact that she was recalling events from decades earlier; and the affidavit was written for her by a lawyer, and as with Mr. Fletcher, when laypeople sign things that lawyers draft for them, sometimes they miss things.

Third, Adams, the art teacher, testified that the

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2023 of 2044 PageID #:11958
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2022

author of the work was very patient, was not volatile, and was not violent; and yet Ms. Sharpe, who was the common law wife of Mr. Doige, testified that Doige was violent and quick to anger.  These seem like two different people on the surface; but that discrepancy is not significant, because it's not surprising that somebody would act differently in prison, where you need to behave to get privileges, like the ability to attend an art class, than when they're at liberty.

And then there was the suggestion that if Doige was convicted in Sudberry and Toronto, which he was, it's unlikely that he would be sent all the way to Thunder Bay to serve his sentence.  Why not send him to a prison closer to Toronto? Mr. Cowley testified credibly, based on his experience, that he saw defendants convicted in Toronto or Sudberry sent to Thunder Bay Correctional Center, and I believe him.  And again, Mr. Fletcher found the Doige court records in the Thunder Bay courthouse, which is extremely strong evidence that Doige was incarcerated at Thunder Bay.

And finally on the Doige narrative, Doige sought employment through the Seafarers Union.  Mr. Fletcher testified that he brought the creator of the disputed work to the Seafarers Union for an interview; and although Mr. Fletcher now says that he's not sure that the creator of the work actually obtained employment with the Seafarers Union, Mr. Fletcher testified at his mock deposition, which

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2024 of 2044 PageID #:11959
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2023

we had a video of, that the creator was accepted into the union. Plus, Mr. Fletcher told Mr. Bartlow, in Exhibit 509, which I will not put up on the screen, that the author of the work told Mr. Fletcher that the Seafarers Union gave good wages.

Ms. Bovard, who was Doige's sister, found a Seafarers Union patch in Mr. Doige's effects, and that's No. 524, which I'll put up on the screen. It doesn't say the Seafarers Union, but the patch says, "Brotherhood of the Sea," which I'm inferring is the Seafarers Union. And to the extent there's any doubt, it's eliminated by Exhibit 115 at page 3, which are the Seafarers Union's records that were sent to the parties in this case. Jimmy's going to put that up.

These are the Seafarers Union's records. We -- there's an address. It's for Peter Edward Doige. It shows his father, Henry Doige, which is who Marilyn Bovard testified was their father. We have an address in Moncton, which is the address that Marilyn Bovard testified that her father lived. And then we have an address in Thunder Bay, which is in the Port Arthur section of Thunder Bay, which is Mr. Fletcher -- which is where Mr. Fletcher testified that the author of the work lived. And Ms. Bovard testified credibly that the person pictured in the Seafarers records was her brother Peter Edward Doige.

And why is this Seafarers evidence important? It

A72

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2025 of 2044 PageID #:11960
Case: 16-3508     Document: 90         Filed: 09/20/2023     Pages: 158

2024

goes back to the stipulations.  The stipulations were that the person who painted the disputed painting sought employment through the Seafarers Union in Thunder Bay, and this is evidence that Mr. Doige not only sought, but obtained employment through the Seafarers Union in Thunder Bay.

So, for all of those reasons, based on the history, I find that Mr. Doige, Peter Edward Doige, authored the work, and not Peter Marryat Doig.

And I could stop here.  I could have probably stopped a lot earlier, but I'm going to go on.  We have the artistic analysis, and the artistic analysis of the work does not overturn the historical records' convincing demonstration that Doig, Peter Marryat Doig, did not paint the work.

Mr. Fletcher was -- I'm sorry, Mr. Bartlow was the plaintiffs' expert.  He served as his own expert, and there's nothing wrong with that.  And the method that he used to authenticate the work and to identify it as a Peter Doig work is, at least in theory, not unreasonable in light of Doig's particular technique.  And I know on this I part ways with Dr. Shiff, who is a world-famous art expert, and I am not; but as a layperson, and I emphasize in theory, I think that Bartlow's method can make sense if you're authenticating a Peter Doig work.

As Mr. Doig testified, in many of his paintings, he projected images onto the canvas and used those images to

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2026 of 2044 PageID #:11961
Case: 16-3508    Document: 90       Filed: 09/20/2023    Pages: 158

2025

outline elements or create the composition of the painting. And Mr. Bartlow's method, if performed properly, would simply reverse-engineer the composition process.

For example, Mr. Doig testified that he used the skier photograph on *Chopper* and the lion photograph on *Rain in the Port of Spain*. So, if that were true, and I think it is true, you'd be able to superimpose those photographs on the paintings, and it would match up. And that's, I think, all that Mr. Bartlow's authentication method teaches.

So, if Mr. Doig did use the disputed work as the source material for his later works -- and, in fact, I think it's the plaintiffs' position -- I think it's fair to say that the plaintiffs' position was that the disputed work was the mother lode of Peter Doig's later works -- one could superimpose elements of the disputed work onto the elements of the later works and get a match.

But although that method is unobjectionable in theory, Bartlow's use of the method here does not support -- his application of the method here does not support the proposition that Doig painted the disputed work.

The shapes that Mr. Bartlow matched up between the disputed work and the later works were not unique or exceptional in any way. And as the defendant -- the defendant's expert, Dr. Shiff, convincingly demonstrated, and as was demonstrated during Mr. Bartlow's cross-examination,

A74

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2027 of 2044 PageID #:11962
Case: 16-3508     Document: 90        Filed: 09/20/2023      Pages: 158

2026

the shapes on Doig's later work could just as easily match with Larney or Magritte or DaVinci.

There are only so many shapes in the world, and the fact that some of the disputed work's shapes match up with some of the shapes in Mr. Doig's later work does not at all prove that Mr. Doig painted the disputed work.

And there is further -- and this is really beside the point, but there's no evidence that the author of the work obtained a photograph of the work to use later to project those images onto a canvas. Mr. Fletcher testified that the author called him seeking to have professional pictures taken of the painting; but Mr. Fletcher could not testify that those pictures were actually taken, and there's no evidence in the record suggesting as much.

And more to the point and far more importantly, Doig did not need the disputed work, the lines and the shapes of the disputed work, to create the later works that Mr. Bartlow highlighted in his expert report.

He didn't need the disputed work to create *Chopper* because he had the actual photograph from the Chamonix postcard.

He didn't need the disputed work to create the shape of the lion in *Rain in the Port of Spain* because he had a picture of the lion, which matches up perfectly with the image of the lion in *Rain in the Port of Spain*.

A75

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2028 of 2044 PageID #:11963
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2027

He didn't need the disputed work to create *Figure in a Mountain Landscape* because he had a photograph of the Canadian painter Franklin Carmichael to do that painting.

He didn't need the disputed work to create *Gasthof*, to create the lines or images in *Gasthof*, because he had a photograph of the dam in the former East Germany that was used to create that work.

So, what I became convinced of during the course of the trial in hearing from Mr. Bartlow, hearing his cross-examination, and hearing from Mr. Shiff, is that as applied to the disputed work, the matches that Mr. Bartlow's method found were purely coincidental as opposed to something that actually happened.

And contrary to the argument that the plaintiff made in closing argument, the method -- Mr. Bartlow's method did not reveal multiple elements in multiple paintings. Rather, the method focused on individual elements in individual paintings, much of which were explained by the photographs, the actual photographs.

And as to the notion that, "Well, even if there wasn't a photograph, the image of the Arizona desert was burned into Mr. Doig's mind because he was on an LSD trip when he was on his way from Utah to Arizona," that seems like a *post hoc* rationalization. It's not at all persuasive.

Then there's the signature on the work. Mr. Bartlow

A76

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2029 of 2044 PageID #:11964
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

2028

analyzed the signature on the work and said that it's not Peter Doige's, but rather is Peter Doig's, and I was not persuaded by that.

Mrs. Doig, Mary Doig, testified credibly that the signature on the disputed work is unlike any way that her son Peter would sign his name. And I find that the signature on the work -- and there were no graphologists here, but you don't need a graphologist to see the similarities between the signature on the work and two of Peter Doige's signatures that were shown during the trial.

Jimmy, if you could put up Plaintiffs' Exhibit B. That's the signature on the disputed work. And then if you could put up No. 103. I don't think you can get them both on at the same time, but that's fine. So, there's the disputed work, and here comes 103.

Those signatures are very similar in many respects. The "e" in Doige on both signatures is separated by a long line from the "g." The "P" and the "t" of Pete are roughly the same height, even though the former is a capital letter and the latter is lower case.

The "o" in both Doiges resembles the Greek -- resembles the Greek letter sigma, except that the tail at the top cuts to the left rather than to the right, and the circle is not closed, with a gap under the tail pointing up and to the left.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2030 of 2044 PageID #:11965
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2029

The horizontal line in the "t" is longer on the right side of the staff than on the left side. The "i" in the Doige comes off a short horizontal line from the "o" and then dips down.

The signatures on the disputed work and on the Lakehead University ID are very, very similar.

And Mary Doig and Peter Doig testified credibly that Peter Doig never went by the name Pete. I'm considering that. I don't think it's that significant, but it's something that I'm considering.

And then there's the signature in the Anthony Thorn notebook, which is Defendant's Exhibit 523. That's not as similar to the signature on the disputed work as the Lakehead University ID was, but it's still quite similar.

We have the terminal "e" in Doige is separated by a long line from the "g." A similarity between this signature and the disputed work that wasn't really found to the same extent in 103 is that the "D" in Doige is very similar between that signature and the disputed work. The "i" is similar in Doige, and the "o" is similar in Doige.

And the signature on the disputed work looks nothing like -- there's no evidence that the signature on the disputed work looks anything like the way Peter Doig, Peter Marryat Doig, makes his signature.

Now, it's true that some of Doig's work has western

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2031 of 2044 PageID #:11966
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2030

themes and the disputed work has a western theme; but a lot of artists work in western themes, and the western theme is not specific enough to demonstrate common authorship between the disputed work and Doig's acknowledged works, especially in light of the massive evidence, historical evidence that makes it impossible for Peter Doig to have painted the disputed work.

Likewise, I'm persuaded by Dr. Shiff that the aesthetic personality of the disputed work is unlike the aesthetic personality of Peter Doig's acknowledged works.

Then there's the argument that Peter Doig had a motive to lie about the work because he was embarrassed -- he would be embarrassed that he used projection and stencils to make later works. I don't find that persuasive at all. Doig testified credibly and Dr. Shiff testified credibly that Mr. Doig was very clear, made it very clear publicly before 2013 that he used photographs and stencils, and Dr. Shiff testified credibly that that method is not frowned upon in the contemporary art world.

And if Doig was known to use photographs, why would the art world think that he drew the photo images, that he replicated the photographs freehand as opposed to projecting, given how easy it is to project?

And finally, Doig -- the evidence shows that Doig is not averse to authenticating his own work. He testified

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2032 of 2044 PageID #:11967
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

2031

credibly that in 2008, he told Sotheby's that a work was not his, but that earlier this year, he positively authenticated a work, a work for Sotheby's, a work that he did not know had survived.

Like the biographical evidence, the artistic evidence is not perfect.  Olivia Thornton at Sotheby's, when contacted by the plaintiffs, initially referred to the work as a wonderful early painting by Doig; but her e-mail, which is Exhibit 307 at pages 9 and 10 -- we don't have to put that up -- requested more information regarding the work's provenance.  And she later clarified at pages 7 and 8 that Sotheby's did not authenticate the work, and she asked the plaintiffs to stop telling people that Sotheby's had authenticated the work.

What I'm going to find is that the first e-mail, Thornton's initial reaction, is best explained as business development.  She was indicating enthusiasm for the work; and that makes sense, given the likely high price of selling a Peter Doig painting if the work were, in fact, authentic.  And she probably didn't want the plaintiffs to take their business to Christie's or to some other action house, and the way to do that is to indicate enthusiasm.

There's the stipulation that the painting was on linen, and all of the defendant's people said that the painting was on canvas.  And that contradicts the stipulation,

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2033 of 2044 PageID #:11968
Case: 16-3508   Document: 90      Filed: 09/20/2023    Pages: 158

2032

and the stipulation is the stipulation.  So, because the stipulation is the stipulation and both parties agreed to it in the pretrial order, said that the stipulation would govern, that would mean that nobody on the defendant's side could tell the difference between a canvas and a linen.

I don't think that that's significant.  I think it's embarrassing for the defense side that that stipulation was entered into; but I don't think it's that significant, and it doesn't speak one way or the other to the authorship of the work.

And finally, the artistic analysis supports the notion that Doige painted the disputed work.  Both sides -- or at least the plaintiffs said that there was an area in Arizona that was one model for the disputed work; and Ms. Bovard testified credibly that she and Peter Doige lived in Tucson for some period of time with their mother, and that Peter Doige then returned for eight months in Arizona, and that the disputed area looked like the area where they lived in Arizona.  And Ms. Doige's testimony was confirmed with a photograph of her and her brother as children in Arizona, which is Exhibit 521, which you don't have to put up.

Dr. Shiff testified that the disputed work and the other acknowledged Peter Doige works -- now, let me say parenthetically that Dr. Shiff knew of only a small number of Peter Doige works and did not -- was not shown or did not know

about many of the other ones; but the Peter Doige works that he did see, Shiff testified credibly that those works were consistent with Thorn's teachings, Professor Thorn's teachings, which Doige would have received at Lakehead.  And again, we have that book, the Notebook of Anthony Thorn, that was found in Peter Doige's possessions.

Marilyn Bovard testified credibly that Doige was an amateur artist throughout his life, and that he had painted a number of works, including *Killing Time*.  And I saw a number of Peter Doige's works, and again, I'm no art expert; but as a layperson viewing these works, the talent that was required to paint those works, at least a couple of those works, is on par with the talent that was required to paint the disputed work.

Then finally, what do I do with plaintiffs' testimony, especially Mr. Fletcher's historical testimony?  He said he saw the author.  He interacted with the author of the work in '76.  He saw Peter Doig, and he's saying they're the same person.

His testimony doesn't fit with the documentary evidence that we have, which I've already gone over at great length.  I believe that Mary Doig's recollection of where her son was at that particular time is more persuasive than Mr. Fletcher's piecing together history and connecting a person who he saw in 2011, on video in 2011 and 2012 and in

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2035 of 2044 PageID #:11970
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

2034

person in 2016, with somebody that he saw back in 1976.

There's the fact that Mr. Fletcher initially estimated the painter's age at 20 to 21, which would correspond with Doige being the author, and then changing his estimate to 17 to 18, which would have been consistent with Peter Doig being the author.

Mr. Fletcher did testify credibly that the author of the painting told him that he was Scottish, but both Doig and Doige had Scottish ancestry, and the Doige part was established through Ms. Bovard.

And Mr. Fletcher's memory was incomplete and inconsistent, and that's no -- I don't mean that pejoratively because as I mentioned at the outset, Mr. Fletcher's testifying about matters from about 40 years ago. But he initially believed that the author's prison art teacher was Ruth Blaicher rather than Ernie Adams. That was wrong. He misremembered who the author's parole officer was, who the Thunder Bay Correctional Center superintendent was at that particular point in time, confused his brother with Ian McCorriston when remembering who first told him that the painting was likely by Peter Doig.

And those gaps in recollection are understandable, and they also undermine Mr. Fletcher's testimony that the author was imprisoned for a drug or an LSD charge. And remember, that's important, because Peter Doige was in prison

for robbery; and so if the author of the work was in prison for drugs, they may not have been the same person.

But Mr. Fletcher admitted that he saw no documents to the effect that the author of the work was in for a drug charge; and given the other lapses in memory, I'm not going to credit Mr. Fletcher's testimony.  In other words, I don't think he's being intentionally untruthful, but I think he's just incorrect that the author was in for a drug or an LSD charge.

As for Mr. Bartlow, I believe that his desire to attribute the work to Mr. Doig clouded his judgment as an authenticator.  Mr. Bartlow acknowledged that this case is personal to him and that he is -- he acknowledged at some point that he was obsessed with this matter.  And I believe that this led to motivated reasoning on Mr. Bartlow's part in authenticating the work.

I think that his method -- his application of the method to the disputed work revealed to Mr. Bartlow what he really wanted the method to reveal.  As Dr. Shiff noted, as he aptly observed, if you're looking for coincidences between two works of art, you're going to find coincidences.

And in terms of establishing the provenance, I found it significant that Mr. Bartlow declined to contact Mr. Doig's friends who were identified for him because he just assumed that they would lie.  I think that's more evidence of

motivated reasoning here.

So, those are the factual findings, and now I have to give the conclusions of law.

Count 2 of the complaint seeks a declaration that the work was painted by Peter Marryat Doig and that the plaintiffs may attribute the work to Mr. Doig. Mr. Doig didn't paint the work, so the declaratory judgment is denied; and I'm going to find for the defendant, Mr. Doig, on Count 2.

Count 1 is tortious interference with prospective economic advantage. As the Seventh Circuit explained -- or set forth in *Foster versus Principal Life Insurance Company*, 806 F.3d 967 at 971, 2015, "To state a claim under Illinois law for intentional interference with prospective economic advantage, the plaintiff must allege a reasonable expectancy of entering into a valid business relationship, the defendant's knowledge of the expectancy, an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and damage to the plaintiff resulting from the defendant's interference."

I think that Doig, through his agents, did interfere with the auctioning of the work as a Peter Doig, and that's shown by Plaintiffs' Exhibit D. However, if Doig did not author the work, his interference with that expectancy was not unjustified, meaning that it was justified.

And then the question is: Who bears the burden of

A85

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2038 of 2044 PageID #:11973
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

2037

proof on the justification element?  Is it something that the plaintiff must prove by a preponderance of the evidence as an element of the claim, or must the defendant prove by a preponderance of the evidence that the interference was justified?

And in this context, the interference is -- whether it's justified or not turns on whether Mr. Doig actually painted the work or not.  If Mr. Doig did not paint the work, his interference was justified.  If he did paint the work, his interference was not justified because it was based on a lie.

And there is no answer to that question.  In *Nation versus American Capital, Ltd.* -- there's no answer to the question on who bears the burden of proof.  There is an answer to the question of whether Mr. Doig painted the painting.  But as the Seventh Circuit noted in *Nation versus American Capital*, 682 F.3d 648 at 651, footnote 2, in 2012, "Illinois courts have been unclear about whether the issue of conditional privilege is part of the plaintiff's claim, that is, an aspect of the plaintiff's burden to prove that the defendant's interference with the contract was unjustified, or an affirmative defense to be proved by the defendant."

In the opening statement, the plaintiff said that they bore the burden of proof on whether the painting was painted by Doig, and that's a waiver, so I can rely on that.  But in the end, it doesn't matter.  If it's plaintiffs' burden

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2039 of 2044 PageID #:11974
Case: 16-3508     Document: 90     Filed: 09/20/2023     Pages: 158

2038

to show that the work was painted by Doig, in other words, to show that the interference was unjustified, the plaintiffs didn't meet their burden; and if it was the defendant's burden to show that the interference was justified, meaning it was the defendant's burden to show that Doig did not paint the work, Doig met his burden.  And he met the burden not just by a preponderance of the evidence, but I believe by clear and convincing evidence, although a preponderance is all that's required now.

And because Doig did not paint the work, the interference was justified; and, therefore, the tortious interference claim fails.

And I'll just cite one more case, *Kempner Mobile Electronics versus Southwest Bell*, 428 F.3d 706 at 716, Seventh Circuit 2005, where the court held, "There is no liability for interference with prospective contractual relation on the part of one who merely gives truthful information to another."

And that's what Peter Doig did here.  He gave truthful information -- his agents, Doig, through his agents, gave truthful information to Mr. Bartlow and to Miss Hindman that he was not the author of the work.

Now, in closing argument, I asked plaintiffs' counsel whether that would end the matter.  In other words, if I find that Doig did not paint the work, does the tortious

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2040 of 2044 PageID #:11975
Case: 16-3508      Document: 90          Filed: 09/20/2023      Pages: 158

2039

interference claim fail?  And he said no.  He said that even if Peter Doig did not author the work, his interference with the sale of the disputed work was unjustified and that they're still entitled to judgment and damages.

But actually, Jimmy, if you can go to Plaintiffs' Exhibit D, which is the Doig letter, Doig through his agents letter to Leslie Hindman, which is what ultimately put the kibosh on the auction, there's the first page, which introduces the author of the letter, who's Mr. Dontzin.  It says, "We understand you've been advised by a dealer that the painting is owned by Robert Fletcher."

And if you can go to the next page, please, the letter goes on to say, "Mr. Doig does not know Mr. Fletcher, and certainly never gave him any paintings," and then goes on to give a couple of other reasons why Mr. Dontzin believes that the work is not of Mr. Doig's.

And the key paragraph is the last one, which is, "Under the circumstances, the gallery," meaning Michael Werner Gallery, which represents Peter Doig, "will have no choice but to take legal action if the painting is auctioned or otherwise sold as a work by Mr. Doig."  And that's the key phrase, "as a work by Mr. Doig."

So, the letter, Doig, through his agents, did not stop anybody from selling the work.  What Doig did was to incent Miss Hindman, lead Miss Hindman not to sell the work as

A88

2040

a Peter Doig.  And that was not unjustified, and, in fact, it's amply justified.

An artist is well within his rights to ensure that works that he did not create are not sold or offered under his name.  The artist has a right to protect his reputation and his oeuvre.

This is a right that's recognized -- first, it's just common sense; but it's recognized in law by the Visual Artists Rights Act of 1990, 17 USC 106A(a)(1)(B).  And while that act does not apply to this case because the work was created before its effective date, it confirms the notion that we all already know, and that's common sense, that an artist has a strong interest and is amply justified in denying authorship of a work that he did not create.

So, for those reasons, I'm going to find for the defendant on the tortious interference count.

I had previously dismissed Gordon VeneKlasen, Matthew Dontzin, and the Dontzin Law Firm on personal jurisdiction grounds under the fiduciary shield doctrine, and that's in the same opinion where I denied Mr. Doig's personal jurisdiction motion.  Even if I was wrong to dismiss VeneKlasen, Dontzin, and the law firm, they still would be entitled to judgment on the grounds that I've articulated as to the claims against Peter Doig.

So, in conclusion, I'm going to find for defendant,

Peter Doig, on both counts, and I'm going to enter judgment in favor of the defendants Peter Marryat Doig, Gordon VeneKlasen, Matthew S. Dontzin, and the Dontzin Law Firm, LLP, and against the plaintiffs Robert Fletcher and Bartlow Gallery, Ltd. The deadlines for any post-judgment filings are set forth in the applicable rules and local rulings.

Is there anything else that -- well, is there anything else that we need to address other than what we're going to do with the painting?

MR. DONTZIN: Not from the defendant's side.

MR. ZIESKE: I don't think so, your Honor, other than possible confidentiality issues that are outstanding. But we can address those in post-trial motions as well if the Court desires.

THE COURT: Involving what?

MR. ZIESKE: There were many confidential designations, of course, in the case. A lot of the information that was originally designated confidential, most of it, I would say, came out in open trial, so it's unclear at this point as to what might remain designated confidential and still be appropriately kept confidential and what isn't. And that may become an issue in the future. It certainly was an issue brought up by the defendants during the trial -- or during the case's pendency.

THE COURT: Okay. Why don't -- I have all the

A90

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2043 of 2044 PageID #:11978
Case: 16-3508     Document: 90        Filed: 09/20/2023      Pages: 158

2042

exhibits, and again, I don't think I showed anything during the verdict that wasn't already shown during the trial. If there are materials that you believe should be confidential, why don't you talk with defense counsel about it; and then you can contact Jackie, and we'll figure out what to do with it.

MR. ZIESKE: And I think it would be the other way around. I think it would be the defendants that are seeking confidentiality, and we can certainly discuss that.

THE COURT: Okay.

MR. ZIESKE: We've never designated anything confidential, for understandable reasons.

THE COURT: Okay. Whoever wants anything to be confidential, the onus is on you to do something about it. And contact the other side, figure out what you want to do; and then contact Jackie, and we'll figure out how to go forward on the confidentiality.

As to the work, Mr. Zieske, we could keep it here, or Mr. Bartlow can take it.

MR. ZIESKE: I think I'm going to defer to Mr. Bartlow and Mr. Fletcher on that, since they're the owners and people with greatest interest in the painting.

THE COURT: That's fine. So, you can just let Jimmy or Jackie know what you want to do. If you want it to stay here, I'll put it in the vault. If you want to take it home, you can take it home.

Case: 1:13-cv-03270 Document #: 273-8 Filed: 10/21/16 Page 2044 of 2044 PageID #:11979
Case: 16-3508     Document: 90          Filed: 09/20/2023     Pages: 158

2043

MR. ZIESKE:  Okay.  Very good.  I think I'm hearing until tomorrow.

THE COURT:  That's fine.

MR. ZIESKE:  If that's okay.

THE COURT:  All right.  So, we'll keep it here. Mr. Bartlow, if you could box it up, and I'll put it in a secure place in the courthouse.

Okay.  Is there anything else that we need to address?

MR. ZIESKE:  Nothing on our side.

THE COURT:  All right.  Thank you.

MR. DONTZIN:  Thank you, Judge.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Charles R. Zandi*                    *August 24, 2016*

Charles R. Zandi                         Date
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT FLETCHER and BARTLOW )
GALLERY, LTD., )
 )
 )
Plaintiffs, )
 )
-vs- )    Case No. 13 C 3270
 )
PETER DOIG, )    Chicago, Illinois
 )    April 6, 2016
Defendant. )    4:00 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY FEINERMAN

APPEARANCES:

For the Plaintiffs:    ZIESKE LAW
                       BY:  MR. WILLIAM F. ZIESKE
                       453 Coventry Lane
                       Suite 104
                       Crystal Lake, Illinois  60014
                       (312) 252-9599

For the Defendant:    DONTZIN NAGY & FLEISSIG, LLP
                      BY:  MR. TIBOR L. NAGY
                           MR. MATTHEW S. DONTZIN
                      980 Madison Avenue
                      New York, New York  10075
                      (212) 717-2900

Also Present:    MR. PETER BARTLOW.


Court Reporter:

             CHARLES R. ZANDI, CSR, RPR, FCRR
                  Official Court Reporter
                United States District Court
         219 South Dearborn Street, Suite 2128
                  Chicago, Illinois  60604
               Telephone:  (312) 435-5387
        email:  Charles_zandi@ilnd.uscourts.gov

(Recess had.)

THE COURT:  So, I really appreciate both sides' briefs and arguments here in court.  The case was very ably presented -- or the motion was very ably presented by both sides.

I'm going to deny the summary judgment motion, and I'm going to -- rather than burden the docket with an opinion, I'm just going to state my reasons on the record.

This is a summary judgment motion, and I've already talked about the lens through which I have to view the record.  And while it is the plaintiffs' burden of proving by a preponderance of the evidence that -- at least at a minimum, that the painting was authored by Doig, on summary judgment, it is the defendant's obligation to show that no reasonable trier of fact could conclude that -- based on the record evidence, could conclude that the painting was authored by Doig.

And I can't make that -- I can't find that on summary judgment.  I think if I did, I'd get reversed, and you'd just be back down here a year from now in front of a different judge, because it's a bench trial, and they probably wouldn't send it back to me.

So, let me -- there are really three things that I'm basing my decision on, and all three of them, I believe, are essential to my conclusion that a reasonable fact-finder

A94

could, but of course, need not necessarily, find that the painting was authored by Doig.

And everything I say right now -- I know I've said it before, but I'm going to say it again. Everything I say right now takes the record in the light most favorable to the plaintiffs and resolves all genuine factual disputes and credibility disputes in the plaintiffs' favor. So, nothing I say now will prevent the fact-finder at trial, me, from taking a different view of the evidence from the lens of a fact-finder at trial.

And among other things, this means that I can take a different view of the documents at trial than I'm taking here, and that while I must believe Fletcher's affidavit on summary judgment, I may, but need not believe his testimony at trial.

So, number one, there's -- I can't find for purposes of summary judgment that Doig was in Toronto from the summer of '76 through the fall of '77. Now, Fletcher avers that he met Doig -- let me just say he met the author at Lakehead in 1975 or 1976, and I'm going to focus on 1976; that the author stopped showing up at Lakehead, and then the next time Fletcher saw him was at Thunder Bay Correctional Centre; that the author spent five months at Thunder Bay Correctional Centre, during which time he painted the work; and that for three to four months after his release, after the author's release, Fletcher served as his volunteer parole officer,

A95

Case: 1:13-cv-03270 Document #: 273-6 Filed: 10/21/16 Page 149 of 670 PageID #:8804
Case: 16-3508    Document: 90       Filed: 09/20/2023    Pages: 158

62

during which time Fletcher bought the painting.

So, as the defendant correctly observes, for the author to be Doig, Doig had to be living in Thunder Bay outside -- in other words, not in Toronto, for at least eight months. And viewing the record in the light most favorable to the plaintiffs, a reasonable fact-finder could find that.

The school records do not account for -- the documents do not account for Doig's whereabouts for the 1976 to 1977 school year, and that's page 321 of the appendix. The records start there. The dates are for the end of the year, and we have him in 10th grade during the '74 to '75 school year, in 11th grade from the '76 -- I'm sorry, '75 to '76 school year, and then a year is skipped, and he's in -- it shows him in 12th grade from the '77 to '78 school year. Where was he from '76 to '77?

And again, this timeline fits with the plaintiffs' theory of the case only if Fletcher met the painting's author in 1976 as opposed to '75, and only if Fletcher met the author at Lakehead before seeing him at Thunder Bay, and I have to accept those averments as true.

Further complicating the situation is that the May 29th, 2012, e-mail from Mogadassi to VeneKlasen places Doig in Alberta working as a roughneck from May 1976 to October 1976. And this -- the context of the e-mail is not apparent from the face of the e-mail, but this e-mail was sent

after VeneKlasen had been contacted by, I believe, Bartlow; and I think it's a reasonable inference that the reason Mogadassi sent this e-mail to VeneKlasen is to establish a timeline to refute the soon-to-be plaintiffs' suggestion that Doig painted the painting in Thunder Bay in late -- at some point in 1976.

So, it places Doig in -- the e-mail places Doig in Alberta working as a roughneck from May '76 to October of '76, and it doesn't put him in school from '77 to '78, and that was wrong, and -- because currently -- well, it may or may not be wrong, but it contradicts what Doig is currently saying, which is that he was in Toronto during that entire time, and that he was a roughneck in Alberta during the summer months of '77, not in '76.

And I understand that Doig says that the e-mail should have said 1977 rather than 1976, and he may be right; but that's a triable issue, and I can't say on summary judgment -- and it would be a -- they would laugh at me upstairs if I did say this on summary judgment, that an e-mail that Doig's partner sent to Doig's dealer, presumably with Doig's input, was indisputably a mistake. I can't say that on summary judgment.

So, in terms of the documentary evidence and the -- from the schools and the e-mail, we don't know where Doig was from '76 to '77, which is -- the summer of '76 through the

Case: 1:13-cv-03270 Document #: 273-6 Filed: 10/21/16 Page 151 of 670 PageID #:8806
Case: 16-3508    Document: 90        Filed: 09/20/2023    Pages: 158

64

fall of '77, which is the key time frame.

Now, Doig points to affidavits from family members and friends placing him in Toronto during the relevant time frame. And it is true that I cannot deny summary judgment solely on the ground that the fact-finder might not find those affidavits credible. There has to be actual evidence pointing in the other direction. And I agree with that.

We have that actual evidence here. We have the school records with the gap, and we have the changing of the story from the Mogadassi e-mail to what Doig's current position is.

The school records go on. At pages 323 to 324, it shows Jarvis. It shows S.E.E.D. that's capital S-E-E-D. And that -- there's still a similar gap from -- now, it says November of '76 rather than June of '76, but his school record does not pick up again until September of '77; and so, therefore, that doesn't place him in Toronto during that time.

There is appendix 331, which is grades for -- as of June 10th -- or June 18th, 197- -- it's 1976, and the notation, it says, "For," end paren -- this is probably for the spring of 1977 -- "grade 12, Jarvis or S.E.E.D. home school." But the document itself says, "Form 11S," which I think means in European or Canadian speak 11th grade, spring semester. And it matches up -- the grades match up with 321, the 11th grade grades for -- the 11th grade marks, scores, for

A98

11th grade that ended in 1976, not 1977.

The yearbook photos and the letters, I can't say on summary judgment what year they're from.

The fact that the passport was renewed in 1976, the record doesn't reveal, it hasn't been argued, whether you had to renew your passport in person during that time frame.  It doesn't say whether Canadian law required the photograph to be a contemporary photograph or, even if the law required that, whether that -- whether they complied with the law and gave a contemporary photograph.

So, during that gap from the summer of '76 through the fall, maybe September, August or September of '77, a reasonable fact-finder could come out either way.  Maybe he was in Toronto.  Maybe he was somewhere else.

And it's true, as the defendant says, there's no record from Thunder Bay Correctional Centre placing him there, but there's no official record placing Doige there, either.

The presence of the Lakehead and the Seafarers records for Doige but not for Doig certainly favors Doig. There is no doubt about that.  But it's not strong enough evidence, given all of the evidence in the record, including the evidence that I just talked about, making it indisputable, making it so that no reasonable fact-finder could conclude that Doig was not the person at Thunder Bay who was the author of the painting.

In addition to that, we have Fletcher's averments regarding the author's facial features, hand gestures, and mannerisms being the same as what he saw of Doig; and whether it was a video from the '80s or from the aughts doesn't matter.  People maintain the same mannerisms -- or they often maintain the same mannerisms throughout their life, so that doesn't matter.  So, that's number one.

Number two, the defendant's timeline for Peter Doige, for Doige, does not indisputably cohere.  So, what -- doesn't cohere with Fletcher's timeline, which I need to assume is true.

Fletcher said that he met Doige in '75 or '76 at Lakehead and then at Thunder Bay, and that includes late '76. And because that time frame includes late '76, that causes a problem because Doige's Lakehead University student records, which are at pages 207 to 211 of the appendix, indicate that he started at Lakehead in the fall of '76 and was in school through December of '76; and Fletcher avers that he met Doige at Lakehead before seeing him at the prison, and Doige started at Lakehead in '76.  That doesn't leave enough time for Doige to have painted the work in prison in 1976.

And again, this conclusion turns on the truth, the assumed truth of Fletcher's averment that he met the author at Lakehead before seeing him at Thunder Bay and placing the timeline as including late '76.

Now, I was concerned about the signature, and that's why I asked Mr. Zieske about it. I've looked at the signatures again. They look close. Can I say as a matter of law that those signatures are by the same hand? As a matter of law, I can't say that.

The Exhibit No. 11, which are Fletcher's notes from his visit to the courthouse and from talking to the folks at the courthouse and the court file, I think a reasonable person could read those notes as Fletcher suggesting that it was Doige who was transferred to Thunder Bay Correctional Centre in December of '75, which, if true, would make all the dates work for Doig. But I -- this -- I can't -- this document, I can't reach that conclusion based solely on the document; and I reviewed the relevant portion of the deposition, and whether Fletcher was telling the truth or not, and I have to assume he was telling the truth, he didn't complete the circle and say, "Yes, I was told," or, "I saw that" -- and even if he was told, it might have been hearsay, but, "Yes, I was told that it was Peter Doige who was transferred to Thunder Bay."

He testified, "Well, I was just writing down that it was a possibility." I have to assume that's true through the summary judgment lens. I may see him testify and continue to believe that what he's saying is true. I may see him testify and conclude that he's lying or that he's mistaken. But in the summary judgment setting, he gets the benefit of the

Case: 1:13-cv-03270 Document #: 273-6 Filed: 10/21/16 Page 155 of 670 PageID #:8810
Case: 16-3508    Document: 90    Filed: 09/20/2023    Pages: 158

68

doubt.

Third are what the experts have said. And I know that -- I know that Wiener -- that's W-I-E-N-E-R -- and Thornton did not authenticate the work. However, Wiener talked about the many features that he believed are common between the disputed work and Doig's later acknowledged works. And Schiff strongly disagrees with Wiener's methodology. And at trial, I may agree with Wiener. I may agree with Schiff. But that's not the grist for summary judgment.

I'll cite, among other -- I can cite many cases for that, but I'll just rely on *Morisch*, M-O-R-I-S-C-H, *versus United States*, 653 F.3d 522 at 529, Seventh Circuit 2011.

If I only had two of those three things, maybe I would have come out a different way. If I didn't have Fletcher's averments on the timing, maybe I would have come out a different way on the summary judgment motion. But with Fletcher's averments and with those three things, I cannot say that this is a summary judgment -- that this case can be disposed of on summary judgment.

In terms -- the defendant also makes an argument about the elements of tortious interference, and I think that the Hindman affidavit establishes a triable issue of fact as to whether she would have auctioned the work as Doig's had he not disclaimed authorship. So, I believe there was a reasonable expectation of a commercial relationship with

Hindman.

So, for those reasons, I'm going to deny the summary judgment motion. And I understand that it's more than -- inconvenient doesn't even begin to describe what doing -- what appearing for this trial will be for Mr. Doig and, if his partner appears, for his partner, particularly that they've just had a baby. I just -- I just can't -- I'm not -- I couldn't in good conscience, given -- for the reasons that I've just given, grant summary judgment. So, we'll have to go to trial.

Again, I want to thank both sides for their really excellent presentations both in writing and here in court.

MR. DONTZIN: Your Honor, thank you for staying so late, and thank your staff for staying so late tonight. We appreciate that.

Your Honor did indicate a July trial date, and I really appreciate that the Court understands the enormous burden on Mr. Doig, his wife, his mother, who's elderly. His father passed away, so unfortunately, very recently won't be a witness at the trial. But we have an enormous burden to get a dozen or so witnesses to Chicago for trial. We'd ask the Court to set a trial sometime in late September, early October, to give us the benefit of the next three or four months so we can track down all of these people and see if we can get them all to Chicago.

THE COURT:  Why don't you -- I'm -- this trial date has been set for quite some time, so -- and my trial calendar is about as ugly as a trial calendar can get.  And I couldn't fit you in in September and October at this point because I have cases that I know are going to go.

But -- you know, so, it's -- the trial date's set in loose concrete at this point.  If there's a really, really good reason, I could entertain moving it.  Obviously, I'd have to hear from plaintiffs as well.  But you'd really have to set forth the circumstances -- the justifications in a written motion.

MR. DONTZIN:  Sure.  We'll do that, your Honor.

THE COURT:  All right.  Thank you.

MR. ZIESKE:  Thank you, your Honor.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Charles R. Zandi*              *April 8, 2016*
_____              _____
Charles R. Zandi                  Date
Official Court Reporter

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Adam J. Sedia*