## Nos. 23-2364 & 16-3508

# In the
# United States Court of Appeals
## for the Seventh Circuit

———— • ————

ROBERT FLETCHER and BARTLOW GALLERY, LTD.,

*Plaintiffs,*

v.

PETER DOIG,

*Defendant-Appellee,*

APPEAL OF: WILLIAM FREDERICK ZIESKE

———————————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:13-cv-03270.
The Honorable Mary M. Rowland, Judge Presiding.

## RESPONSE BRIEF OF DEFENDANT-APPELLEE

TIBOR L. NAGY, JR. (*Counsel of Record*)
MATTHEW S. DONTZIN
DAVID A. FLEISSIG
DONTZIN NAGY & FLEISSIG LLP
980 Madison Avenue
New York, NY 10075
(212) 717-2900

*Counsel for Appellee Peter Doig*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 16-3508

Short Caption: Robert Fletcher and Bartlow Gallery LTD. v. Peter Doig, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

|     | **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** |

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

(1) Peter Doig;

(2) Gordon VeneKlasen;

(3) Matthew S. Dontzin; and (4) The Dontzin Law Firm.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

(1) Dontzin Nagy & Fleissig LLP;

(2) Agrawal Evans LLP ; and

(3) Massey & Gail LLP.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: _____ Date: 9/27/2016

Attorney's Printed Name: Tibor L. Nagy, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☒   **No** _____

Address: 980 Madison Avenue

New York, New York 10075

Phone Number: (212) 717-2900      Fax Number: (212) 717-8088

E-Mail Address: tibor@dnfllp.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __16-3508__

Short Caption: __Robert Fletcher and Bartlow Gallery LTD v. Peter Doig, et al.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    (1) Peter Doig;

    (2) Gordon VeneKlasen;

    (3) Matthew S. Dontzin; and (4) The Dontzin Law Firm.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    (1) Dontzin Nagy & Fleissig LLP;

    (2) Agrawal Evans LLP; and

    (3) Massey & Gail LLP.

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: _____    Date: __11/15/2018__

Attorney's Printed Name: __Matthew S. Dontzin__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____    No ✕

Address: __980 Madison Avenue, Floor 2__

    __New York, New York 10075__

Phone Number: __(212) 717-2900__    Fax Number: __(212) 717-8088__

E-Mail Address: __mdontzin@dnfllp.com__

rev. 01/15 GA

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>16-3508</u>

Short Caption: <u>Robert Fletcher and Bartlow Gallery LTD v Peter Doig, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>(1) Peter Doig; (2) Gordon VeneKlasen; (3) Matthew S. Dontzin, and (4) The Dontzin Law Firm</u>

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>(1) Dontzin Nagy & Fleissig LLP; (2) Agrawal Evans LLP; and (3) Massey & Gail LLP</u>

_____

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

_____

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

_____

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____

Attorney's Signature: _____ Date: <u>10/20/2023</u>

Attorney's Printed Name: <u>David A. Fleissig</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: <u>980 Madison Avenue</u>

<u>New York, New York 10075</u>

Phone Number: <u>(212) 717-2900</u>        Fax Number: <u>(212) 717-8088</u>

E-Mail Address: <u>dafleissig@dnfllp.com</u>

rev. 12/19 AK

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS............................................i

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE.............................................................. 1

I.    UPON DISCOVERING THAT THE DISPUTED WORK MIGHT BE WORTH A SUBSTANTIAL SUM, FLETCHER AND BARTLOW THREATEN DOIG AND HIS ASSOCIATES ................................................................. 5

II.   FLETCHER AND BARTLOW "CORRECT" FLETCHER'S MEMORIES OF THE PAINTER TO FIT THE LIFE OF PETER DOIG ................................. 8

III.  AFTER ZIESKE FILES THE COMPLAINT, DOIG SERVES HIS RULE 11 LETTER AND PRODUCES THE BOVARD DECLARATION ................... 9

IV.   AFTER DEFENDANTS PROVIDED EVIDENCE THAT DOIG WAS NOT THE PAINTER, THE DISTRICT COURT ASKED ZIESKE TO CONSIDER WHETHER TO DETERMINE THE ISSUE; HE REFUSED ................ 12

V.    OVER THE NEXT TWO YEARS, DISCOVERY CASTS EVER GREATER DOUBT ON ZIESKE'S LIKELIHOOD OF SUCCESS ......................... 14

      A.   On May 4, 2014, Zieske Acknowledges That The Witness He Intended To Call To Impeach Bovard's Declaration Would Not Cooperate........ 14

      B.   In May 2015, The Seafarers' Union Confirms That Doige, Like The Painter, Was A Member Of The Seafarers' Union .............................. 15

      C.   In June 2015, Lakehead University Releases Records Demonstrating That Doige, Like The Painter, Was A Student There .......................... 15

      D.   In December 2015, Doig Produces A Declaration From Matthew Esquega, An Inmate At TBCC, Identifying Bovard's Brother As The Painter...................................................................... 15

      E.   In December Of 2015, Doig Produced A Declaration From The Painter's Art Teacher Ernest Adams, Who Identified Him As Bovard's Brother ...................................................................... 16

      F.   After Doig Discloses The Identity Of Over Two Dozen People Having Knowledge Of His Whereabouts, Zieske Declines To Depose Any Of Them Because Plaintiffs Believe They Would Testify In Doig's Favor 17

VI.   THE DISTRICT COURT DENIED SUMMARY JUDGMENT ..................................... 17

VII.  THE DISTRICT COURT FOUND THAT DOIGE PAINTED THE DISPUTED WORK.... 20

VIII. THE DISTRICT COURT SANCTIONED PLAINTIFFS AND ZIESKE FOR PROSECUTING THIS ACTION WITHOUT A REASONABLE BASIS.............................. 23

SUMMARY OF ARGUMENT ...................................................... 27

ARGUMENT ...................................................................................................... 28

I.    STANDARD OF REVIEW ............................................................................... 28

II.   THE DISTRICT COURT PROPERLY APPLIED THIS COURT'S SANCTIONS
      PRECEDENT ................................................................................................. 28

      A.    Neither *LeBeau* Nor Any Other Case Imposes An "Egregious Conduct"
            or "Improper Means" Standard ......................................................... 30

      B.    The District Court's Decision Is Consistent With *LeBeau* ................... 33

      C.    Even If An Egregious Conduct Or Improper Means Test Applied,
            Zieske's Conduct Satisfied It ............................................................. 36

III.  THE DISTRICT COURT PROPERLY APPLIED THIS COURT'S DECISION IN
      *SHALES* ......................................................................................................... 38

IV.   THE DISTRICT COURT PROPERLY CONSIDERED AND AWARDED FEES .............. 42

CONCLUSION ................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aeroground, Inc. v. CenterPoint Properties Tr.*,
738 F.3d 810 (7th Cir. 2013) .................................................................. 28

*Blue v. U.S. Dep't of Army*,
914 F.2d 525 (4th Cir. 1990) .................................................................. 32

*Calloway v. Marvel Ent. Grp.*,
854 F.2d 1452 (2d Cir. 1988) ................................................................. 36

*Connelly-GPM v. Donegan*,
2004 WL 2600625 (N.D. Ill. Nov. 16, 2004) .................................................... 42

*Cuna Mut. Ins. Soc. v. Off. & Pro. Emps. Int'l Union, Loc. 39*,
443 F.3d 556 (7th Cir. 2006) .................................................................. 34

*De Manez v. Bridgestone Firestone N. Am. Tire, LLC*,
533 F.3d 578 (7th Cir. 2008) .................................................................. 40

*Donald v. Wexford Health Sources, Inc.*,
982 F.3d 451 (7th Cir. 2020) .................................................................. 33

*Est. of Borst v. O'Brien*,
979 F.2d 511 (7th Cir. 1992) .................................................................. 42

*Garnett v. Remedi Seniorcare of Virginia, LLC*,
892 F.3d 140 (4th Cir. 2018) .................................................................. 42

*Goldstein v. Costco Wholesale Corp.*,
337 F. Supp. 2d 771 (E.D. Va. 2004) ........................................................... 32

*Guerrero v. Holder*,
407 F. App'x 964 (7th Cir. 2011) .............................................................. 41

*Jolly Grp., Ltd. v. Medline Indus., Inc.*,
435 F.3d 717 (7th Cir. 2006) .................................................................. 28

*Knorr Brake Corp. v. Harbil, Inc.*,
738 F.2d 223 (7th Cir. 1984) .............................................................. 28, 34

*LeBeau v. Libbey-Owens-Ford Co.*,
799 F.2d 1152 (7th Cir. 1986) ............................................................. 27, 30

*Lee v. Glessing*,
2006 WL 2524185 (N.D.N.Y. Aug. 30, 2006) .................................................... 32

*Lemaster v. United States,*
    891 F.2d 115 (6th Cir. 1989) ........................................................ 32, 36

*Lightspeed Media Corp. v. Smith,*
    761 F.3d 699 (7th Cir. 2014) ............................................................. 28

*Matter of Lisse,*
    921 F.3d 629 (7th Cir. 2019) ............................................................. 28

*McClain v. Retail Food Emps. Joint Pension Plan,*
    413 F.3d 582 (7th Cir. 2005) ............................................................. 41

*Nichols v. Illinois Dep't of Transportation,*
    4 F.4th 437 (7th Cir. 2021) ............................................................... 42

*Payne v. Pauley,*
    337 F.3d 767 (7th Cir. 2003) ............................................................. 33

*Perry v. S.Z. Rest. Corp.,*
    45 F. Supp. 2d 272 (S.D.N.Y. 1999) ................................................. 32

*Raitz v. Libbey-Owens-Ford Glass Co.*
    (N.D. Ohio Sept. 23, 1973) ............................................................... 30

*Riddle & Assocs., P.C. v. Kelly*
    414 F.3d 832, 835 (7th Cir. 2005) .................................................... 40

*Shales v. Gen. Chauffeurs, Sales Drivers & Helpers Loc. Union No.*
    *330,*
    557 F.3d 746 (7th Cir. 2009) ......................................................... 5, 38

*Tate v. Showboat Marina Casino P'ship,*
    431 F.3d 580 (7th Cir. 2005) ....................................................... 39, 41

*In re TCI Ltd.,*
    769 F.2d 441 (7th Cir. 1985) ............................................................. 29

*Tomazzoli v. Sheedy,*
    804 F.2d 93 (7th Cir. 1986) ............................................................... 44

*Townsend v. Sears, Roebuck & Co.,*
    879 N.E.2d 893 (Ill. 2007) ................................................................. 42

*United States v. Crawley,*
    837 F.2d 291 (7th Cir. 1988) ............................................................. 39

*United States v. Glob. Distributors, Inc.,*
    498 F.3d 613 (7th Cir. 2007) ............................................................. 28

*Vega v. Chicago Park Dist.,*
    12 F.4th 696 (7th Cir. 2021) ......................................................... 42, 44

*Waldridge v. Am. Hoechst Corp.*,
    24 F.3d 918 (7th Cir. 1994) .............................................................................. 33

*Wilson v. Cook Cnty.*,
    937 F.3d 1028 (7th Cir. 2019) ......................................................................... 41

**Statutes**

28 U.S.C. § 1927...................................................................................*passim*

Fed. R. Civ. P. 11. ...............................................................................*passim*

## JURISDICTIONAL STATEMENT

Defendant-Appellee[1] Peter Doig states that the jurisdictional statement of Respondent-Appellant William F. Zieske is complete and correct.

## STATEMENT OF THE ISSUES

1. Whether the District Court abused its discretion when it sanctioned Zieske under 28 U.S.C. § 1927 and Rule 11 for prosecuting this case after he knew, or should have known, that his clients' claims lacked a plausible legal or factual basis.

2. Whether the District Court abused its discretion by adhering to this Court's decision in *Shales v. General Chauffeurs* and concluding that Zieske's alleged inability to pay was irrelevant under 28 U.S.C. § 1927.

3. Whether the District Court abused its discretion by awarding Defendants 80% of the fees they incurred in the years Zieske prosecuted this case after he knew or should have known that his clients' claims lacked a plausible legal or factual basis.

## STATEMENT OF THE CASE

In 2013, the District Court (Feinerman, J.) warned William F. Zieske that, if he continued to prosecute this case in the face of evidence produced by the Defendants establishing his clients' claims were meritless, he should not be surprised if he is sanctioned. A decade later, Zieske challenges the District Court's decision to impose those sanctions. For the reasons set forth below, the decision of the District Court should be affirmed.

---

[1] Doig has chosen not to pursue his cross-appeal. *See* Dkt. 263.

On April 30, 2013, Zieske filed a complaint (the "Complaint") alleging that the world-renowned artist Peter Marryat Doig created a painting in 1976 that was signed by "Pete Doige" (the "Disputed Work"). Zieske alleged that Doig attended Lakehead University in 1975 or 1976; was thereafter incarcerated at Thunder Bay Correctional Center ("TBCC"), where he painted the Disputed Work during an art class for inmates; and, after he was paroled, sold the Disputed Work to his parole officer, Plaintiff Robert Fletcher, in 1976. One year later, Zieske possessed overwhelming evidence that each of these allegations—all of which were premised on Fletcher's hazy recollection of decades-old events—was demonstrably false. Doig and his gallerist categorically denied that Doig had painted the Disputed Work. Documents from Lakehead University demonstrated that Doig had never attended that institution. A report from the Royal Canadian Mounted Police confirmed that Doig had no criminal record. And a series of records from the Ontario Ministry of Education—along with school yearbooks and correspondence from members of Doig's family—established that Doig was a high schooler living, working, and studying in Toronto when, according to the Complaint, the Disputed Work was composed hundreds of miles away in Thunder Bay.

Zieske also possessed irrefutable evidence that the Disputed Work had in fact been painted by the man who signed his name to it: Peter Edward *Doige*, with an "e." On August 27, 2013, counsel to Doig and the other defendants provided Zieske with the sworn declaration of Mr. Doige's sister, Marilyn Doige Bovard. In her declaration, Ms. Bovard confirmed that her brother, who died in 2012, had attended Lakehead University; had been incarcerated at Thunder Bay Correctional Center, where he took art classes; had been an amateur painter

2

throughout his life; and that the scene depicted in the Disputed Work resembled a location in Arizona where Doige and Bovard had lived as children.  Moreover, Bovard produced photographs of her brother, including a photo on his Lakehead student ID that Fletcher said bore a "unbelievable" resemblance to the man he had observed paint the Disputed Work.

During a status conference on September 3, 2013, the District Court asked Zieske to consider whether, in light of the evidence produced by the defense, the case should be discontinued because it no longer had an objective basis.  It then cautioned Zieske that, should he continue to prosecute the case in the face of that evidence, he should not be surprised if sanctions were imposed.  In defiance of that admonition, Zieske refused to dismiss the case,  declaring that he possessed evidence rebutting Bovard's account and establishing that Doige could not have painted the Disputed Work.  That representation, the District Court later found, was false; Zieske *never* came forward with the evidence he had described and, by May 4, 2014, had all but admitted he would be unable to do so.  Nevertheless, in violation of his legal and ethical obligations as an officer of the Court, Zieske continued to prosecute this action for years, causing Doig and his co-defendants to expend millions of dollars to defend themselves—through discovery, summary judgment, and trial—from allegations that Zieske knew or should have known had no factual or legal basis.  After conducting an eight-day bench trial on the merits, the District Court found that the evidence—including the materials provided to Zieske by the defense in 2013—conclusively demonstrated that Peter Edward Doige, not Peter Marryat Doig, painted the Disputed Work.  Thereafter, the

3

defense moved for sanctions, asking the District Court to hold Zieske accountable for his egregious abuse of the judicial process.

The District Court, informed by its years of experience with the case, granted that motion. Even if Zieske had an objectively reasonable basis for initiating this case, the Court found, that basis was extinguished when, over the course of a year, the evidence demonstrated that the self-interested attestations of his clients—the sole affirmative evidence for their claims—were irreparably shaky and inherently unreliable. Finding that Zieske's prosecution of the suit after May 4, 2014 was therefore sanctionable, the District Court awarded Defendants their fees and costs—subject to discounts based on the Court's assessment of their reasonableness—under Rule 11 and 28 U.S.C. § 1927. That decision was subsequently reaffirmed in a decision denying Zieske's motion for reconsideration. On appeal, Zieske tellingly declines to challenge the District Court's findings of fact. Instead, he points to three supposed legal errors committed by the District Court.

*First*, he suggests that the District Court applied an impermissibly low standard in determining whether his conduct was sanctionable. But the standard Zieske proposes—that a claim that survives a motion for summary judgment cannot be frivolous unless its proponent engaged in egregious conduct or used improper means to overcome the motion—has no basis in this Court's precedents. This Court's decisions confirm that the relevant inquiry is whether, in light of all the evidence, a claim has an objective legal and factual basis, not whether it is capable of surviving a motion in which the non-moving party's evidence is assumed to be true. Moreover, even if an egregious conduct standard applied, this case

4

clearly satisfied it; among other things, Zieske repeatedly misled and outright lied to the District Court and went as far as threatening a witness with arrest and prosecution unless he supported Plaintiffs' side of the story.

*Second*, Zieske faults the District Court for declining to consider his ability to pay in determining the amount awarded under 28 U.S.C. § 1927. This argument fails as well. In *Shales v. Gen. Chauffeurs, Sales Drivers & Helpers Loc. Union No. 330*, 557 F.3d 746 (7th Cir. 2009), this Court expressly held, in a decision that Zieske himself has conceded is "clear," that an attorney's ability to pay is irrelevant under § 1927. Nothing in Zieske's brief gives cause to revisit that decision.

*Finally*, Zieske argues that the District Court somehow impermissibly relieved the defense of its burden to prove the reasonableness of its fees and costs. That claim is inconsistent with the record, which demonstrates that the District Court carefully considered Zieske's objections to the defense's fees, slashed the defense's fee request by $600,000, and cut its costs request in half.

Because Zieske has failed to identify any reversible error, the Court should affirm the decision of the District Court and reject Zieske's last-ditch effort to avoid responsibility for the consequences of his misconduct.

## I. UPON DISCOVERING THAT THE DISPUTED WORK MIGHT BE WORTH A SUBSTANTIAL SUM, FLETCHER AND BARTLOW THREATEN DOIG AND HIS ASSOCIATES

In the mid-1970s, Plaintiff Fletcher purchased the Disputed Work from a man (the "Painter") who had been incarcerated at TBCC and composed the work in art classes TBCC held for inmates. Compl. ¶¶ 23–26. Nearly forty years later, after a friend suggested that the Disputed Work might be a painting by world-

5

renowned artist Peter Doig, Fletcher's brother contacted Peter Bartlow on September 2, 2011. Dkt. 273-11 at 60. At the time, Bartlow, a Chicago-based art dealer, had never heard of Peter Doig and had no familiarity with his work. *See* Dkt. 273-7 at 286:22–287:11. Nevertheless, Bartlow decided that, if the pair could mount a "convincing enough argument" that the Disputed Work was produced by the hand of a famous artist, they could sell it for hundreds of thousands of dollars. Dkt. 273-16 at 34. To that end, Bartlow attempted to contact Doig and asked him to confirm that he had painted the Disputed Work in "Thunder Bay while in school." A8. Doig's partner replied that Doig had neither lived in nor attended school in Thunder Bay and had never met Fletcher, let alone sold him an early work. *Id.*

Fletcher and Bartlow refused to accept that answer. Dkt. 273-18 at 28–30. On October 1, 2011, Bartlow sent an email to Defendant Gordon VeneKlasen, Doig's longtime gallerist. Remarking that Fletcher did "not wish to bring up anything which Mr. Doig would wish to remain private," Bartlow directed VeneKlasen to "ask the artist to agree to admit he painted" the Disputed Work in which case "the circumstances" of its composition would be "forgotten" and Bartlow would "stop digging into [Doig's] past." *See* Dkt. 273-15 at 7. In doing so, Bartlow sounded an extortionate theme that would recur throughout his correspondence with Doig and his associates: unless Doig admitted that he painted the Disputed Work, Bartlow and Fletcher would disseminate alleged "facts" about Doig's life that would prove embarrassing and potentially expose him to criminal and civil consequences. Two days later, VeneKlasen informed Bartlow that the Disputed Work had not been painted by Doig. *Id.* at 6. Undeterred, Bartlow

6

encouraged Doig to "talk to his attorneys" and decide whether "there is anything he needs to tell them." *Id.*

The next day, Bartlow sent VeneKlasen another email that, by Bartlow's own admission, attempted to "spell[] out potential problems Doig might suffer if he" did not authenticate the Disputed Work. *Id.* at 2. "Given [Doig's] admitted drug use," Bartlow explained, it was possible that Doig had "gotten into trouble with the law" and "would be very interested in trying to cover it up." *Id.* at 3. Otherwise, Bartlow warned, federal law enforcement might discover that "he had lied upon entry to the U.S. about a former drug conviction," leading to a five-year ban from the country. *Id.* Touting his claimed relationship with federal law enforcement[2]—whom he described as being "somewhat in awe of" his "fearlessness"—Bartlow made clear that, if Doig gave into his demands, he could "avoid unpleasantness" associated with the public disclosure of the "truth" about his life. *Id.* Bartlow concluded: "I don't back down. I am battling throat cancer and I have got nothing to lose." *Id.*

In the face of VeneKlasen's denial that Doig painted the Disputed Work, Bartlow resolved to "turn up the heat a notch." Dkt. 273-16 at 36. He did so by contacting Doig's father, David, who was 79 at the time. Over several emails with David Doig, Bartlow explained that, while his initial motivation was to "sell the painting and obtain money," the matter had become "personal." *Id.* at 39. Admitting that he had already become "obsessed," Bartlow demanded that David Doig convince his son to admit that he had painted the Disputed Work. *See, e.g.,*

---

[2] One year later, Bartlow confessed that his "wording could be considered a veiled threat." Dkt. 273-15 at 2.

7

*id.* at 40 ("This affair has caused you considerable pain, and I implore you to convince me to end it, but stonewalling and ridiculing me will only harden my resolve."); *id.* at 41 ("What I can't figure out is if you are protecting him or if he is protecting you.  We can still work this out like gentlemen."); *id.* at 43 ("You cannot hide forever, and I am not the least intimidated by attorneys or auction houses."); *id.* ("Why don't we work something out that will put an end to this?").

## II.  FLETCHER AND BARTLOW "CORRECT" FLETCHER'S MEMORIES OF THE PAINTER TO FIT THE LIFE OF PETER DOIG

Fletcher initially maintained that the Painter was twenty-one years old when he created the Disputed Work in 1976.  Dkt. 273-11 at 59.  After Bartlow discovered that Doig was born in 1959, and thus had been only seventeen years old in 1976, he wrote to Fletcher asking him to change his story:

> I know you will be asking what you can do as far as signing a document testifying that you purchased the painting from a 17 year old Peter Doig in Canada in 1976.  How far can you go in terms of what you say?  This painting could be worth hundreds of thousands of dollars if we can provide a convincing enough argument that he, Peter Doig, painted it.

Dkt. 273-16 at 34.  Fletcher agreed to correct his memory to bolster their claims, alleging in the Complaint and subsequently testifying that the Painter was a "mature" 17-year-old who had, apparently, opted to be housed among adults.  *See* Dkt. 273-8 at 2020:8-15.

Bartlow also prepared a "mock deposition" outline that invited Fletcher to declare that the Painter had used LSD and was incarcerated for its possession when he painted the Disputed Work.  After Fletcher questioned the truth of that assertion, Bartlow wrote to Fletcher that, if Fletcher "can state that he beleved [sic] that the guy he knew used LSD it would help" establish that Doig, who

8

reportedly had also used LSD, was the Painter.  Dkt. 273-11 at 38.  That concocted claim later found its way into the Complaint, which alleged that the Painter was incarcerated at TBCC for the possession of LSD.  Compl. ¶ 23.

### III.  AFTER ZIESKE FILES THE COMPLAINT, DOIG SERVES HIS RULE 11 LETTER AND PRODUCES THE BOVARD DECLARATION

In the Complaint, Plaintiffs and their counsel alleged that there were certain "uncanny convergences" between the life of the Painter and Doig—including those Bartlow persuaded Fletcher to "remember" to strengthen their case—which demonstrated that Doig must have been the Painter.  Compl. ¶ 32.  According to the Complaint, the Painter enrolled as a student at Lakehead University in 1975 or 1976 and met Fletcher there.  Compl. ¶ 21.  Shortly after the two men met, the Painter stopped attending Lakehead because he had been convicted for the possession of LSD and incarcerated at TBCC, where Fletcher served as a corrections officer.  Compl. ¶ 22.  There, the Painter enrolled in the TBCC's fine arts program, during which he composed the Disputed Work.  Compl. ¶ 23.  Five months after his arrival, the Painter was paroled and, with Fletcher's help, joined the Seafarers' Union, at which time he sold the work—signed "1976 Pete Doige"—to Fletcher for $100.  Compl. ¶¶ 8, 27–28.

Mere months after Zieske filed the Complaint, Defendants served Zieske with a Rule 11 letter.  In the Rule 11 Letter, Defendants provided Plaintiffs with the following information and documents about Doig (among other things), which made crystal clear that he was not the Painter identified in the Complaint:

- A statement from Lakehead University that Doig, unlike the Painter of the Disputed Work described in the Complaint, had never enrolled as a student there.  Dkt. 273-3 at 61.  *See* Compl. ¶ 21.

9

- Verification from the Canadian Royal Mounted Police National Depository of Criminal Records that no criminal record exists for Doig. *See* Dkt. 273-3 at 62; Dkt. 273-14 at 2–4. In contrast, the Complaint alleged that the Painter of the Disputed Work had been convicted and remanded to prison at TBCC. *See* Compl. ¶ 22.

- Records from the Ontario Ministry of Education, confirming that Doig was a high school student from 1974 through June 1976 and from 1977 until June 1978. Dkt. 273-3 at 63–67. These records established that Doig could not have been a student at Lakehead University before 1978 or incarcerated at TBCC in 1975.

- A February 1976 letter from Doig's mother to his grandmother showing that Doig was performing Romeo and Juliet in school. Dkt. 273-3 at 68. The letter established that Doig could not have been incarcerated at TBCC before that date; nor could he have been a university student.

- A November 1976 letter from Doig's father to his grandmother indicating that Doig was working as a busboy at the Firehall Restaurant in Toronto. Dkt. 273-3 at 70. Doig could not have been incarcerated at TBCC—or even been in Thunder Bay—if he was working in Toronto.

- Doig's U.K. passport showing that it was renewed in Ottawa, Canada in December 1976—the same period the Complaint alleged that the Painter had been incarcerated at TBCC. Dkt. 273-3 at 75.

10

- A July 1977 letter evidencing that Doig was in Edmonton and was planning to go off to the oil rigs in Saskatchewan. Dkt. 273-3 90–91. By contrast, the Painter had, by this point, joined the Seafarers' Union in Thunder Bay. Compl. ¶ 27.

The Complaint alleged that, "[d]espite extensive research, no evidence has been found of any other person with a first name of Pete or Peter and a family name of Doig or Doige in Canada in the late 1970s." Compl. ¶ 32(f). This allegation was proven to be false; as Fletcher later testified, before filing their Complaint, Plaintiffs *had* identified several people with the last names Doig and Doige who could have been the Painter. One of these people was the man who the District Court ultimately held created the Disputed Work—the late Peter Edward Doige, a resident of Canada in the 1970s whose biography fit the description of the Painter in the Complaint.

Although Zieske and his clients never disclosed that they had identified Peter Edward Doige, the Defendants, through their own research, identified him just a few months after the Complaint was filed. Thereafter, on August 27, 2013, Defendants provided Zieske with a sworn declaration of Marilyn Doige Bovard, Peter Edward Doige's sister. *See* Dkt. 273-4 at 6–9. In her sworn declaration, Bovard averred that Peter Edward Doige, like the Painter described in the Complaint: (1) attended Lakehead University in the 1970s; (2) had been incarcerated at TBCC in the 1970s, where he "took painting and music classes"; and (3) had an interest in "music and art" and created several paintings and drawings. *Id.* Ms. Bovard further averred that the desert scene depicted in the Disputed Work resembled a location in Arizona where she and her brother had

lived for about six months. *Id.* at 8. Bovard attached several exhibits to her declaration, including copies of Peter Edward Doige's Lakehead University student ID, driver's license, and official Statement of Death certificate. *Id.* at 10–12. Fletcher, along with others, would later remark on the strong resemblance between the man depicted in Mr. Doige's student ID and the Painter. *See, e.g.*, Dkt. 273-8 at 307:15-21 (Fletcher testifying that the resemblance was "unbelievable"); Dkt. 273-5 at 203 (Ernie Adams, the Painter's art teacher at TBCC, stating that the man depicted in the student ID and the Painter were the same person). Similarly, Fletcher would later admit that the signature on Doige's ID resembled that found on the Disputed Work. *See* Dkt. 273-6 at 455:21–456:1.

## IV. AFTER DEFENDANTS PROVIDED EVIDENCE THAT DOIG WAS NOT THE PAINTER, THE DISTRICT COURT ASKED ZIESKE TO CONSIDER WHETHER TO DETERMINE THE ISSUE; HE REFUSED

On September 3, 2013, the District Court held a status conference in which it discussed the conduct of discovery. Having been apprised of the evidence Defendants had submitted to Zieske, the District Court invited Zieske to consider whether it would be appropriate to put the case on hold:

> [G]iven that there's been a Rule 11 letter served, I'm wondering whether you think it would be in your interests to put the brakes on this case and figure out whether, in fact, the painting was made by Peter Doig with an "e," who seems not to have gone on with an art career, or Peter Doig without an "e," in which case your client has a painting that has some value.

Dkt. 273-6 at 6:9-15. The District Court went on to remind Zieske that, even if he had a reasonable basis for initiating the case, "you can lose an objectively reasonable basis in the middle of the litigation." *Id.* at 10:16-21. It was "at least" conceivable, the Court said, that time had come. *Id.* Consistent with that

12

admonition, the Court made clear, in no uncertain terms, that, should the case "break" in Defendant's favor, Zieske should not be surprised if the sanctions "hammer" comes down. *Id.* at 11:5-12.

At the hearing, Zieske declared his intent to continue prosecuting the case. *See id.* at 273-6 at 5:21-23 ("At this point, certainly my clients would not and I would not be satisfied with just this affidavit and the attachments . . . ."). He claimed to have found witnesses—whom he never even deposed, let alone called at trial—who would testify that Doige was not the Painter: "Judge, there are other people related to this man [Doige] who say that it's impossible for him to have been in Thunder Bay at that time." *Id.* at 6:24–7:1. Zieske suggested that the death certificate Ms. Bovard had provided was inauthentic. *Id.* at 5:4-6 ("[T]he death notice that is attached to that affidavit is not an official death certificate."). Finally, Zieske claimed that he had substantial other evidence, which he never produced, casting doubt on the Bovard declaration; as he put it, referring to the death certificate, "that's only the tip of the iceberg, Judge." *Id.* at 5:13-14. In subsequent statements, Zieske's clients doubled down on these assertions, characterizing Ms. Bovard as a liar, without ever substantiating their false claims. *See, e.g.*, Dkt. 273-11 at 72 (Bartlow stating to a journalist: "The lawyers for Doig have come up with a woman who claims to be the sister of the real painter of the picture. She claims he had been at the prison and had gone to Lakehead [University]. We believe she is a false witness and that she is lying.").

13

**V.     OVER THE NEXT TWO YEARS, DISCOVERY CASTS EVER GREATER DOUBT ON ZIESKE'S LIKELIHOOD OF SUCCESS**

**A.     On May 4, 2014, Zieske Acknowledges That The Witness He Intended To Call To Impeach Bovard's Declaration Would Not Cooperate**

As the District Court observed in its December 30, 2022 sanctions decision, Zieske's representations that he would produce evidence disputing that Peter Edward Doige created the Disputed Work were utterly false: Zieske never "possessed evidence undermining Bovard's account." A21. For example, on February 17, 2014, Zieske claimed that Doige's mother rejected Bovard's assertions and believed that Doige had never been at Thunder Bay. *See* A13. But Zieske failed to introduce testimony from Doige's mother (or any other relatives of Doige) that contradicted Bovard's assertions about her brother. Nor did he ever explain his suggestion that the alleged inauthenticity of Doige's death certificate was just the "tip of the iceberg," Dkt. 273-6 at 5:13–14. Ultimately, on May 7, 2014, Zieske stated that Doige's mother would not be willing to cooperate with Plaintiffs. A13. By contrast, Bovard—who had identified her brother as the Painter—was ready to serve as a witness for the defense.[3] *See id.* By that point, the District Court concluded, Zieske should have been aware that, with no ability to contest the Bovard Declaration, his claims had no likelihood of success. *See* A21–22.

---

[3] Bovard ultimately testified at trial. *See, e.g.*, Dkt. 273-8 at 2012:24-25 (the District Court finding that "Ms. Bovard credibly testified that her brother, Peter Doige, told her that he had been incarcerated at Thunder Bay").

**B.    In May 2015, The Seafarers' Union Confirms That Doige, Like The Painter, Was A Member Of The Seafarers' Union**

In May 2015, the Seafarers' Union produced a series of documents to the parties confirming that Peter Edward Doige had been a member of the Union.  *See* Dkt. 273-11 at 45–47.    In contrast, Plaintiffs never introduced any evidence substantiating the false allegation in their Complaint that Doig had "obtain[ed] employment through the Seafarers Union in Thunder Bay" with Fletcher's assistance.  Compl. ¶ 27.

**C.    In June 2015, Lakehead University Releases Records Demonstrating That Doige, Like The Painter, Was A Student There**

In June 2015, Lakehead University issued a response to Zieske's request that the University produce documents concerning Peter Marryat Doig and Peter Edward Doige.  The documents produced confirmed that Doige had been enrolled at Lakehead University between 1976 and 1978.  By contrast, Lakehead stated that it had "no records at all for Peter Marryat Doig."  Dkt. 273-11 at 40.

**D.    In December 2015, Doig Produces A Declaration From Matthew Esquega, An Inmate At TBCC, Identifying Bovard's Brother As The Painter**

In 2012, Fletcher and Bartlow contacted Matthew Esquega, who had been incarcerated at TBCC, taken art classes there with the Painter, and sold a painting to Fletcher.  *See* Dkt. 273-12 at 11.  In planning their communications with Esquega, Bartlow advised Fletcher that it was best to "be a little deceptive" and appeal to Esquega's self-interest to persuade him to take their side:

> What we don't want is to clue him [Esquega] in on our real focus which is to have Pete Doige identified as today's Peter Doig.  Unfortunately, ***we should be a little deceptive and let him feel as though there might be something in it for him***.  If he is not opposed to his coming out as an ex-con we

15

could pretend that I am organizing an exhibition of works by artists who have turned their lives around. The one thing that artists desire the most is to have their work shown. If he thinks we might be interested in his work he is more likely to cooperate

. . . .

***If he chooses to publicly deny that Pete is Peter we are pretty much out of luck***, so it is with extreme caution and awareness that we approach him. ***It may be wiser to just keep him in reserve and not mention him unless we have some assurance that he will not betray us.***

Dkt. 273-12 at 11, 14.[4] Despite having spoken to Esquega long before they instituted suit, Plaintiffs did not initially disclose him to the defense. When the defense eventually discovered his identity, he signed a sworn declaration in December 2015 stating that the man shown in Doige's student ID—the same man Fletcher stated bore a "unbelievable" resemblance to the Painter—was "a former inmate at TBCC" who "was a good painter." Dkt. 273-5 at 200. Esquega confirmed that the man's "name was Peter Doige." *Id.*

### E.    In December Of 2015, Doig Produced A Declaration From The Painter's Art Teacher Ernest Adams, Who Identified Him As Bovard's Brother

As they sought to contact Esquega, Plaintiffs also learned that Ernie Adams had been the Painter's art teacher at TBCC. After the defense discovered Adams's identity, they secured a sworn declaration from him, dated December 8, 2015. *See id.* at 203. In his declaration, Adams averred that he had reviewed the image of Peter Edward Doige that Bovard had produced and identified him "as a former student in [Adams's] art class at TBCC during the late 1970s. His name was Peter Doige." *Id.* Adams went on to declare that Doige was the Painter because Adams had observed him paint the Disputed Work while he was at TBCC. *Id.* Zieske

---

[4] Unless otherwise indicated, all emphases have been added.

16

would later falsely inform the District Court that Adams had "recanted" his testimony. *See id.* at 21.  However, at trial, Adams testified that his declaration was *truthful* and that he had never recanted it despite Zieske's threat that he would ensure Adams's arrest for perjury unless he signed a declaration Zieske had prepared.  *See* Dkt. 273-8 at 1416:9-10 (Adams stating that his original declaration was "absolutely" true); *id.* at 1415:23–1416:3 (Adams testifying: "Zieske . . . when I told him I wasn't going to sign it, he said that he would have a U.S. Marshal charge me with perjury . . . to which I disagreed to the point where I believe I hung up on him eventually.").

> **F.     After Doig Discloses The Identity Of Over Two Dozen People Having Knowledge Of His Whereabouts, Zieske Declines To Depose Any Of Them Because Plaintiffs Believe They Would Testify In Doig's Favor**

On October 9, 2015, Doig issued updated Rule 26(a)(1) disclosures identifying more than two dozen witnesses who possessed information relevant to his whereabouts between January 1, 1975 and December 31, 1978.  *See* Dkt. 273-5 at 9–17.  Despite repeatedly claiming Doig's alleged failure to prove that he was not in Thunder Bay suggested that he was the Painter, Zieske declined to depose any of these witnesses.  At trial, Bartlow purported to explain that decision by stating the Plaintiffs assumed all of these witnesses would give false testimony to support Doig's side of the story.  *See* Dkt. 273-8 at 737:10-11 (Bartlow testifying that "[t]here was no point. These people were all going to back him no matter what he told them to say").

## VI.   THE DISTRICT COURT DENIED SUMMARY JUDGMENT

On December 15, 2015, Doig moved for summary judgment.  Doig argued that the overwhelming evidence established that Doige, the man Bovard, Adams,

and Esquega identified as the Painter, and who Fletcher acknowledged bore a "unbelievable" resemblance to the man he met at TBCC, was the Painter. This evidence included—in addition to the fact that the Disputed Work is signed by "Pete Doige" and not by "Peter Doig"—records establishing that, like the Painter and unlike Doig, Peter Edward Doige had attended Lakehead University, had been incarcerated at TBCC, and had been a member of the Seafarers' Union. Doig argued that, in the absence of any credible affirmative evidence suggesting that he created the Disputed Work, Plaintiffs' claims should be dismissed.

In their opposition, Plaintiffs took a two-part approach. First, they dismissed the evidence that Doige was the Painter because the facts of Doige's life, while coinciding with Fletcher's recollection of the Painter in many respects, were inconsistent with other aspects of Fletcher's recollection. *See* Dkt. 181 at 4. Second, they contended that the Disputed Work itself provided compelling evidence that Doig was the Painter:

> The evidence of defendant Doig having painted the Disputed Work is so strong from an artistic point of view – as found by Olivia Thornton of Sotheby's, expert Victor Wiener, and Peter Bartlow – that it cannot be said that defendant has met its burden of establishing the lack of any genuine issue of material fact.

Dkt. 273-5 at 39.

Despite touting the strength of the artistic evidence—which Zieske falsely claimed consisted of multiple "experts' findings that the Disputed Work . . . is certainly the work of . . . Peter Doig," *id.* at 37—Plaintiffs knew that their claims could not command the assent of any independent expert. Thornton, who had never seen the Disputed Work in person, asked Bartlow to desist from falsely claiming that she and Sotheby's had authenticated it. *See* Dkt. 273-9 at 14–15;

18

Dkt. 273-8 at 634:18–635:5.  Wiener, likewise, expressly disclaimed any attempt to authenticate the work: he was a valuation expert, not an authenticator, who offered no evidence as to the Painting's authorship or authenticity.  *See* Dkt. 273-7 at 182:5–185:9; Dkt. 273-8 at 1127:1-7, 1142:14–1143:5.  And Bartlow testified that, despite his efforts to do so, he had not been able to retain an independent expert to support Plaintiffs' positions.  *See* Dkt. 273-8 at 816:19–823:2; Dkt. 273-18 at 37–43.  Rather than withdrawing the suit when it became clear that no expert would support it, Zieske permitted Bartlow to compose a report and act as Plaintiffs' expert despite his having had no experience with Doig or Doig's works apart from this litigation (Dkt. 273-6 at 286:22–287:11); having never sold or even seen a Doig work before the litigation, let alone authenticated one (*id.* at 281:5–284:21); his demonstrated inability to answer basic questions about Doig's oeuvre, such as whether most of Doig's works contain bodies of water or whether Doig typically signs his works (*id.* at 302:8–305:6, 312:6–314:9); and his concession, at deposition, that he did not "know enough to judge whether or not the 16 year old Peter Doig would have painted" the Disputed Work (Dkt. 273-6 at 322:4-12; Dkt. 273-15 at 2).

Ultimately, the District Court denied Doig's motion for summary judgment. In doing so, it emphasized the limited scope of its inquiry:

> Everything I say right now takes the record in the light most favorable to the plaintiffs and resolves all genuine factual disputes and credibility disputes in the plaintiffs' favor.  So, nothing I say now will prevent the fact-finder at trial, me, from taking a different view of the evidence from the lens of a fact-finder at trial.  And among other things, this means that I can take a different view of the documents at trial than I'm taking here, and that while I must believe Fletcher's affidavit on summary judgment, I may, but need not believe his testimony at trial.

19

A94. Viewing the evidence through that prism, the District Court concluded that summary judgment was inappropriate because: (1) the evidence adduced was inconsistent with Fletcher's recollection, which the Court took as true for purposes of the motion; and (2) Wiener's and Thornton's statements suggesting some facial similarity between the Disputed Work and Doig's paintings created an issue of fact.

## VII.   THE DISTRICT COURT FOUND THAT DOIGE PAINTED THE DISPUTED WORK

After an eight-day bench trial, the District Court found that the evidence "conclusively demonstrate[d]" that Peter Edward Doige, not Peter Marryat Doig, painted the Disputed Work.  A38–A39.  Doig could not be the Painter, the Court found, because the evidence established that he was in high school in Toronto, and not an inmate at TBCC, from 1975 to 1979.

Mary, Doig's mother, testified that, from "1975 to 1979, putting aside vacations and [Doig's] summer job in western Canada," Doig lived, worked, and attended school in Toronto. *See*, *e.g.*, A48 (describing Doig's parents' recollection that Doig was working at a diner in Toronto at the time Fletcher allegedly knew the Painter).  That testimony, the District Court explained, enjoyed substantial documentary support.  Photographs in high school yearbooks depicted Doig in 1975, 1976, and 1977, and other yearbook entries referenced his participation in school activities.  *See* A42–A44.  The teenager depicted in those photographs—and identified as Doig by his mother and himself—bore no resemblance, the Court found, to Doige.  *See* A45 ("The person in that yearbook is a relative boy compared to the man who is in this Lakehead University ID.  They are *plainly* different people.").  And letters exchanged among members of the Doig family—which the

20

District Court characterized (at A41) as "unimpeachable" evidence—established Doig's whereabouts during the relevant period. *See, e.g.*, A52–A53 (discussing letters between Doig and his mother describing Doig's work on oil rigs in the summer of 1977). By contrast, the District Court found that the principal evidence underlying Plaintiffs' case—Fletcher's recollection—was "incomplete and inconsistent" and irreconcilable with the documentary evidence. *See* A83:11-12. Surveying the evidence—including Doig's own credible testimony that he had no criminal record in Canada—the District Court concluded that Doig could not possibly be the Painter. *See* A49:14-21 ("Mr. Fletcher testified that the creator of the work entered the Thunder Bay Correctional Center in October of 1976 . . . [I]n light of Peter Doig's and Mary Doig's credible testimony about Peter's whereabouts . . . Peter Doig . . . could not be the author of the painting");

By contrast, the evidence compelled the conclusion that Doige *was* the Painter. As the District Court noted, Fletcher had consistently testified that "he recognized the painter from Lakehead University." *See* A57:10-14. The Court observed that the ID card Bovard found among her brother's effects established that "Peter Doige, not Peter Doig," was, like the Painter, a student at Lakehead. *See* A58:6-11. That conclusion was supported by the Lakehead University files stating that Peter Edward Doige—not Peter Doig—had enrolled as a student there; the Court found there was "no basis to doubt their authenticity." A59:11. Ernie Adams' testimony—which the Court characterized as "especially credible"— likewise made clear that the man depicted in the ID card and identified in the Lakehead student records was the Painter. A58:12-13. That fact was confirmed by Bovard: the District Court found that she had credibly "testified that her

brother, Peter Doige, told her that he had been incarcerated at Thunder Bay" and that he had "mentioned Ernie Adams" to her in the past. A60:24-25, A67:13-15. She also "testified credibly that Doige was an amateur artist throughout his life." *See* A82:7-8. The final piece of evidence establishing Doige's identity as the Painter was that Doige, like the Painter, was a member of the Seafarers' Union, a fact evidenced by Union records and Bovard's discovery of a Seafarers Union patch in Doige's effects. A72–A73. For these reasons, the Court concluded that Doige was the Painter.

Having established that Doige was the Painter and Doig was not, the District Court turned to the Disputed Work itself. It first rejected Bartlow's analysis of the signature on the Disputed Work, concluding that the signature belonged to Doige. *See* A77:7-8 ("[Y]ou don't need a graphologist to see the similarities between the signature on the work and two of Peter Doige's signatures that were shown during the trial."); A78:21-24 ("[T]here's no evidence that the signature on the disputed work looks anything like the way Peter Doig, Peter Marryat Doig, makes his signature."). As to Bartlow's method of proving common authorship—which involved identifying the recurrence of certain shapes to determine whether an artist used a prior image as a template or basis for a new work—the District Court found it failed to shed light on the authorship of the Disputed Work. The Court observed that Bartlow's application of the method failed to establish common authorship; it identified commonalities, for example, between a Da Vinci and a Magritte, which were obviously the result of the limited universe of possible shapes, not common authorship. *See* A74–A75. So too with the recurrences in Doig's works, none of which suggested, as Bartlow had argued,

22

that the Disputed Work—or the vista it depicted—was a model for Doig's later work.  *See* A75.  The limited commonalities that Bartlow managed to identify at trial were, the Court concluded, coincidental rather than indicative of common authorship.  A76.

Finally, the Court turned to the aesthetic features of the Disputed Work. The Court credited the analysis of the defense's expert and concluded that the "aesthetic personality of the disputed work is unlike the aesthetic personality of Peter Doig's authenticated works."  *See* A79:8-10.  It also credited Ms. Bovard's statement—which she had first made in her declaration—that the vista depicted in the Disputed Work resembled an area in Arizona where she and her brother had lived; notably, Plaintiffs themselves had argued that "an area in Arizona" was a model for the Disputed Work.  *See* A80:13-14.  The artistic evidence, the Court concluded, did not suggest that anyone but Doige had painted the Disputed Work.

## VIII. THE DISTRICT COURT SANCTIONED PLAINTIFFS AND ZIESKE FOR PROSECUTING THIS ACTION WITHOUT A REASONABLE BASIS

After prevailing at trial, the defense submitted a renewed motion to sanction Plaintiffs and Zieske for the improper institution and maintenance of this suit under Rule 11, 28 U.S.C. § 1927, and the Court's inherent power.  After requesting that the defense submit their billing records in support of their request for fees, the District Court granted in part and denied the motion.  In its decision, the District Court recounted the history of this litigation and explained that, while it would not sanction Plaintiffs and Zieske for failing to properly investigate the case, the defense's submission of a Rule 11 letter and the Bovard declaration quickly cast "substantial doubt" on Plaintiffs' claims.  A21.  Recalling its admonition that Zieske reconsider the prudence of prosecuting this action, the

23

District Court concluded that the maintenance of this action became sanctionable no later than May 7, 2014. "By that point," the Court explained, "Plaintiffs and Zieske should have realized that there were no 'other people related to [Doige]' that would undermine Bovard's account or otherwise overcome Defendants' evidence that Doig never attended Lakehead or spent any time in Canadian prison." A21. To continue the litigation after that juncture was, therefore, unreasonable. *See* A22.

In proceedings before the District Court, as here, "Zieske's primary argument against sanctions [was] that this suit remained objectively reasonable through judgment because it survived summary judgment . . . and proceeded to trial." *Id.* Rejecting that argument, the District Court explained that "[t]he fact that a claim survives summary judgment . . . is not a shield against sanctions for pressing the claim." A23 (collecting cases). That is because, at summary judgment, a court's inquiry is limited to whether, without weighing the evidence or making credibility determinations, and after affording the non-movant the benefit of all permissible inferences from the evidence adduced, an issue of material fact exists. A23–24. Put differently, the District Court explained, it "was required to accept Plaintiffs' evidence on its face" at the summary judgment stage. A24. By contrast, it was Zieske's responsibility to look at his case objectively. Had he done so, the Court concluded, he would have realized that "Fletcher could not reasonably have believed that his identification of Doig as the painter was accurate, Bartlow could not reasonably have believed that his analysis of the painting (later entered as expert testimony) as Doig's was sound, and Zieske could not reasonably have believed either of those things." *Id.*

24

Finally, rejecting Zieske's argument that sanctions are appropriate only "where a plaintiff's only evidence was a self-serving and unsupported affidavit with no independent evidence," the Court remarked that, even if this Court's precedents established that principle, this was just such a case:

> Plaintiff's primary evidence came from Bartlow and Fletcher, whose testimony was necessarily self-serving given their stake in the case. The remainder of ***Plaintiffs' case consisted largely of attempts to poke holes in Doig's story as to his whereabouts in the 1970s. Even if Plaintiffs succeeded in poking some such holes—which is entirely expected for events occurring some forty years earlier—those holes could not reasonably imply that Doig, not Doige, was the painting's author. . . . The point is that no reasonably objective person—viewing the case as a trier of fact—could have expected as of May 2014 that Plaintiffs' story would prevail over Doig's***. A further and perhaps more important point is that the evidence adduced by Defendants by that point would have led any reasonable person in Fletcher's and Bartlow's shoes to reconsider what at the case's inception might have been a sincere belief that Doig authored the painting and to recognize that the author surely was Doige, not Doig.

A24–A25.

Having concluded that Plaintiffs and Zieske should be sanctioned, the District Court conducted an analysis of the reasonableness of the defense's fees. After considering and rejecting Zieske's challenges to the reasonableness of defense counsel's rates and the propriety of their billing practices, the District Court imposed a 20% discount on counsel's fees—a reduction of over half a million dollars—and awarded the defense 50% of its non-taxable costs. A31. In doing so, the Court rejected Zieske's request to reduce the fee award to reflect his claimed inability to pay. *See* A33 (holding that this Court's precedents forbid consideration of ability-to-pay in making an award under 28 U.S.C. § 1927).

25

After entry of the sanctions award, Zieske moved for reconsideration. Rejecting that request, the District Court (Rowland, J.) reaffirmed Judge Feinerman's conclusion that a denial of summary judgment does not immunize a party from the consequences of prosecuting frivolous claims. A2–A3. The existence of a question of fact on summary judgment, the Court explained, does not preclude a finding that the evidence as a whole "made pursuing the case untenable" and sanctionable. A3. The Court also rejected Zieske's argument that it was error not to consider his ability to pay in making an award under § 1927: *Shales* made clear, the Court held, that "§ 1927 damages are akin to damages for an intentional tort and therefore governed by the injury to the tortfeasor not the wrongdoer's ability to pay." A4. Finally, Judge Rowland disagreed with Zieske's contention that Judge Feinerman erroneously presumed the reasonableness of the defense's fee request; to the contrary, the Court held, Judge Feinerman's "review was careful and deliberate" and resulted in a meaningful reduction in the amounts requested by the defense. A5.

Summarizing the record, Judge Rowland found that, while "[a] Court never relishes imposing sanctions," Judge Feinerman "conducted a thorough review of the progression of the case and specifically when certain information became available to Plaintiffs and their counsel in determining that sanctions were unfortunately appropriate." *Id.* The District Court accordingly reaffirmed the imposition of sanctions.

## SUMMARY OF ARGUMENT

The District Court's decision to impose sanctions on Zieske should be affirmed.

*First*, the District Court applied the correct legal standard in finding that Zieske's conduct was sanctionable. Zieske argues that this Court's decision in *LeBeau v. Libbey-Owens-Ford Co.,* 799 F.2d 1152 (7th Cir. 1986) holds that, if a claim survives summary judgment, it may be deemed frivolous only if the non-moving party overcame summary judgment through "improper means" or "egregious" conduct. Br. at 23–24. That proposition finds no support in *LeBeau* or this Court's precedents. To the contrary, the case law unmistakably holds that the institution or maintenance of a claim that survives summary judgment is sanctionable if it lacked an objective legal or factual basis. Here, after consideration of the totality of the evidence, the District Court correctly found that Zieske prosecuted claims he knew or should have known, by May 7, 2014 at the latest, would never prevail on the merits. That warranted the imposition of sanctions.

*Second*, the District Court properly declined to consider Zieske's ability to pay in computing the sanctions award under 28 U.S.C. § 1927. This Court's precedent makes unequivocally clear that the proper measure of a § 1927 award is the damages caused by the statute's violation, not the amount the violator can afford to pay.

*Third*, the District Court did not err in computing Defendants' fee award. Contrary to Zieske's contention, the District Court did not improperly assume the reasonableness of Defendants' fees or shift the burden to Zieske. Instead, the

27

Court scrutinized the requested fees, considered and rejected Zieske's objections to them, and applied a discount that reflected the District Court's sense of a reasonable fee award. That was not an abuse of discretion.

## ARGUMENT

### I.     STANDARD OF REVIEW

This Court reviews sanctions decisions for abuse of discretion. *See Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014). A district court abuses its discretion when it makes a ***clearly erroneous*** factual finding or commits an ***error of law***. *United States v. Glob. Distributors, Inc.*, 498 F.3d 613, 620 (7th Cir. 2007). "A finding is clearly erroneous when, even though there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Aeroground, Inc. v. CenterPoint Properties Tr.*, 738 F.3d 810, 812–13 (7th Cir. 2013).

### II.     THE DISTRICT COURT PROPERLY APPLIED THIS COURT'S SANCTIONS PRECEDENT

Under § 1927 and Rule 11, the prosecution of a claim is sanctionable when done in objective bad faith. The test of objective bad faith is whether a claim lacks "a plausible legal or factual basis." *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226–27 (7th Cir. 1984*); see also Matter of Lisse*, 921 F.3d 629, 641 (7th Cir. 2019) ("Attorneys demonstrate objective bad faith when they pursue a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." (Internal quotation marks omitted).) Because § 1927 "impose[s] a continuing duty upon attorneys to dismiss claims that are no longer viable," *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006), "dogged pursuit of a colorable claim becomes actionable bad faith once the attorney learns

28

(or should have learned) that the claim is bound to fail," *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985).

The District Court's reasoned decision, informed by years of experience with the case, applied these principles to determine that, long before trial, Zieske lacked any reasonable basis to continue prosecuting this suit and thus should be sanctioned. By September 2013, the Complaint's core allegation—that Doig was the man from whom Fletcher purchased the Disputed Work—had been demolished by the Bovard Declaration and an extensive set of materials submitted by Doig's counsel. Recognizing that the Bovard Declaration in particular presented compelling evidence of the Painter's identity, Zieske tried and failed to secure evidence capable of rebutting it, a fact he admitted in May of 2014. By that point, the District Court concluded, any reasonable lawyer would have known that the paltry (and entirely self-interested) affirmative evidence Zieske had in hand—Fletcher's shifting and inconsistent recollections from forty-years earlier and Bartlow's last-resort "expert" analysis of the Disputed Work—had no reasonable likelihood of carrying the day at trial. Nevertheless, Zieske persisted in the prosecution of this action, thereby causing parties he knew would ultimately prevail to needlessly expend millions of dollars of legal fees in their defense.

Zieske does not seriously challenge any of these facts—nor could he, because the District Court's findings were amply supported by the record. Instead, as he did below, Zieske seeks to avoid the consequences of his misconduct by inventing a standard out of whole cloth. In his view, this Court's decision in *LeBeau* established a clear rule of law: if a claim survives summary judgment, that claim cannot be deemed frivolous unless its proponent engaged in "improper means" or

29

"egregious" conduct to overcome summary judgment. Zieske's argument has no basis in *LeBeau* or any other precedent of this Court.

## A. Neither *LeBeau* Nor Any Other Case Imposes An "Egregious Conduct" or "Improper Means" Standard

In *LeBeau*, this Court considered the propriety of an award of attorney's fees under Title VII's fee-shifting provision, which provides that a prevailing defendant may recover its fees when the claims asserted against it were, as relevant here, frivolous. 799 F.2d at 1157. The plaintiff—the EEOC—prosecuted claims against the defendants (an employer and a union) alleging that they had engaged in unlawful sex discrimination by, among other things, permitting women to work only in certain departments. *Id.* at 1155. In response, the defendants asserted that they could not be liable for discrimination because their practices were implemented in good faith reliance on EEOC guidelines which, they contended, immunized employers from liability for compliance with the mandates of state employment law. *Id.* at 1157. After a trial on the merits in which the defense prevailed, the EEOC took an appeal to this Court. After the Court affirmed, the defendants sought their fees.

The district court granted that request on the ground that the EEOC's maintenance of the suit was frivolous. *Id.* The basis for that view was the district court's decision in *Raitz v. Libbey-Owens-Ford Glass Co.*, (N.D. Ohio Sept. 23, 1973). In *Raitz*, the district court found that, upon proof that the defendant employer "was on the horns of a dilemma"—that is, that state law compelled something federal law forbade—good-faith reliance was established as a matter of law. *See LeBeau*, 799 F.2d at 1157. The EEOC in *LeBeau* disagreed; in its view, a defendant had to present proof of *actual* reliance—not a mere conflict between

30

state and federal law—to establish a good-faith defense. *Id.* at 1162. Citing *Raitz*, the *LeBeau* district court rejected that argument, concluding that, because Illinois and federal law conflicted, the EEOC should have known that its claims were precluded as a matter of law. *Id.* at 1157 ("[T]he district court found it to be the 'apex of unreasonableness' for the EEOC to have brought and maintained this suit in light of its 1965 guidelines, which the court had ruled allowed the defendants to maintain their employment practices in order to comply with state law.").

This Court reversed. In concluding that the district court had erred in finding the EEOC's claims frivolous, this Court noted that, on two separate occasions in the very same litigation, the district court had taken the very position for which it had sanctioned the EEOC. *See id.* at 1157–58 (discussing the district court's earlier conclusion that good-faith reliance was a "question of fact" on which the EEOC "had the right to demand proof"). This Court explained that it was improper for a court to hold that a position the court itself had taken was so obviously meritless as to warrant the imposition of sanctions. *Id.* at 1158. *LeBeau*, therefore, holds only that, where a district court reaches a conclusion of fact or law, it cannot later deem *that* conclusion frivolous. It does not stand for the sweeping proposition advanced by Zieske here that denial of summary judgment militates against the imposition of sanctions in every case irrespective of the grounds on which the sanctions and summary judgment decisions are premised.

Nor does *LeBeau* establish that, when a claim does survive a summary judgment motion, sanctions are available only if the non-movant engaged in egregious conduct or employed "improper means" to avoid summary judgment. That principle appears nowhere in *LeBeau* and is, as evidenced by Zieske's failure

31

to cite a single case articulating it, contrary to the overwhelming weight of authority holding that courts may impose sanctions—irrespective of whether a claim survives summary judgment—if, upon a consideration of the evidence, a claim is frivolous under generally applicable principles.[5]  *See, e.g.*, *Lemaster v. United States*, 891 F.2d 115, 121 (6th Cir. 1989) (stating that "*[a]ll* courts addressing this issue have concluded that mere survival of a summary judgment motion, in which all facts are construed in the non-movant's favor, does not insulate the party from sanctions if it is later determined that all factual claims were groundless"); *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 535 (4th Cir. 1990) ("Cases that are ultimately viewed as frivolous may well survive motions for summary judgment in which the evidence may be presented in sketchy fashion and credibility may not be taken into account." (internal quotation marks and ellipses omitted)); *Lee v. Glessing,* 2006 WL 2524185, at *4 (N.D.N.Y. Aug. 30, 2006) (awarding sanctions because "trial on Plaintiff's claims exposed their frivolity and unreasonableness" notwithstanding the court's earlier denial of summary judgment); *Goldstein v. Costco Wholesale Corp.*, 337 F. Supp. 2d 771, 780 (E.D. Va. 2004) (imposing sanctions after summary judgment); *Perry v. S.Z. Rest. Corp.*, 45 F. Supp. 2d 272, 274 (S.D.N.Y. 1999) (imposing sanctions despite plaintiff's claims having "survived two summary judgment motions" because the plaintiff's testimony established the claims were frivolous).

---

[5] The rule Zieske proposes would have pernicious consequences.  Parties faced with frivolous lawsuits would be disinclined to make summary judgment motions for fear that doing so would extinguish their right to recover fees and costs caused by their adversary's misconduct.  That, in turn, would frustrate the early resolution of claims and afford vexatious litigants further opportunity to inflict harm on their opponents.

## B.    The District Court's Decision Is Consistent With *LeBeau*

The District Court did not run afoul of *LeBeau*.  Its decision on the sanctions motion was not inconsistent with its decision at summary judgment.  That is because motions for summary judgment and for sanctions are governed by two completely different standards.

At summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making that determination, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Rather, it must view "all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment."  *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).

That approach is clearly reflected in the District Court's decision denying summary judgment.

> And everything I say right now—I know I've said it before, but I'm going to say it again.  Everything I say right now takes the record in the light most favorable to the plaintiffs and resolves all genuine factual disputes and credibility disputes in the plaintiffs' favor.  *So, nothing I say now will prevent the fact-finder at trial, me, from taking a different view of the evidence from the lens of a fact-finder at trial.*  And among other things, this means that I can take a different view of the documents at trial than I'm taking here, and that while I must believe Fletcher's affidavit on summary judgment, I may, but need not believe his testimony at trial.

33

Dkt. 273-6 at 148:3–10. With that framework in mind, the District Court repeatedly emphasized that its decision on summary judgment reflected an assumption that the Plaintiffs' evidence was correct. *See, e.g.*, *id*. at 149:16–20 (stating that, for purposes of summary judgment, the District Court "ha[d] to accept [Fletcher's] averments as true"); *id*. at 153:22–25 ("And again, this conclusion turns on the truth, the assumed truth of Fletcher's averment . . . ."). When the District Court ultimately declined to grant summary judgment, it did not conclude, as Zieske suggests, that he had an objectively reasonable basis for continuing to prosecute this action. It held only that, without assessing the credibility of any of Plaintiffs' evidence and assuming its truth, there were issues of material fact.

The inquiry at the sanctions stage is quite different. Rule 11 and § 1927 charge a lawyer with the obligation to not interpose or maintain objectively baseless litigation. *See Knorr Brake Corp.*, 738 F.2d at 227 ("Thus, before a court may assess fees under section 1927, the attorney must intentionally file or prosecute a claim that lacks a plausible legal or factual basis."). Because Rule 11 and § 1927 require lawyers to satisfy themselves that their actions have a sufficient legal and factual basis, courts assessing compliance with that principle must themselves weigh the evidence and the inferences that may permissibly be drawn from it. *See Cuna Mut. Ins. Soc. v. Off. & Pro. Emps. Int'l Union, Loc. 39*, 443 F.3d 556, 560 (7th Cir. 2006) (stating that a court assessing a sanctions motion must "undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless" (internal quotation marks omitted)).

34

As the District Court's opinion made clear, that is exactly what it did. Drawing a distinction between its summary judgment decision and the task before it, the Court explained that, while it "did not and could not view the evidence through the lens of a factfinder" at the summary judgment stage, it was required to do just that in ruling on Defendants' sanctions motion. *See* A25 ("The point is that no reasonably objective person–*viewing the case as a trier of fact*–could have expected . . . that Plaintiffs' story would prevail over Doig's"); *see also* A24 (assessing what Zieske could "have reasonably believed" given the evidence available to him). *See* A24. Applying that analytical framework, the District Court concluded that, by May 7, 2014, Zieske could and should have realized that the principal evidence on which he intended to rely was "irreparably shaky and, in fact, wrong" and that he had no hope of prevailing at trial. *Id.* It then concluded that Zieske's decision to continue to litigate the case despite its being premised only on self-serving, unsubstantiated statements by a party warranted imposing sanctions. *Id.*

Unlike the decision this Court overturned in *LeBeau*, the District Court's decision to award sanctions did not contradict its prior ruling at summary judgment. At summary judgment, the district court assumed the truth of Plaintiffs' evidence and afforded them the benefit of every favorable inference. At the sanctions stage, it no longer needed to indulge such presumptions. Instead, it looked at the evidence as a factfinder—as Zieske was required to do—and found it provided no objective basis for the continued prosecution of this case. That conclusion is entirely consistent with *LeBeau*.

35

**C.     Even If An Egregious Conduct Or Improper Means Test Applied, Zieske's Conduct Satisfied It**

Because Zieske's imagined standard has no basis in the precedents of this Court, the District Court could not possibly have erred in failing to apply it. But even if the District Court's denial of summary judgment *did* require it to find that Zieske engaged in egregious conduct or employed improper means, Zieske clearly did so here.

Zieske relies upon *Lemaster v. United States*, 891 F.2d 115 (6th Cir. 1989) and *Calloway v. Marvel Ent. Grp.*, 854 F.2d 1452 (2d Cir. 1988) as presenting two examples of the kind of egregious conduct his test requires, *see* Br. at 26–27. Even if those case were read to apply Zieske's novel standard—they do not—they *support* a finding of egregious conduct and improper means in this case. In *Calloway*, the Second Circuit held that a suit was sanctionable because, while it had survived summary judgment, it did so because of "baseless allegations" by the non-moving party. *See* 854 F.2d at 1473. Similarly, in *Lemaster*, the basis for imposing sanctions was that, given the "transparent" falsity of the key premise of the plaintiffs' complaint, "neither the [plaintiffs] nor [their lawyer] could reasonably have thought" they would prevail on the merits. *See* 891 F.2d at 120. Even under Zieske's view of the law, therefore, parties and their counsel engage in egregious misconduct (or employ wrongful means) when they make statements to a tribunal that know or should know are false in service of claims that are meritless. The record demonstrates that Zieske repeatedly did just that:

- In the Complaint, Zieske falsely stated that, "[d]espite extensive research, no evidence has been found of any other person with a first name of Pete or Peter and a family name of Doig or Doige in Canada in the late 1970s."

36

Fletcher later admitted that this allegation was "not accurate" because Plaintiffs had in fact identified several people with those names. *See* Dkt. 273-6 at 632:8–10; Dkt. 273-8 at 372:18–74:23.

- In statements to the Court on the record, Zieske falsely stated that "Plaintiffs possessed evidence undermining Bovard's account." A21. After admitting that he was unable to produce any such evidence, Zieske continued to make false statements to the Court about alleged defects in Bovard's declaration and the evidence submitted therewith. *See, e.g.*, Dkt. 273-5 at 22 ("Ms. Bovard has no shred of credibility left."); *id.* ("There is no evidence that [Doige] was ever at the Thunder Bay Correctional Centre"); *id.* ("The documents she allegedly provided to defendant's counsel, including her brother's non-official 'death certificate' . . . not only remain questionable, but become increasingly so . . . ."). Meanwhile, Bartlow and Fletcher were forced to admit that they had no factual basis for disputing the accuracy of Bovard's declaration or the evidence produced therewith. *See* Dkt. 273-6 at 324:14-16 (Bartlow testifying that he had "no factual basis to dispute [Bovard's] assertion" that "her brother attended Lakehead University and served a jail sentence at Thunder Bay Correctional Center"); Dkt. 273-6 at 528:6-533:8 (Fletcher testifying that he had no factual basis for disputing Bovard's statement about Doige's attendance at Lakehead and incarceration at TBCC).

- In Plaintiffs' opposition to summary judgment, Zieske falsely stated that Plaintiffs' position was supported by multiple "experts' findings that the Disputed Work . . . is ***certainly*** the work of the painter, defendant Peter

37

Doig." Dkt. 273-5 at 37. Thornton and Wiener, Plaintiffs' purported "experts," however, had expressly denied that they had made any such finding. *See, e.g.*, Dkt. 273-9 at 15 (Thornton stating that Sotheby's "did not authenticate the work as being an original Peter Doig"); Dkt 273-15 at 185 (Wiener stating at his deposition that he had never authenticated a work as being by Peter Doig).

- Zieske falsely stated to the Court that Adams had "recanted" his sworn declaration that Doige was the Painter. *See* Dkt 273-5 at 27. As Adams later testified, he never recanted his statement despite Zieske's threat to have him prosecuted for perjury unless he did so. *See* Dkt. 273-8 at 1415:19–16:10.

As the District Court correctly held, Plaintiffs' claims were premised almost entirely on the "self-serving" and unbelievable claims of Fletcher and Bartlow and alleged deficiencies in the defense's evidence that "could not reasonably imply that Doig, not Doige, was the painting's author." A25. If deceiving a court in service of such frivolous claims is not egregious, wrongful conduct by a lawyer, it is difficult to imagine what is.

## III. THE DISTRICT COURT PROPERLY APPLIED THIS COURT'S DECISION IN *SHALES*

In *Shales v. Gen. Chauffeurs, Sales Drivers & Helpers Loc. Union No. 330*, 557 F.3d 746 (7th Cir. 2009), this Court conclusively foreclosed one of Zieske's principal arguments below and on appeal: that, despite having needlessly imposed millions of costs on Defendants, he should be excused from liability for his misconduct under 28 U.S.C. § 1927 because of his alleged inability to pay. In *Shales*, this Court rejected an argument that awards under § 1927 are to be

determined, in part, by the sanctioned party's ability to pay.  Drawing a distinction between the statute and Rule 11, the Court explained that, while Rule 11 was not a "pure fee-shifting statute" that imposes liability for the entirety of the opponent's fee award, § 1927 is.  *Id.* at 748–49.  A violation of 28 U.S.C. § 1927, therefore, "is an intentional tort" for which the extent of the victim's injury—not the tortfeasor's ability to pay—provides the measure of compensation.  *Id.* at 749.

*Shales*'s holding that a party's ability to pay is irrelevant in making an award under § 1927 is the law of this Circuit.  Despite acknowledging in his brief below that the Court's holding "is clear," Dkt. 418 at 9, Zieske now faults the District Court for adhering to it, deeming *Shales*'s characterization of an award under § 1927 as compensatory a mere dictum that deserved to be ignored.  *See* Br. at 34 ("*Shales* says in dicta, 'We speak here of compensatory rather than punitive damages in tort litigation; the award under § 1927 is compensatory, not punitive.'").  It very clearly is not.  As in this case, the appellant in *Shales* was sanctioned under both Rule 11 and § 1927 and the court refused to consider the appellant's ability to pay.  Because Rule 11 unquestionably requires such consideration, this Court's decision to affirm necessarily depended on its conclusion that § 1927 does not.  *See Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) ("[T]he holding of a case includes, besides the facts and the outcome, the reasoning *essential* to that outcome." (Posner, J.)); *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (stating that a dictum is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may

not have received the full and careful consideration of the court that uttered it" (internal quotation marks omitted)).  Zieske's suggestion otherwise is baseless.

So too is his claim that statements in two of this Court's pre-*Shales* decisions—neither of which even considered the issue presented here—somehow "remain[] authoritative" because *Shales* "fail[ed] to address" them.  *See* Br. at 34.  Those statements could not "remain authoritative" because they never were in the first place.  In *De Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578 (7th Cir. 2008), this Court did not pass on the criteria a court must consider before imposing sanctions under § 1927.  Rather, it decided whether the defendant had received sufficient due process before the imposition of an award.  *Id.* at 594.  Its passing reference to the district court's "authority under 28 U.S.C. § 1927 to punish" was, as Zieske admits (Br. at 34), a mere dictum.  Even if it were contrary to *Shales*, therefore, *Shales* would control; holdings, not dicta, constitute the law of this Circuit.

The other case on which Zieske relies, *Riddle & Assocs., P.C. v. Kelly* similarly did not depend on its statement that "[t]he purpose of § 1927 is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them," 414 F.3d 832, 835 (7th Cir. 2005) (internal quotation marks omitted), let alone in a manner that conflicts with *Shales*.  *Riddle* dealt with whether the conduct at issue was sanctionable because it lacked an objective basis.  *Id.* at 836.  To reach that conclusion, *Riddle* did not "hold" that the purpose of an award under § 1927 is punitive.  *See* Br. at 34.  Rather, it held that the conduct at issue—"demand[ing] $3000 to release a blatantly frivolous claim"—was improper.  *Id.*

40

Neither *Riddle* nor *De Manez*, therefore, have anything to say about the proposition *Shales* established. Accordingly, *Shales*'s holding that a lawyer's ability to pay is irrelevant in determining the amount of an award under § 1927 may not be revisited without a "compelling reason." *See Wilson v. Cook Cnty.*, 937 F.3d 1028, 1035 (7th Cir. 2019) ("[A]bsent a compelling reason, we will not overturn circuit precedent."); *McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005) ("[P]rinciples of stare decisis require that we give considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling." (internal quotation marks omitted)). Zieske has failed to offer one here.

First, Zieske's reliance upon two district court decisions is unpersuasive; neither case even considers the relevance of a party's ability to pay to an award under § 1927, let alone decides that issue in a manner inconsistent with *Shales*. Second, the mere fact that the Ninth Circuit—and some other federal courts— have reached conclusions different from *Shales* is no basis to revisit it. *See Guerrero v. Holder*, 407 F. App'x 964, 967 (7th Cir. 2011) ("[R]estless movement to another side of the circuit split would waste judicial resources on a disagreement that only the Supreme Court can resolve.") (internal quotation marks omitted)); *Tate*, 431 F.3d at 584 ("The only other basis on which the plaintiffs' lawyer urges overruling is that Harkins was, he thinks, decided incorrectly. That, as we have explained, is not reason enough."). Finally, Zieske's suggestion that this Court's characterization of violations of § 1927 as intentional torts somehow "invokes a punitive element," Br. at 36, does nothing to undermine *Shales's* rationale.

41

"*[E]very* tort rule is designed both to deter other wrongdoers *and to* compensate the injured person" by imposing the social costs of tortious conduct on the tortfeasor. *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 909 (Ill. 2007) (emphasis in original); *see also Garnett v. Remedi Seniorcare of Virginia, LLC*, 892 F.3d 140, 143 (4th Cir. 2018) (stating that "it is elementary that tort law aims to redress private wrongs and deter misconduct"). That does not mean that damages awards for violations of those rules must take account of a tortfeasors' ability to pay. To the contrary—such evidence is, as a general rule, *irrelevant*. *See, e.g.*, *Connelly-GPM v. Donegan*, 2004 WL 2600625, at *1 (N.D. Ill. Nov. 16, 2004) ("Plaintiff's ability to pay or lack thereof is not relevant to a determination of liability or damages."). There is no basis to revisit *Shales* or to disapprove the District Court's faithful application of it.

## IV.  THE DISTRICT COURT PROPERLY CONSIDERED AND AWARDED FEES

In Zieske's final argument, he asks this Court to vacate the District Court's fee award because, he alleges, the District Court failed to hold Defendants to their burden of establishing the reasonableness of their fees and improperly included certain items in the award. That argument is inconsistent with the record.

In computing a fee award, "district courts need not undertake a line-by-line inquiry." *See Nichols v. Illinois Dep't of Transportation*, 4 F.4th 437, 444 (7th Cir. 2021). Instead, courts may rely upon "their overall sense of" the litigation to determine whether the fees sought are reasonable. *See Vega v. Chicago Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021). "Appellate review of attorneys' fees awards is limited to a highly deferential abuse of discretion standard" in light of the fact-

42

specific reasonableness inquiry required. See *Est. of Borst v. O'Brien*, 979 F.2d 511, 514 (7th Cir. 1992) (internal quotation marks omitted).

The District Court did not engage in impermissible burden-shifting. Zieske's position rests on a statement made by the District Court in response to Zieske's argument that he could not mount a challenge to the defense's fees because the Court had failed to "identif[y] what pleading(s) or conduct, if any" would form the basis for its sanctions award. *See* Dkt. 406 at 5. Rejecting that argument, the Court stated that it had already informed Zieske that he should assume, for purposes of responding to any fee request, "that sanctions are warranted for the post-5/6/2014 time frame." *See* A27–A28. The District Court was not, as Zieske suggests, erecting a presumption that all fees incurred after that date were reasonable: it was only identifying the point at which Zieske's conduct became sanctionable.

That there was no presumption of reasonableness—or any improper burden-shifting—is evidenced by the District Court's careful consideration of the reasonableness of counsel's fees. Contrary to Zieske's claim that the District Court accepted counsel's billing rates at face value, the District Court considered Zieske's arguments and rejected them: "the court disagrees that the hourly rates charged by Dontzin Nagy & Fleissig LLP were unreasonable. It would be inappropriate to find that the average rate should obtain in a case that is far from average." A28. Similarly, the District Court did not simply *assume* that the time spent on each task was appropriate. Rather, upon reviewing the defense's billing records, the Court reduced the award by 20% because it determined that some tasks had received more attention than the Court thought warranted. *See* A26. Such across-

43

the-board reductions are a permissible means of ensuring a fee award is reasonable. *See Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("The district court acted within its discretion when it chose to cut the number of hours by a lump sum in response to appellees' claim that the time was inflated. We endorse the court's approach as a practical means of trimming fat from a fee application."). Finally, Zieske's suggestion that the award improperly included fees incurred in opposing Zieske's motion for discovery-related sanctions is meritless. Putting aside that, as Zieske acknowledges, that motion was denied insofar as it sought sanctions against counsel, this Court has long recognized that "it is generally unrealistic to expect a trial court" to conduct a line-by-line review of requested fees. *See id.; see also* Vega, 12 F.4th at 705 ("[W]e do not require a district court to undertake a line-by-line inquiry of a voluminous fee petition." (internal quotation marks omitted)).

These are not the acts of a court blindly acceding to the defense's demands; rather, they evince a thoughtful consideration of the facts and circumstances of the case in light of the principles established by this Court's precedents. Zieske offers no basis to disturb the Court's award.

## CONCLUSION

For all the foregoing reasons, the decision awarding sanctions against Zieske should be affirmed.

Dated:  October 20, 2023                    Respectfully submitted:

45

/s/ Matthew S. Dontzin
Matthew S. Dontzin
Tibor L. Nagy, Jr.
David A. Fleissig
DONTZIN NAGY & FLEISSIG LLP
980 Madison Avenue
New York, NY 10075
Telephone:   +1 212 717-2900

*Attorneys for Defendant-Appellee*
*Peter Doig*

45

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because this document contains 12,708 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook style font.

Dated:  October 20, 2023

/s/ Matthew S. Dontzin
Matthew S. Dontzin
One of the Attorneys for Appellee

46

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2023 the Brief of Defendant-Appellee was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Matthew S. Dontzin*
Matthew S. Dontzin